IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**L'Association des Américains Accidentels**
34 Rue Alexandre Dumas
78110
Le Vésinet
France

**Kristopher Lazarz**
Jahnplatz 6
Apt. K606
49080 Osnabrueck
Germany

**Sofiane Thoulon**
45D route de Tully
74200
Thonon-les-bains
France

**Lilian Pam**
10 Rue du président Wilson
92300
Levallois-Perret
France

**Christopher Bousigues**
1 Essex Road
309329
Singapore

**Anne Misslin**
5 Rue Strauss-Durkheim
67000
Strasbourg
France

**Philip Boeffard**
28 Rue de la Gourmette
44300 Nantes
France

**Mark Lewis**
Torontodreef 24
3564KR Utrecht

Case No. 1:21-cv-2933-TNM

The Netherlands

**Joshua Grant**
Casparistr. 12
38100 Braunschweig
Germany
**Martin Kracklauer**
Gunillantie 24 B 26
00870 Helsinki
Finland

**Stephen Collins**
Richtiarkade 1,
8304 Wallisellen
Zürich
Switzerland

         *Plaintiffs*,


     v.


**U.S. Department of State**
The Executive Office,
Office of the Legal Adviser
Suite 5.600, 600
19th Street NW.
Washington DC 20522


**Antony J. Blinken**
In his official capacity as Secretary of State
c/o Civil Process Clerk,
United States Attorney's Office
555 4th Street NW
Washington, D.C. 20530

**Rena Bitter**
In her official capacity as Assistant Secretary of
State for Consular Affairs
c/o Civil Process Clerk,
United States Attorney's Office
555 4th Street NW
Washington, D.C. 20530

*Defendants.*

### FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE

### RELIEF

L. Marc Zell
D.C. Bar No. 959437
ZELL & ASSOCIATES INTERNATIONAL
ADVOCATES, LLC
1345 Ave. of the Americas
2nd Floor
New York, NY 10105
(212)-971-1349
*Email:* mzell@fandz.com
(Not admitted in New York)

Noam Schreiber,
*pro hac vice to be filed*
34 Ben Yehuda St.
15th Floor
Jerusalem, Israel 9423001
011-972-2-633-6300
*Email:* schreiber.noam@gmail.com

*Counsel for Plaintiffs*

## PRELIMINARY STATEMENT

1.      Returning to a policy reminiscent of the feudal era, the United States appears to be intent on preventing U.S. citizens from exercising their natural and fundamental right to voluntarily renounce their citizenship.  For over a decade, a rapidly increasing number of U.S. nationals residing abroad have elected to voluntarily renounce their U.S. citizenship.  However, as Plaintiffs allege below, voluntary renunciation has become impossible due to a continuing worldwide suspension of renunciation services at American consular offices.

2.      Voluntary renunciation is governed by Section 349 of the Immigration and Nationality Act of 1952, 8 U.S.C. §1481(a)(5), which requires taking an oath of renunciation before a consular official abroad in order to perfect renunciation.  To take the mandatory oath individuals must apply to a U.S. embassy or consulate abroad and schedule an interview. Only after the interview and taking the oath is an applicant eligible to receive a Certificate of Loss of Nationality ("CLN"). A CLN is the definitive proof and recognition that the applicant is no longer a U.S. citizen. Without a CLN, banks and other financial institutions which are an essential part of the daily lives of U.S. citizens residing abroad, will continue to treat renunciants as U.S. citizens.

3.      Most U.S. citizens, especially those residing in the United States, cherish their citizenship.  However, for the nine million U.S. citizens living abroad, recent legislation and regulations have transformed U.S. citizenship into a financial nightmare.  Ever since the passage of the Foreign Account Tax Compliance Act ("FATCA")[1] — a bulk data collection program requiring foreign financial institutions to report to the IRS detailed information about the accounts

---

[1] Hiring Incentives to Restore Employment Act (HIRE), Pub. L. No. 111-147, §§ 501-531, 124 Stat. 71 (2010) (codified in scattered sections of the Internal Revenue Code).

of U.S. citizens living abroad– U.S. expatriates have been treated as financial pariahs. In many countries, banks have closed or frozen accounts maintained by U.S. persons.  Elsewhere, banks refuse to provide basic services to U.S. citizens, imposing unreasonable limitations on their ability to carry out their daily affairs.  Almost all U.S. citizens abroad have been forced to incur burdensome compliance costs and endure bureaucratic procedures as yet unknown to ordinary Americans residing stateside.[2]

4.       In justifying FATCA, the U.S. government painted all U.S. citizens abroad as tax cheats and criminals, who by virtue of their residence overseas, deserve to be deprived of their fundamental right to privacy.[3]

5.       For many of these U.S. citizens – including, in particular, the Plaintiffs in this case – expatriation may be the only way to escape from the financial and bureaucratic horrors imposed by FATCA and related legislation.

6.       Paradoxically, precisely when many overseas Americans are seeking freedom from the strictures of FATCA, the defendants, under the guise of the COVID-19 pandemic, have suspended all services required to effect formal expatriation.  Relief from this CATCH-22 dilemma is the principal object of this lawsuit.

7.       For almost two years now, since March 2020, U.S. consular missions around the world have been refusing to schedule interviews for voluntary expatriation cases. Without such

---

[2] As of the commencement of this litigation, the current Administration is proposing to impose a FATCA-like regime upon financial transactions carried out by the vast majority of U.S.-resident Americans. *See e.g.*, https://edition.cnn.com/videos/business/2021/10/16/biden-admin-seeks-to-get-irs-access-for-bank-accounts-over-600.cnn (last accessed on December 27, 2021).
[3]      *See*      https://www.bloomberg.com/opinion/articles/2019-11-26/tax-nightmare-for-american-expats-as-irs-treats-them-like-cheats (last accessed on December 27, 2021); *see also* https://www.wsj.com/articles/kuenzi-american-expats-tax-nightmare-1404924705 (last accessed on December 27, 2021).

an interview, voluntary renunciation is not possible, preventing applicants from obtaining a CLN necessary to prove their expatriation. Moreover, those few U.S. missions that have not explicitly suspended voluntary renunciation services, are placing applicants on waitlists with up to 400-600 potential renunciants, thereby effectively suspending such services for the foreseeable future.

8.      Astonishingly, while U.S. missions are suspending voluntary expatriation services, many have recommenced providing non-immigrant visa services for foreign nationals. In so doing, the U.S. government would appear to discriminate against its own citizens, who have a constitutional right to renounce, in favor of non-resident aliens. This is not only non-sensical, it is unfair and illegal.

9.      This is not the first time the U.S. government has knowingly discriminated against expatriates. In 2015, the government increased the fee for voluntary renunciation from $450 to the record-high $2,350 current fee. Coincidentally, prior to 2010, in the pre-FATCA era, voluntary renunciation was free of charge. The legality of the renunciation fee is being challenged in *L'Association Des Americains, et al. v. United States Department of State, et al.*, 1:20-cv-03573-TSC (D.D.C.), now pending before this Court.

10.     The government's suspension of voluntary expatriation services is unlawful for several reasons:

   A. *First*, the government's suspension of renunciation-related services violates Plaintiffs' substantive due process rights under the Fifth Amendment of the Constitution. U.S. CONST., amend. V.

        i. The right to voluntary expatriate is a natural and fundamental right and can only be restricted to the extent necessary to further a compelling government interest.

    ii.   The wholesale suspension of voluntary expatriation services is patently *not necessary* to further a compelling government interest.

    iii.   In the era of never-ending global and national emergencies, the U.S. government must ensure that it can continue to provide services essential for the protection of fundamental rights.

    iv.   In other areas during the COVID-19 emergency, the federal government has found ways to accommodate citizens' constitutional liberties, while protecting public health and well-being.  For example, the federal court system has continued to operate, utilizing remote communication technology and physical encapsulation arrangements, both of which would be readily adaptable to voluntary renunciation services.  Just as the COVID-19 world has become more flexible, the State Department consular services must similarly adapt.

B.    *Second*, the government's decision to halt renunciation services altogether lacks statutory or constitutional authority.

C.    *Third*, the government's suspension of renunciation-related services also violates the Administrative Procedure Act, 5 U.S.C. §500, *et seq*. ("APA"). The APA provides that "within a reasonable time, each agency shall proceed to conclude a matter presented to it," 5 U.S.C. §555(b), and empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1). By refusing to schedule appointments for the renunciation oath, the government is unlawfully withholding and unreasonably delaying the services specified by law for the exercise of the fundamental right to expatriate.

11.     Accordingly, the Court is requested to direct the government to immediately resume providing renunciation services worldwide and to provide those services in a timely and efficient manner.

## SUBJECT MATTER JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction under 28 U.S.C. §1331 because this lawsuit arises under the Constitution and laws of the United States. Specifically, this lawsuit challenges the suspension of renunciation services under (a) the Fifth Amendment's Due Process Clause; (b) Section 349 of the Immigration and Nationality Act ("INA"), Pub. L. 89–236, 79 Stat. 911, *codified at* 8 U.S.C. §1481(a); and (c) the APA.

13.     This Court also has subject matter jurisdiction under 28 U.S.C. §1361 because Plaintiffs are requesting that the Court compel the Secretary of State and the Assistant Secretary of State for Consular Affairs to perform a duty owed to Plaintiffs.

14.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because Defendant Department of State is an agency of the United States and is based in the District of Columbia and Defendants Secretary of State and Assistant Secretary of State for Consular Affairs are being sued in their official capacities.

## PARTIES

### Plaintiffs

15.     Plaintiff L'Association des Américains Accidentels ("AAA") is a Paris-based non-profit organization that was established in 2017 under French law. AAA's members include individuals described as "Accidental Americans." The goal of the AAA is to defend and represent the interests of persons holding American nationality, but residing outside the United States, against the harmful effects of the extraterritorial nature of the U.S. law. *See*

5

https://www.americains-accidentels.fr/page/234149-nos-objectifs. *See* ¶32(b) below for a definition of "Accidental Americans."

16.     Plaintiff Kristopher Lazarz is a U.S. citizen, residing in Germany. Mr. Lazarz has been trying to renounce his U.S. citizenship for the past few months without success. He has contacted the consulate in Frankfurt, Germany via e-mails. However, all of his e-mails and letters have been ignored. He has also contacted other U.S. embassies throughout Europe with no success. Mr. Lazarz is effectively prevented from renouncing his U.S. citizenship as a result of the suspension of voluntary expatriation services.  Due to FATCA-related matters, Mr. Lazarz's U.S. citizenship has prevented him from securing a mortgage to purchase a residence in Germany. Because of his U.S. citizenship, German banks refuse to extend Mr. Lazarz any loan to assist him in purchasing a residence, resulting in unstable housing.  Securing funds to finance the purchase of a house has become essential for Mr. Lazarz and his family because his daughter, less than a year old, has already undergone open-heart surgery and has more surgeries looming in the horizon. Having a stable, secure residence is essential for Mr. Lazarz's daughter's health and well-being. The government's suspension policy, coupled with the unbearable obstacles generated by FATCA, have created a cruel impasse for Mr. Lazarz and similarly situated individuals.

17.     Plaintiff Sofiane Thoulon is a dual U.S. and French citizen, residing in France. Ms. Thoulon wishes to renounce her U.S. citizenship under 8 U.S.C. §1481(a)(5). Holding U.S. citizenship has proven to be an obstacle for Ms. Thoulon. She repeatedly encounters hardships in connection with banks and other financial institutions due to her U.S. citizenship. In addition, Ms. Thoulon no longer wants to associate with the American Republic. She has attempted to schedule a renunciation appointment at the U.S. embassy in France. However, her request was denied due to the suspension of voluntary expatriation services.

18.     Plaintiff Lilian Pam is a dual U.S. and French citizen, residing in France. Ms. Pam wishes to renounce her U.S. citizenship under 8 U.S.C. §1481(a)(5). Holding U.S. citizenship has proven to be an obstacle for Ms. Pam. She repeatedly encounters hardships in connection with banks and other financial institutions due to her U.S. citizenship. In addition, Ms. Pam no longer wants to associate with the American Republic due to its discriminatory policies towards U.S. citizens abroad. She has attempted to schedule a renunciation appointment at the U.S. embassy in France. However, her request was denied due to the suspension of voluntary expatriation services.

19.     Plaintiff Christopher Bousigues is a dual U.S. and French citizen, currently residing in Singapore. Mr. Bousigues wishes to renounce his U.S. citizenship under 8 U.S.C. §1481(a)(5). Holding U.S. citizenship has proven to be an obstacle for Mr. Bousigues.  He repeatedly encounters hardships in connection with banks and other financial institutions due to his U.S. citizenship. In addition, Mr. Bousigues no longer wants to associate with the American Republic due to its discriminatory policies towards U.S. citizens abroad. He has attempted to schedule a renunciation appointment at the U.S. embassy in Singapore. However, his request was denied due to the suspension of voluntary expatriation services.

20.     Plaintiff Anne Misslin is a dual U.S. and French citizen, residing in France. Ms. Misslin wishes to renounce her U.S. citizenship under 8 U.S.C. §1481(a)(5). Holding U.S. citizenship has proven to be an obstacle for Ms. Misslin.  She repeatedly encounters hardships in connection with banks and other financial institutions due to her U.S. citizenship. In addition, Ms. Misslin no longer wants to associate with the American Republic due to its discriminatory policies towards U.S. citizens abroad.  However, due to the suspension of voluntary expatriation services, she is effectively unable to expatriate.

21.     Plaintiff Philip Boeffard is a dual U.S. and French citizen, residing in France. Mr. Boeffard wishes to renounce his U.S. citizenship under 8 U.S.C. §1481(a)(5). Holding U.S. citizenship has proven to be an obstacle for Mr. Boeffard.  He repeatedly encounters hardships in connection with banks and other financial institutions due to his U.S. citizenship. In addition, Mr. Boeffard no longer wants to associate with the American Republic due to its discriminatory policies towards U.S. citizens abroad. However, due to the suspension of voluntary expatriation services, he is effectively unable to voluntary expatriate.

22.     Plaintiff Mark Lewis is a dual U.S. and Dutch subject, residing in the Netherlands. Mr. Lewis wishes to renounce his U.S. citizenship under 8 U.S.C. §1481(a)(5) but is unable to do so because of the government's suspension of voluntary expatriation services.

23.     Plaintiff Joshua Grant is a U.S. citizen residing in Germany. Mr. Grant wishes to renounce his U.S. citizenship. In July 2020, Mr. Grant applied for an interview at the U.S. consulate in Frankfurt to take the oath of renunciation.  However, due to the government's suspension of expatriation services, despite repeated inquiries, his application has not been processed and to date no appointment has been scheduled.

24.     Plaintiff Jeremiah Bornstein is a U.S. citizen who resides in Germany. Mr. Bornstein wishes to renounce his U.S. citizenship. In October 2021, Mr. Bornstein was notified via e-mail by the U.S. consulate in Frankfurt that under "guidance from the U.S. Department of State, we are currently unable to process Loss of Nationality applications and cannot provide a timeframe for when this service will resume."

25.     Plaintiff Martin Kracklauer has U.S., Finnish and Italian citizenship. He currently resides in Helsinki, Finland.  Mr. Kracklauer wishes to renounce his U.S. citizenship under 8 U.S.C. §1481(a)(5).  Holding U.S. citizenship has proven to be an obstacle for Mr. Kracklauer.

He repeatedly encounters hardships in connection with banks and other financial institutions due to his U.S. citizenship. In addition, Mr. Kracklauer no longer wants to associate with the American Republic due to its discriminatory policies towards U.S. citizens abroad. He has attempted to schedule an appointment at the U.S. embassy in Helsinki, but was turned down due to the government's suspension of services. Mr. Kracklauer then made an attempt to begin the renunciation process at the U.S. consulate in Naples, Italy, and was offered an interview for September 10, 2021. However, two days later, Mr. Kracklauer was informed that the interview had been cancelled. The stated reason for the cancellation was the crisis triggered by the withdrawal of U.S. troops from Afghanistan. Mr. Kracklauer is effectively being prevented from renouncing his U.S. citizenship.

26.     Plaintiff Stephen Collins is a U.S. citizen, residing in Switzerland. Mr. Collins wishes to renounce his U.S. citizenship under 8 U.S.C. §1481(a)(5).  Holding U.S. citizenship has proven to be an obstacle for Mr. Collins.  He repeatedly encounters hardships in connection with banks and other financial institutions due to his U.S. citizenship. In addition, Mr. Collins no longer wants to associate with the American Republic due to its discriminatory policies towards U.S. citizens abroad. In or around September 15, 2021, Mr. Collins e-mailed the U.S. embassy in Bern, Switzerland, attaching the necessary documents for renunciation.  The next day, the embassy e-mailed Mr. Collins the following response:

> Please note that we have a waiting list of over 600 customers and are scheduling appointments in the order in which we receive the requests. At the moment we are scheduling customers who contacted us in spring/summer 2020. It may yet be some time until we will be able to offer an appointment to you. We will make every effort to schedule you as soon as possible. Meanwhile we thank you for your patience and understanding.

As of the date of the filing of this Complaint, no appointment has been scheduled for Mr. Collins.

**Defendants**

27.   Defendant Department of State ("DOS") is a department of the Executive Branch of the United States Government (22 U.S.C. §2651) and is an agency within the meaning of 5 U.S.C. §552(f)(1).

28.   Defendant Antony Blinken is the Secretary of State and is being sued in his official capacity as Secretary of State.

29.   The Assistant Secretary of State for Consular Affairs, Rena Bitter, is responsible for the Bureau of Consular Affairs, an office under the auspices and supervision of the DOS. The Bureau of Consular Affairs is "responsible for the welfare and protection of U.S. citizens abroad, for the issuance of passports and other documentation to citizens and nationals, and for the protection of U.S. border security and the facilitation of legitimate travel to the United States." https://www.state.gov/about-us-bureau-of-consular-affairs/.

30.   The Office for Overseas Citizen Services is one of the eight offices managed by the Bureau of Consular Affairs in the DOS. The Office for Overseas Citizen Services is responsible for processing voluntary expatriation applications and issuing CLNs.

31.   The Defendants will sometimes be referred to collectively "government" or "DOS."

## STANDING

32.   Plaintiff AAA has organizational standing:

(a) AAA's members would otherwise have standing to sue in their own right. AAA's members include United States citizens who wish to renounce their U.S. citizenship, but are unable to do so because the DOS has effectively suspended voluntary expatriation services.

(b) The interests AAA seeks to protect are germane to AAA's purpose. AAA's purpose is to further the interests of overseas Americans, including Accidental Americans – *i.e.*, those individuals who are deemed United States citizens due to place of birth but have no or inconsequential connections with the United States. In furthering the interests of Accidental Americans, AAA also campaigns against the effective suspension of voluntary expatriation services by the DOS.

(c) Neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. The relief sought by AAA is to compel the DOS and the indicated officials to fulfill their duties to restore voluntary expatriation services immediately so that Plaintiffs may exercise their fundamental right to expatriate in a timely manner. The question undergirding this lawsuit is, for the most part, legal and does not require the participation of individual members of AAA.

33.     The individual Plaintiffs in this action all have standing. Plaintiffs are all holders of United States citizenship who wish to voluntarily expatriate but are unable to do so because the DOS has suspended voluntary expatriation services all over the globe.

34.     Plaintiffs have sustained and are continuing to suffer injury-in-fact from Defendants' actions because they are being forced to remain U.S. citizens against their will. *Schnitzler v. United States*, 761 F.3d 33, 40 (D.C. Cir. 2014) (being required to continue association with the United States against wishes is sufficient for injury-in-fact requirement); *accord*, *Farrell v. Blinken*, 4 F.4th 124, 130 (D.C. Cir. 2021).

11

35.     In addition to the direct injury, the suspension of voluntary expatriation services has also generated indirect harm to Plaintiffs — *i.e.*, the expenses, burdens and other obstacles associated with being a United States citizen in foreign countries. Plaintiffs have all suffered injuries in connection with the maintenance of their bank accounts and other financial dealings as a result of holding United States citizenship. These burdens and obstacles are a result of their United States citizenship which they wish to renounce.

36.     Plaintiffs' actual injury-in-fact is a direct and proximate result of Defendants' actions and inactions as alleged.

37.     As to redressability, the relief Plaintiffs seek is within the power of the Court to grant and, if granted, would eliminate the unconstitutional and illegal burdens imposed upon their fundamental right to expatriate.

## STATUTORY AND LEGAL FRAMEWORK

38.     The current process by which an individual can exercise his/her right to voluntarily expatriate is governed by 8 U.S.C. §1481(a).

39.     Section 1481(a)(5) provides that a U.S. national "shall loose his nationality" by making a "formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State."

40.     Expatriation by way of renunciation can only occur once the applicant has taken the oath before a consular official.

41.     The detailed procedures for voluntary renunciation are set out in the Code of Federal Regulations and in the DOS Foreign Affairs Manual ("FAM"). The FAM is the "comprehensive, and authoritative source for the Department's organization structures, policies,

and procedures that govern the operations of the State Department, the Foreign Service and, when applicable, other federal agencies." https://fam.state.gov/.

42.     The DOS has promulgated regulations concerning voluntary renunciation under 8 U.S.C. §1481(a)(5).   22 C.F.R. §50.50 provides:

> A person desiring to renounce U.S. nationality under section 349(a)(5) of the Immigration and Nationality Act [8 U.S.C. §1481(a)(5)] shall appear before a diplomatic or consular officer of the United States in the manner and form prescribed by the Department. The renunciant must include on the form he signs a statement that he absolutely and entirely renounces his U.S. nationality together with all rights and privileges and all duties of allegiance and fidelity thereunto pertaining.

43.     7 FAM 1260 sets out in greater detail the procedures prescribed by DOS for processing a voluntary renunciation application:

> i.   Step One- Initial Information Session: The process for renunciation begins with an "Initial Information Session." 7 FAM 1262.2.  The purpose of the Initial Information Session is to **(a)** explain the serious consequences of renunciation as summarized in the one-page Form DS-4081, entitled "Statement of Understanding Concerning the Consequences and Ramifications of Relinquishment or Renunciation of U.S. Citizenship;" and **(b)** inform the individual to think over whether he or she truly wishes to renounce U.S. nationality.   *Id.*   The   DS-4081   is   available   online, https://eforms.state.gov/Forms/ds4081.pdf.   The Initial Information Session may be conducted by telephone by a consular mission member. 7 FAM 1262.2. In practice, these sessions are usually done via telephone.[4]

---

[4] At least one Plaintiff, Martin Kracklauer, has already participated in an Initial Information Session.

ii. <u>Step Two- Payment of Fee/Interview/Taking Oath of Renunciation</u>: After the Initial Information Session, an appointment for the renunciation oath is scheduled. *Id*.  A renunciation applicant must appear before a consular officer. 8 U.S.C. §1481(a)(5); 22 C.F.R. §50.50.  During the meeting with the consular officer, the renunciant reads Form DS-4081, and indicates that he or she comprehends it.   Form DS-4081 contains twelve statements that must ultimately be declared by the renunciant and attested to by the consular officer. After reading Form DS-4081, the renunciant signs the form. 7 FAM 1262.4(b). Next, the renunciant must read the one-page Form DS-4080, entitled "Oath/Affirmation of Renunciation of the Nationality of the United States," and then sign it. 7 FAM 1262.4(c). Form DS-4080 is publicly available online, https://eforms.state.gov/Forms/ds4080.pdf.  Prior to taking the oath of renunciation, the renunciant must pay a $2,350 fee. 22 C.F.R. §22.1; 7 FAM 1262.4.[5] For further details, the Court is respectfully referred to the proceeding pending in *L'Association Des Americains, et al. v. United States Department of State, et al*., 1:20-cv-03573-TSC (D.D.C.).

---

[5] 7 FAM 1262.4:

Under Federal regulations at 22 CFR 22.1, an administrative processing fee applies to documenting renunciation of U.S. nationality.  The fee should be collected after the individual has decided to proceed with the renunciation and has arrived at post to take the oath of renunciation.  The fee should be collected before conducting the ceremony and administering the oath.

      iii.  <u>Step Three- receipt of voluntary expatriation case in CA/OCS/ACS</u>[6] from the

<u>consular officer</u>: After the renunciation ceremony, the consular officer must

forward the forms and documents, including his/her recommendations to

CA/OCS/ACS for final approval. *See* 7 FAM 1264 and 7 FAM 1220.

      iv.  <u>Step Four- Approval:</u> If approved, the consular officer overseas provides the

applicant with a CLN. If approved, the date of expatriation is the date that the

oath was taken in front of the consular officer. If the oath is not approved and

no CLN is issued, the renunciant remains a citizen of the United States.[7]

44.     Nowhere in either the DOS regulations or in the FAM is there any reference to the

suspension of renunciation services in the event of a pandemic or other emergency.  Similarly,

neither the INA nor any other congressional legislation addresses the suspension of these services.

## FACTUAL BACKGROUND

### A.  FATCA and the increase in voluntary expatriation applications

45.     According to all estimates, renunciations[8] have been on the rise since 2010, the year

the Foreign Account Tax Compliance Act ("FATCA")[9] — a bulk data collection program

---

[6] "CA/OCS/ACS" is the common abbreviation used in the FAM and refers to the Bureau of Consular Affairs, Overseas Citizens Services, American Citizen Services.

[7] *See also* 26 U.S.C. §877A(g)(4) (establishing criteria for the voluntary renunciation of U.S. citizenship for income tax purposes and providing specifically that no renunciation will be deemed effective until a CLN has been issued.).

[8] Under 26 U.S.C. §6039G, every three months the U.S. government publishes the names of all Americans who renounce their citizenship. The list names U.S. citizens who have renounced their citizenship. The accuracy of this list has been questioned. *See*, for example, https://www.imidaily.com/reasonable-doubt/under-cover-of-covid-the-us-is-preventing-citizens-from-renouncing-on-purpose/ (claiming that government is purposefully underreporting the number of renunciations).

[9] Hiring Incentives to Restore Employment Act (HIRE), Pub. L. No. 111-147, §§ 501-531, 124 Stat. 71 (2010) (codified in scattered sections of the Internal Revenue Code).

requiring foreign financial institutions to report to the IRS detailed information about the accounts of U.S. citizens living abroad– went into effect.



**Ever More U.S. Expats Are Giving Up Their Citizenship**
Renunciations have been accelerating since an Obama-era compliance law

■ Clinton ■ Bush ■ Obama ■ Trump

Source: U.S. Office of the Federal Register via Mark Fitzpatrick

46.    In 2020, the IRS reported that over 6,000 Americans renounced their citizenship, a 260% increase above 2019 when the IRS recorded 2,577 renunciations.  *See also*,  Robert W. Wood, *Renouncing American Citizenship Hits All-Time Record*, Forbes (Feb. 7, 2021), available at   https://www.forbes.com/sites/robertwood/2021/02/07/renouncing-american-citizenship-hits-all-time-record/?sh=7f3ea3085127  (last accessed on  December  27,  2021);  Brett Goodin, *Americans Renouncing U.S. Citizenship in Record Numbers*, U.S. News and World Report (Sept. 9,  2020),  available  at  https://www.usnews.com/news/best-countries/articles/2020-09-09/americans-renouncing-us-citizenship-in-record-numbers  (last  accessed  on  December  27, 2021).

47.    FATCA was and remains the primary cause of the discriminatory and unfair practices employed by foreign banks and other financial institutions against U.S. nationals in their foreign places of residence.  Although FATCA has created the circumstances that have prompted Plaintiffs and others to renounce, this case does not involve a direct challenge to FATCA.

48.     It is no surprise that FATCA has been the primary catalyst for the sharp rise in renunciation applications.

49.     FATCA is a bulk data collection program requiring foreign governments and financial institutions to report to the IRS detailed information about the accounts of U.S. citizens living abroad, including their account balances and account transactions.  Although the framers of the legislation sought to justify it on the grounds of proscribing tax evasion, FATCA has swept up thousands, if not millions, of law-biding expatriate Americans who are tax compliant and have nothing to hide, all the while infringing on their fundamental right to privacy.[10]

50.     FATCA has caused many foreign financial institutions to curtail their business dealings with U.S. citizens living abroad because the costs associated with compliance do not warrant keeping U.S. citizens and other U.S. persons as customers.

51.     According to a 2014 study conducted by "Democrats Abroad", almost one-quarter (22.5%) (over two million) of Americans living abroad who attempted to open a savings or retirement account and 10% (approximately 900,000) of those who attempted to open a checking account were unable to do so due to FATCA.[11] In 2014, it was estimated that almost one million Americans living abroad had their bank accounts closed because of FATCA.

---

[10] In fact, studies have shown that FATCA has failed to produce additional revenues over and above the steep costs of administration. *See e.g.*, William H. Byrnes, IV and Robert Munro, *Background and Current Status of FATCA*. LEXISNEXIS® GUIDE TO FATCA & CRS COMPLIANCE (5th ed., 2017), Texas A&M University School of Law Legal Studies Research Paper No. 17-31, Available at SSRN: https://ssrn.com/abstract=2926119 or http://dx.doi.org/10.2139/ssrn.2926119 (last accessed on December 27, 2021).
[11] Democrats Abroad, FATCA: Affecting Everyday Americans Every Day 6 (2014), https://www.democratsabroad.org/fatca_research_affecting_everyday_americans_every_day. (last accessed on December 27, 2021).

52.     In addition to causing Americans overseas to lose access to basic financial services, FATCA has also had a detrimental impact on U.S. citizens living abroad at work and at home. Many U.S. expats have reported that they are being denied consideration for promotions at their place of employment (especially executive-level positions), because of the compliance burdens imposed on employers by FATCA. Indeed, in a study by "Americans Abroad," 5.6% of respondents reported that they had been denied a position because of FATCA. Others reported difficulty opening a business or partnering with others in joint ventures because of obstacles created by FATCA. *See* https://www.americansabroad.org/why-fatca-is-bad-for-america-update/ (last accessed on December 27, 2021).

53.     Since 2014, these statistics have changed for the worst.  Holders of American citizenship are still considered financial pariahs. *See also* "More Dutch banks turning away 'unintentional Americans', latest NRC Handelsblad report reveals" (Dec. 7, 2020), available at https://americanexpatfinance.com/tax/item/593-more-dutch-banks-turning-away-unintentional-americans (last accessed on December 27, 2021); *see also* Vivienne Walt, *Why 'Accidental Americans' Are Desperate to Give Up Their U.S. Citizenship*, Time  (Dec. 23, 2020), available at https://time.com/5922972/accidental-americans-fatca/ (last accessed on December 27, 2021).

**B.   The sharp decrease of voluntary expatriation applications due to the government's suspension of services**

54.     In or around March 2020 at or around the time that COVID-19 was formally declared a pandemic, the U.S. government began suspending all voluntary expatriation services throughout the world.[12] As a direct result, renunciation applications dramatically decreased. In the

---

[12] On March 13, 2020, then President Trump declared a national emergency concerning the COVID-19.    https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed on

first quarter of 2021 the government reported only 228 renunciations, a sharp decline from the last

and first quarter of 2020.  86 Fed. Reg. 22781  (April 29, 2021).  In the second quarter of 2021,

the government recorded 733 expatriations. 86 Fed. Reg. 40899 (July 29, 2021).  While that

number represents an increase compared to Q1, it is nevertheless a deep drop in comparison with

earlier years.[13]

55.     The sharp drop in the number of expatriations in 2020-2021 is due to the

government's worldwide suspension of voluntary expatriation services.  Under the guise of the

COVID-19 global pandemic, U.S. diplomatic missions around the world have shut down all

possibility for U.S. citizens overseas to renounce, with the result that Plaintiffs must remain

citizens against their will indefinitely.  *See* Adam Taylor, *How the Coronavirus Made it Nearly

Impossible to Renounce U.S. Citizenship*, Washington Post (Oct. 31, 2020), available at

https://www.washingtonpost.com/world/2020/10/27/us-citizenship-renouncement-fatca/        (last

accessed on December 27, 2021).

56.     The government's decision to suspend renunciation services [while continuing to

provide other consular services (*see* ¶¶69-70 below)] reflects its policy against voluntary

renunciation.  This anti-expatriation policy is evident from the government's refusal to recognize

---

December 27, 2021).  On February 24, 2021, President Biden declared a continuation of the
national         emergency.         https://www.whitehouse.gov/briefing-room/presidential-
actions/2021/02/24/notice-on-the-continuation-of-the-national-emergency-concerning-the-
coronavirus-disease-2019-covid-19-pandemic/ (last accessed on December 27, 2021).

The declaration of national emergency remains in effect as of the date the Complaint was filed.

[13] Although expatriation data reported in the Federal Register were published in 2021, the relevant
expatriation proceedings most likely had commenced much earlier.  For example, the 733
individuals who were reported in the second quarter of 2021, most probably began the process of
expatriation in 2019, prior to the outbreak of COVID-19.

expatriation as a natural, fundamental and constitutional right.  *See*, for example, the government's brief in *L'Association Des Americains, et al. v. United States Department of State, et al*., 1:20-cv-03573-TSC (D.D.C.), ECF 11-1.  It is also reflected in the record-high $2,350 fee imposed by the government as a precondition to exercise the right to voluntarily renounce U.S. citizenship.

57.     Even prior to the COVID-19 pandemic, voluntary renunciation applicants were placed on wait lists that would normally last months. With COVID-19, the government was able to completely halt all expatriation-related services around the globe.  Nor has the government taken any steps to restore renunciation services, despite its ability to do so.

58.     Most U.S. diplomatic and consular missions have formally suspended all expatriation services until further notice. The following is a non-exhaustive list of major U.S. missions that have explicitly suspended all expatriation services together with a quotation of the language announcing the suspension. Attached to the Complaint as **Exhibit "A"**, and incorporated by reference herein, is a more complete list of U.S. missions that have suspended voluntary expatriation services.[14]

| Country | Notice on Website/Response to E-mail Inquiry (all websites last accessed on December 27, 2021) |
|---|---|
| Germany[15] | "In accordance with United States Department of State worldwide regulations in place due to COVID-19 and in line with efforts by the Government of Germany to prevent the spread of COVID-19, the Consular Section of the U.S. Consulate |

---

[14] Many U.S. embassies and consulates have published formal suspension notices on their websites. There are U.S. missions which have not published such announcements. For the latter posts, Plaintiffs sent out e-mails sent out inquiring as to the availability of renunciation services. Many of the U.S. missions who did not publicly display their suspension policies provided the information as requested by return.  One, however, the U.S. embassy in Mauritania, in an e-mail dated Sept. 29, 2021, described Plaintiffs' inquiry as "spam."

[15] Plaintiffs Kristopher Lazarz and Joshua Grant reside in German and are unable to renounce.

| | |
|---|---|
| | General in Frankfurt has temporarily restricted some routine consular processing.<br><br>U.S. Consulate General in Frankfurt is currently not scheduling citizenship renunciation appointments."<br><br>https://de.usembassy.gov/ |
| **United Kingdom** | "The U.S. Embassy London is in the process of resuming Loss of Nationality services. At this time, we remain unable to accept new requests for appointments. We cannot provide a timeframe for when this service will fully resume, but we will update this website as information becomes available. Please do not email documents or send by mail until normal services resume.<br><br>Consulate General Edinburgh and Consulate General Belfast are currently unable to accept appointments for Loss of Nationality applications."<br><br>https://uk.usembassy.gov/u-s-citizen-services/citizenship/loss-of-u-s-citizenship-i-e-expatriation/ |
| **France[16]** | "Due to COVID-19, renunciation services are suspended until further notice. We apologize for the inconvenience."<br><br>https://fr.usembassy.gov/renunciation/ |
| **Singapore[17]** | "U.S. Embassy Singapore has limited American citizen services appointment availability to maintain appropriate social distancing for the safety of our applicants and staff. There may be increased wait times for an appointment. During this time, appointments for U.S. citizenship renunciation remain suspended." |

---

[16] Plaintiffs Sophiane Thoulon, Lilian Pam, Anne Misslin, and Plaintiff Phillipe Boeffard reside in France and are unable to renounce.
[17] Plaintiff Christopher Bousigues resides in Singapore and is unable to renounce.

| | |
|---|---|
| | https://sg.usembassy.gov/temporary-reduction-in-u-s-citizen-services-appointments/ |
| Finland[18] | Response to e-mail inquiry:<br><br>*We are not scheduling renunciation appointments.*<br>*We do not have an estimated date for the resumption of this service.*<br>*Best, US consulate.* |
| **Czech Republic** | "**IMPORTANT      INFORMATION**<br>Due to limited staffing and resources during the COVID-19 outbreak, the U.S. Embassy in Prague is unable to accept appointments for Loss of Nationality applications. We cannot provide a timeframe but will update this website when services can resume."<br><br>https://cz.usembassy.gov/u-s-citizen-services/citizenship-services/loss-of-u-s-citizenship/ |

59.     The IRS has recognized the suspension of renunciation services by American consular offices abroad. *See* https://www.irs.gov/individuals/international-taxpayers/relief-procedures-for-certain-former-citizens ("We are aware that some United States embassies and consulates have limited or suspended various services, including processing renunciation of citizenship requests, in light of country specific COVID-19 conditions and for the health and safety of the staff and those seeking consular services.") (last accessed on December 27, 2021).

60.     Other U.S. missions – such as the U.S. embassy in Switzerland – while not specifically suspending expatriation services, have effectively made it impossible for U.S. nationals to schedule an appointment and exercise their right to renounce. Thus, the U.S. embassy

---

[18] Plaintiff Martin Kracklauer resides in Finland and is unable to renounce.

in Switzerland has a waiting list of approximately 600 renunciation applicants. Applicants who wish to apply now are told that it "may yet be some time until we will be able to offer an appointment to you."  Plaintiffs have not been advised as to whether the U.S. embassy in Bern has begun processing renunciation requests from its wait list.

61.    Still other U.S. missions will only provide services to U.S. citizens residing in the country where the mission is located. These missions include those in Austria, Belgium, Bangladesh, Brazil, Chile, Croatia, Dominican Republic, India, Japan, Jordan, Latvia, Lithuania, Malaysia, Moldova, Montenegro, Nicaragua, Poland, Uruguay, and South Korea. U.S. nationals who reside outside the consular district in these jurisdictions are ineligible obtain voluntary expatriation there. Moreover, even if non-residents were eligible to renounce at a consular facility outside their place of residence, given the costs of travel and current international travel restrictions, their constitutional right to expatriate would nevertheless be infringed.

62.    Consequently, U.S. nationals who are able and willing to pay the astronomical (and unconstitutional) $2,350 fee to renounce cannot do so because of the government's worldwide suspension policy.

63.    Plaintiffs Sophiane Thoulon, Lilian Pam, Anne Misslin, and Phillipe Boeffard, cannot renounce their U.S. citizenship because the U.S. missions in France have suspended all renunciation services. Moreover, applying for renunciation at U.S. missions in other countries is also impossible because – as discussed above – most U.S. missions have similarly suspended renunciation services. And most of those missions which have not formally announced a suspension of renunciation services, limit access to such services solely to U.S. citizens actually residing within the consular jurisdiction of such missions.  Also, if for some reason it were possible to apply for renunciation in a U.S. mission in a different country (which on information and belief,

23

Plaintiffs do not believe is the case), forcing these Plaintiffs to do so is impracticable and unfair, considering travel restrictions and the expense of international travel (not to mention the $2,350 renunciation fee).

64.     Plaintiff Christopher Bousigues, a dual French and U.S. citizen, who resides in Singapore, is similarly prevented from exercising his right to expatriate because the U.S. embassy in Singapore has suspended renunciation services.

65.     Plaintiff Martin Kracklauer, Kristopher Lazarz, Joshua Grant, and Mark Lewis share the same fate.

66.     Plaintiff Steven Collins is also effectively prevented from voluntarily renouncing his U.S. citizenship. While the U.S. embassy in Bern, Switzerland, has not formally suspended renunciation services, the failure of the embassy to fix a definite time for the appointment to renounce is tantamount to a formal suspension.

67.     The government's policy as implemented is preventing Plaintiffs from exercising their fundamental right to voluntarily expatriate, because without taking the oath before a consulate official no renunciation can occur.

68.     Plaintiff AAA is comprised of thousands of members who also wish to voluntarily renounce their U.S. citizenship. Some of these members are unable to do so on account of the $2,350 renunciation fee.  However, others are unable to schedule an appointment to take the renunciation oath due to the government's suspension of such services.

69.     Notably, many of the U.S. missions that have suspended renunciation services continue providing non-immigrant visa services for foreign nationals. For example, U.S. consular offices and consulates general in France offer certain visa services, yet have completely suspended

renunciation services.[19] The same appears to be true in Germany and the United Kingdom where there is no suspension of non-immigrant visa services.   *See also* the websites for the following U.S. missions (non-exhaustive):  Israel,[20] Denmark,[21] Greece,[22] Hungary,[23] and Australia.[24]

70.     Recently, the U.S. embassy in Israel announces that it is resuming various American citizen services, but explicitly excluded renunciation services.[25]

---

[19] https://fr.usembassy.gov/visas/ (last accessed on December 27, 2021).

[20] https://il.usembassy.gov/visas/visa-services-update/ (last accessed on December 27, 2021) ("The United States Embassy in Jerusalem and Embassy Branch Office Tel Aviv have resumed certain nonimmigrant visa services, including employment (E/H/L/O/P/R/C1D), student (F/J/M), and very limited tourist and business (B) nonimmigrant visas. Embassy Jerusalem has also resumed processing of K1 fiancé(e) visas, as well as all categories of immigrant visas. Interview capacity remains limited, so there may be a delay in scheduling your interview once your case is documentarily qualified.")

[21] https://dk.usembassy.gov/visas/ (last accessed on December 27, 2021) ("Visa Appointment Availability:  The U.S. Embassy in Copenhagen is currently offering as many visa appointments as resources allow and is committed to working through the significant visa appointment backlog in place as a result of COVID-19.  Schedule an appointment for a visa interview at the U.S. Embassy in Copenhagen via our appointment scheduling website.").

[22] https://gr.usembassy.gov/visas/nonimmigrant-visas/ (last accessed on December 27, 2021) ("At this time, we are offering services for citizens and residents of Greece. If you are in an excepted category to listed below, you may schedule an appointment at: https://ais.usvisa-info.com/")

[23] https://hu.usembassy.gov/visas/ (last accessed on December 27, 2021) ("The U.S. Embassy in Budapest is currently offering as many nonimmigrant visa appointments as local conditions, resources, and safety considerations allow. Because of the increased wait times, we encourage all applicants to apply early. Appointments will be available on a first-come, first-serve basis as capacity allows.").

[24] https://au.usembassy.gov/visas/ (last accessed on December 27, 2021) ("The U.S. Consulate General Perth and Melbourne are providing visa services. The U.S. Consulate General Sydney has paused routine and emergency visa services. Additional information on visa services and restrictions relating to COVID-19 is available here.").

[25] *See* https://il.usembassy.gov/message-to-u-s-citizens-u-s-embassy-jerusalem/?fbclid=IwAR3PIZXdBZJVYOByRsPugI8X-TYZDjWgH0lwKOZ9R3-fkW-f7WZYwQg3f3g (last accessed on December 27, 2021):

> U.S. citizens are our highest priority, and nonimmigrant visa services will continue to be limited until this backlog is addressed.  Notarial and renunciation services will also remain suspended until the backlog is addressed.  When these services resume, we will make a public announcement.

71.     On information and belief, Plaintiffs allege that the government has not taken any effective action to provide renunciation services to them and other U.S. citizens during the COVID-19 pandemic. Had the government wished to protect Plaintiffs' right of expatriation in good faith, it could have easily devised an alternative arrangement, as it has done with respect in other areas of administration.  For example, the government could have easily deployed a system to administer renunciation oaths through remote electronic communication, like that used by the federal courts in connection with testimony by witnesses.

72.     The government's suspension of voluntary expatriation services is a violation of Plaintiffs' rights of due process under the Fifth Amendment of the U.S. Constitution and also contravenes the government's duties under the INA and APA.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF DUE PROCESS UNDER THE FIFTH AMENDMENT [SUSPENSION OF SERVICES]

73.     Plaintiffs incorporate by reference all the allegations above.

74.     Under the Due Process Clause of the Fifth Amendment, when government action substantially interferes with the exercise a fundamental right, courts must review the action under strict scrutiny, *to wit:* the burden imposed on individual liberty must be *necessary* to further a compelling government interest.

75.     Plaintiffs have a fundamental and natural right to renounce their United States citizenship.  Preamble to the Act of July 27, 1868, 15 Stat. 223 (1868) ("[T]he right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty and the pursuit of happiness."); *Savorgnan v. United States*, 338 U.S. 491, 497–98 (1950)

("Traditionally the United States has supported the right of expatriation as a natural and inherent right of all people. Denial, restriction, impairment or questioning of that right was declared by Congress, in 1868, to be inconsistent with the fundamental principles of this Government."); *Afroyim v. Rusk*, 387 U.S. 253, 258 (1967) (stating that by 1818, "no one doubted the existence of the right of voluntary expatriation"); *United States v. Wong Kim Ark*, 169 U.S. 649, 704 (1898) ("the right of expatriation […] must be considered […] a part of the fundamental law of the United States" [referring to the 1868 Expatriation Act and the renunciation of American citizenship]).

76.     Any legislation, regulation or policy that materially restricts or precludes the right to renounce United States citizenship is subject to strict scrutiny.  *See Scahill v. D.C.*, 271 F. Supp. 3d 216, 238 (D.D.C. 2017), *aff'd*, 909 F.3d 1177 (D.C. Cir. 2018) (Government infringement of a substantive fundamental right is analyzed under strict scrutiny).

77.     In order for government action to survive strict scrutiny, it must be narrowly tailored to promote a compelling government interest. *United States v. Playboy Entm't Grp., Inc*., 529 U.S. 803, 813 (2000).

78.     The government's decision to *suspend* voluntary expatriation services is blatantly unconstitutional because it is far from *necessary* to achieve a compelling government interest.

79.     Presumably, the government will argue that its suspension policy is a legitimate limitation on Plaintiffs' fundamental right to expatriate because of the COVID-19 emergency. Under our system of constitutional government, an emergency – whether health-related, economic or created by an event threatening national security – does not endow the federal government with new powers. Nor does it remove or diminish the restrictions imposed by the Constitution upon the exercise of powers duly granted.  *Cf. Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021) (while the public has a strong interest in combating the spread of the

27

COVID–19, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 585–586 (1952).

80.     The government's suspension policy is clearly not necessary because the government can continue to provide renunciation services without endangering staff or the public, as it does with other services that it has not suspended.  Safety and health procedures have become standard operations in all U.S. missions around the globe and would apply to renunciation services as well (*e.g.,* a plexiglass wall between the consular officer and the renunciant or remote communications). The fact that there is no blanket suspension on non-immigrant visa services or other consular services belies the contention that suspension is *necessary* due to COVID-19.

81.     In addition, the suspension of renunciation services due to a decrease in consular staff does not justify the wholesale curtailment of Plaintiffs' constitutional right to renounce their American citizenship.  The government has a constitutional duty to ensure sufficient resources to enable its citizens to exercise their fundamental right to expatriate. Again, if the government has the resources to continue to process non-immigrant visas for foreign nationals, it certainly can muster the resources to continue to provide American citizens with the minimal service required by the INA to allow them to renounce voluntarily.

82.     Accordingly, the Court is requested to declare that the government's suspension of renunciation services is unconstitutional under the Due Process Clause of the Fifth Amendment and the Court is further requested to issue an order directing Defendants to immediately begin providing these services to Plaintiffs and others similarly situated.

**COUNT II**

**VIOLATION OF DUE PROCESS UNDER THE FIFTH AMENDMENT**
**[AS TO THE EFFECTIVE SUSPENSION ("WAIT LIST POLICY") OF SERVICES]**

83.     Plaintiffs incorporate by reference all the allegations above.

84.     As alleged above, DOS is continuing to withhold voluntary renunciation services from Plaintiffs within a reasonable timeframe.  Most applicants, such as Plaintiff Stephen Collins, are forced to wait months just to schedule an appointment to take the renunciation oath. What is more, there is no assurance – even after the appointment is scheduled – that the appointment will be kept.

85.     In addition, if and when the suspension is lifted, there will be an enormous backlog which will generate even more delay and disruption in Plaintiffs' lives.  During all this time, Plaintiffs and others similarly situated are being forced against their will to remain U.S. citizens in violation of their Fifth Amendment Due Process rights.

86.     This wait-list policy is unconstitutional because it fails to satisfy strict scrutiny.  In truth, the government's wait-list policy is nothing more than a suspension in disguise and is being employed – together with the $2,350 renunciation fee— to actively discourage U.S. citizens from exercising their fundamental rights.

87.     There is no justifiable reason why the government is failing to provide renunciation services within a reasonable timeframe. The DOS could and should employ mechanisms that allow for the timely process of renunciation applications. Plaintiffs have suggested at least two alternatives that can be immediately and readily implemented without great effort or expense. Undoubtedly, other alternative solutions are readily available. The time delay being experienced by Plaintiffs to exercise their fundamental right to expatriate is both unjustifiably long and profoundly unfair.

29

88.     That the government elected to reduce its overseas consular staffs is of no moment. The government has a constitutional duty to ensure sufficient resources enabling its citizens to exercise their fundamental right to expatriate within a certain and reasonable timeframe on the order of days or weeks (and not months or years).

89.     Nor can the COVID-19 pandemic serve as a justification for effectively suspending the right of expatriation by placing applicants on indefinite wait lists.  The government is required to cope with the pandemic while at the same time ensuring that it does not trample on fundamental rights. As alleged, there are numerous alternative procedures available that would enable Plaintiffs to exercise their right to voluntarily renounce without jeopardizing the health of consular officials.

90.     Accordingly, the Court is requested to declare that the government's suspension of renunciation services is unconstitutional under the Due Process Clause of the Fifth Amendment for the additional reason that this policy has unduly and unfairly delayed the exercise of Plaintiffs' right to renounce through the use of indefinite wait-lists and the Court is further requested to issue an order directing Defendants to immediately begin commencing these services with all deliberate speed in a fixed and reasonable timeframe.

## **COUNT III**

### **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706(2)**
### **[AS TO THE SUSPENSION OF SERVICES AND THE EFFECTIVE SUSPENSION OF SERVICES (THE "WAIT LIST" POLICY)]**

91.     Plaintiffs incorporate by reference all the allegations above.

92.     Under the APA, a court must "hold unlawful and set aside" agency action that is "not in accordance with law" 5 U.S.C. §706(2)(A) or "contrary to a constitutional right," 5 U.S.C. §706(2)(B), or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(C).

93.     Nowhere in the INA or the federal regulations is the DOS authorized to suspend voluntary renunciation services.  The DOS, in fact, lacks authority to suspend such services even in the case of a pandemic.

94.     The government's suspension of voluntary renunciation services is (1) not in accordance with law, (2) contrary to a constitutional right, and (3) in excess of statutory jurisdiction and authority.

95.     In addition, because the right to voluntarily expatriate is a constitutional right, the government's suspension of that right is "contrary to a constitutional right."

96.     The state of emergency does not authorize the government to suspend renunciation services.  *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021).

97.     Therefore, the government's suspension violates the APA for (1) lack of statutory authorization, (2) it is contrary to a constitutional right, and (3) is otherwise not in accordance with law.

98.     The Court is therefore requested to issue an order holding as unlawful and setting aside Defendants' suspension policy in contravention of the APA and the Court is further requested to issue an order directing Defendants to take appropriate remedial action, including but not limited to making renunciation services available to Plaintiffs and all other U.S. citizens similarly situated.

## COUNT IV

### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706(1) [AS TO THE SUSPENSION OF SERVICES AND THE EFFECTIVE SUSPENSION OF SERVICES (THE "WAIT LIST" POLICY)]

99.     Plaintiffs incorporate by reference all the allegations above.

100.    The APA provides that "within a reasonable time, each agency shall proceed to conclude a matter presented to it," 5 U.S.C. §555(b), and empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1).

101.    As the agency responsible for processing voluntary renunciation applications, the DOS has a mandatory, nondiscretionary duty to fulfill this role. The INA makes this duty clear. Specifically, the statute mandates that a person who is a national of the United States whether by birth or naturalization, "*shall lose* his nationality by voluntarily performing any of the" expatriating acts "with the intention of relinquishing United States nationality." 8 U.S.C. §1481 (emphasis added).

102.    The regulations also make clear that the DOS has a mandatory duty to process voluntary renunciation applications. 22 C.F.R. §50.50. Once a U.S. national submits the applicable form, the "diplomatic or consular officer *shall* forward to the Department for approval the oath of renunciation together with a certificate of loss of nationality as provided by section 358 of the Immigration and Nationality Act." 22 C.F.R. §50.50(b).  "If the officer's report is approved by the Department, copies of the certificate *shall* be forwarded to the Immigration and Naturalization Service, Department of Justice, and to the person to whom it relates or his representative." *Id*.

103.    The duty to provide renunciation services does not only stem from statutes and regulations.  Rather, the duty to provide such services derives from the fundamental nature of the right to expatriate, as alleged above.  It is a natural and inherent right protected by the Due Process Clause of the Fifth Amendment to the Constitution. The government, therefore, has a duty under the Constitution to ensure that its citizens can properly exercise the right to voluntarily renounce.

104.    Because the DOS is mandated to process renunciation applications, it must do so in a reasonable amount of time.

105.    The DOS must also not withhold or unreasonably delay services that serve as a precondition for beginning the process of renunciation and, ultimately, the receipt of a CLN.  The DOS must, within a reasonable time, schedule an appointment with the applicant to take the the oath of renunciation.  The DOS must, after the statutory conditions have been met, provide the applicant with a CLN within a reasonable time.

106.    Some of the Plaintiffs in this case have been waiting for close to two years, and will continue to wait– absent this Court's intervention – much longer than any objective observer would deem reasonable.

107.    Accordingly, the government's suspension policy violates 5 U.S.C. §706(1).

108.    The Court is therefore requested to issue an order holding as unlawful and setting aside Defendants' suspension policy in contravention of the APA and the Court is further requested to issue an order directing Defendants to take appropriate remedial action, including but not limited to making renunciation services available to Plaintiffs and all other U.S. citizens similarly situated with all deliberate speed and without further delay.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of Plaintiffs against Defendant, as follows:

(a) Issue a declaratory judgment that the suspension of renunciation services violates Plaintiffs' rights under Due Process Clause of the Fifth Amendment;

(b) Issue a declaratory judgment that the effective suspension of renunciation services (the "wait-list" policy) violates Plaintiffs' rights under the Fifth Amendment's Due Process Clause;

(c)  Issue a declaratory judgment that the government is not authorized to suspend or effectively suspend renunciation services;

(d)  Issue a declaratory judgment that the suspension and effective suspension of renunciation services violates 5 U.S.C. §706(1);

(e)  Issue an order requiring Defendants to immediately resume renunciation-related services;

(f)  Issue an order requiring Defendants to provide renunciation-related services within a reasonable timeframe with all deliberate speed and without further delay;

(g)  To the extent necessary, issue an order requiring Defendants to reform their renunciation policies and practices to ensure that these services are provided in a timely and efficient manner;

(h)  Award Plaintiffs the costs of this action, including attorney's fees and all reasonable expenses pursuant to 28 U.S.C. §2412; and

(i)  Grant such other and further relief as shall be deemed just and proper by the Court.


<u>Date</u>: December 27, 2021.


Respectfully submitted,


*/s/ Lawrence Marc Zell*

_____

L. Marc Zell                                            Noam Schreiber,
D.C. Bar #959437                                *pro hac vice to be filed*
ZELL & ASSOCIATES INTERNATIONAL     34 Ben Yehuda St.
ADVOCATES, LLC                              15th Floor
1345 Ave. of the Americas               Jerusalem, Israel 9423001
2nd Floor                                          011-972-2-633-6300
New York, NY 10105                         *Email:* schreiber.noam@gmail.com
(212)-971-1349
*Email:*  mzell@fandz.com

*Counsel for Plaintiffs*