**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

L'ASSOCIATION DES AMÉRICAINS
ACCIDENTELS, *et al.*,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

      Defendants.

Civil Action No. 1:21-cv-02933-TNM

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.      The Statutory Basis for Requesting a Certificate of Loss of Nationality of the
        United States ........................................................................................................... 2

II.     The Authority for Issuing a Certificate of Loss of Nationality ............................ 3

III.    The Process for a Request for a Certificate of Loss of Nationality under
        Immigration and Nationality Act 349(a)(5), 8 U.S.C. § 1481(a)(5) ..................... 3

IV.     Disruptions to State Department Services Due to the COVID-19 Pandemic ......... 5

V.      Plaintiffs' Suit ........................................................................................................ 9

STANDARD OF REVIEW .............................................................................................. 10

ARGUMENT .................................................................................................................... 12

I.      L'ASSOCIATION DES AMERICAINS ACCIDENTELS HAS FAILED TO
        SUFFICIENTLY PLEAD ASSOCIATIONAL STANDING. .......................... 12

II.     PLAINTIFFS' STATUTORY APA CLAIMS ARE MERITLESS. ................. 14

        A.      Plaintiffs fail to establish jurisdiction for their unlawful withholding and
                unreasonable delay claim. .......................................................................... 14

        B.      The State Department has not unlawfully withheld or unreasonably
                delayed loss of nationality services ........................................................... 15

        C.      The State Department's temporary cessation of appointments for
                Certificate of Loss of Nationality services at some posts and use of a
                waitlist at others falls well within the Department's statutory authority. ........... 23

III.    PLAINTIFFS' FIFTH AMENDMENT CLAIMS ARE MERITLESS. ............ 27

CONCLUSION ................................................................................................................. 32

i

# TABLE OF AUTHORITIES

## Cases

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
 271 F.3d 262 (D.C. Cir. 2001) ............................................................... 11

*Am. Chemistry Council v. Dep't of Transp.*,
 468 F.3d 810 (D.C. Cir. 2006) ............................................................... 13

*Am. Hosp. Ass'n v. Burwell*,
 812 F.3d 183 (D.C. Cir. 2016) ............................................................... 14

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .............................................................................. 10

*Chamber of Com. of U.S. v. EPA*,
 642 F.3d 192 (D.C. Cir. 2011) ............................................................... 13

*Collins v. City of Harker Heights, Tex.*,
 503 U.S. 115 (1992) .............................................................................. 28

*Cottage Health Sys. v. Sebelius*,
 631 F. Supp. 2d 80 (D.D.C. 2009) ......................................................... 11

*\*Dastigir v. Blinken*,
 ---F. Supp. 3d---, 2021 WL 2894645 (D.D.C. July 9, 2021) ................................ 11, 17, 20, 23

*Didban v. Pompeo*,
 435 F. Supp. 3d 168 (D.D.C. 2020) ......................................................... 31

*Doe v. D.C.*,
 206 F. Supp. 3d 583 (D.D.C. 2016) ......................................................... 27

*Equal Rts. Ctr. v. Post Props., Inc.*,
 633 F.3d 1136 (D.C. Cir. 2011) ............................................................... 12

*Farrell v. Blinken*,
 4 F.4th 124 (D.C. Cir. 2021) .................................................................... 4

*Farrell v. Pompeo*,
 424 F. Supp. 3d 1 (D.D.C. 2019),
 *rev'd and remanded on other grounds Farrell v. Blinken*, 4 F.4th 124 (D.C. Cir. 2021) ........ 31

*Gomez v. Trump*,
 485 F. Supp. 3d 145 (D.D.C. 2020),
 *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), and *amended in part sub nom.*

*Gomez v. Biden*, No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021),
  *appeal filed*, No. 20-5292 (D.C. Cir. Sept. 28, 2020) ............................................................. 18

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ........................................................................................................... 27

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ......................................................................................................... 24

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ......................................................................................................... 13

*Hutchins v. D.C.*,
  188 F.3d 531 (D.C. Cir. 1999) ......................................................................................... 28

*In re Barr Lab'ys, Inc.*,
  930 F.2d 72 (D.C. Cir. 1991) ............................................................................. 20, 22, 23

*In re Core Commc'ns, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) ......................................................................................... 16

*In re United Mine Workers of Am. Int'l Union*,
  190 F.3d 545 (D.C. Cir. 1999) ......................................................................................... 14

*Indep. Mining Co. v. Babbitt*,
  105 F.3d 502 (9th Cir. 1997) ........................................................................................... 16

*Khushnood v. U.S. Citizenship & Immigr. Servs.*,
  CIV A. No. 21-2166 (FYP), 2022 WL 407152 (D.D.C. Feb. 10, 2022) ............... 17, 19, 21, 26

*Kwok Sze v. Johnson*,
  172 F. Supp. 3d 112 (D.D.C. 2016),
  *aff'd sub nom. Kwok Sze v. Kelly*, 2017 WL 2332592 (D.C. Cir. Feb. 21, 2017) ............. 29, 31

*Leong Kwai Yin v. United States*,
  31 F.2d 738 (9th Cir. 1929) ............................................................................................. 31

*Liberty Fund, Inc. v. Chao*,
  394 F. Supp. 2d 105 (D.D.C. 2005) ................................................................................. 22

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ......................................................................................................... 26

*Long Term Care Pharmacy All. v. Leavitt*,
  530 F. Supp. 2d 173 (D.D.C. 2008) ................................................................................. 25

*Lozada Colon v. U.S. Dep't of State*,
  2 F. Supp. 2d 43 (D.D.C. 1998), *aff'd*, 170 F.3d 191 (D.C. Cir. 1999) ................................... 31

iii

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).................................................................................... 10

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003)................................................................ 16

*Massachusetts v. EPA*,
  549 U.S. 497 (2007).................................................................................. 24

*\*Mexichem Speciality Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015)............................................................ 18, 25

*Milligan v. Pompeo*,
  502 F. Supp. 3d 302 (D.D.C. 2020), *appeal dismissed sub nom. Milligan v. Blinken*,
  2021 WL 4768119 (D.C. Cir. Sept. 21, 2021)........................................ 22

*Mohammad v. Blinken*,
  548 F. Supp. 3d 159 (D.D.C. 2021)........................................................ 11

*Murway v. Blinken*,
  Civ. Case No. 21-1618 (RJL), 2022 WL 493082 (D.D.C. Feb. 16, 2022).............................. 20

*Nat'l Law Ctr. on Homeless & Poverty v. U.S. Dep't of Vets. Affs.*,
  842 F. Supp. 2d 127 (D.D.C. 2012)........................................................ 11

*Nishikawa v. Dulles*,
  356 U.S. 129 (1958).................................................................................. 31

*\*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)................................................................................ 14, 15

*Palakuru v. Renaud*,
  521 F. Supp. 3d 46 (D.D.C. 2021),
  *appeal dismissed*, No. 21-5048, 2021 WL 1440155 (D.C. Cir. Apr. 15, 2021)...................... 11

*Pub. Citizen, Inc. v. Trump*,
  297 F. Supp. 3d 6 (D.D.C. 2018)........................................................ 12, 13

*Pushkar v. Blinken*,
  Civ. A. No. 21-2297 (CKK), 2021 WL 4318116 (D.D.C. Sept. 23, 2021)............................ 19

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1 (1973)...................................................................................... 30

*Scott v. United States*,
  No. 1:13-CV-2030 LJO-BAM, 2014 WL 2807652 (E.D. Cal. June 20, 2014)........................ 29

iv

*Simopoulos v. Virginia*,
  462 U.S. 506 (1983)................................................................................................ 30

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)................................................................................................ 13

*Sunny v. Biden*,
  ---F. Supp. 3d---, 2021 WL 5294879 (E.D.N.Y. Nov. 15, 2021) ........................... 23

*Tate v. Pompeo*,
  513 F. Supp. 3d 132 (D.D.C. 2021),
  *dismissed sub nom. Tate v. Blinken*, 2021 WL 3713559 (D.C. Cir. July 22, 2021) .......... 20, 22

*Telecomms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984)................................................................... 16, 18, 21

*Thakker v. Renaud*,
  No. CV 20-1133 (CKK), 2021 WL 1092269 (D.D.C. Mar. 22, 2021),
  *appeal dismissed*, No. 21-5079, 2021 WL 3083431 (D.C. Cir. July 14, 2021)...................... 11

*United States v. Lafley*,
  656 F.3d 936 (9th Cir. 2011) ................................................................................. 30

*United States v. Wells Fargo Bank*,
  485 U.S. 351 (1988)................................................................................................ 27

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978)................................................................................................ 25

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)................................................................................ 27, 28, 29

**U.S. Constitution**

U.S. CONST. amend. V....................................................................................... 28

**Statutes**

5 U.S.C. § 706.................................................................................... 10, 14, 27

22 U.S.C. § 2651a............................................................................................. 26

Immigration and Nationality Act § 104, 8 U.S.C. § 1104 ................................. 3, 24, 26

Immigration and Nationality Act § 349, 8 U.S.C. § 1481 ........................................ *passim*

Immigration and Nationality Act § 358, 8 U.S.C. § 1501 .................................... 3, 24

Foreign Relations Authorization Act, Fiscal Year 2003,
  Pub. L. No. 107-228, 116 Stat. 1373 (Sept. 30, 2002)............................................ 25

**Rules**

Federal Rule of Civil Procedure 12 ........................................................................ 10

Federal Rule of Civil Procedure 56 ........................................................................ 11

Local Rule of Civil Procedure 7 ............................................................................. 11

**Regulations**

22 C.F.R. Part 50, Subpart 50 – Loss of Nationality, §§ 50.40-50.51 ........................... 3

22 C.F.R. § 50.50............................................................................................... 15

**Other Authorities**

Foreign Affairs Manual (FAM),
  https://fam.state.gov/................................................................................. 3, 4, 6, 24

## INTRODUCTION

Plaintiffs' suit challenges delays in the Department of State's ("the Department") provision of so-called "Certificate of Loss of Nationality" (CLN) services (or "the service")—specifically, with respect to individuals seeking to take an oath of renunciation of U.S. nationality before a diplomatic or consular officer abroad under Immigration and Nationality Act § 349(a)(5), 8 U.S.C. § 1481(a)(5).  Plaintiffs bring claims under the Administrative Procedure Act (APA) regarding what they perceive to be an unlawful delay or withholding of CLN services (also referred to as "loss of nationality" services), agency action in excess of statutory jurisdiction or contrary to law, and due process violations based on what they ask the Court to recognize as a fundamental right to expatriate within weeks of requesting a CLN services appointment.  Because there is no right to such an appointment within weeks of requesting one and because the delays caused by the pandemic and other emergent circumstances are reasonable, Plaintiffs' claims fail.

As set forth below, CLN services are one of many services offered at U.S. embassies and consulates abroad (collectively referred to as "posts") adversely affected by the constraints of the pandemic.  At the outset of the pandemic and for many months thereafter, posts and the Bureau of Consular Affairs in Washington, D.C., engaged in massive repatriation efforts to bring U.S. citizens abroad safely home to the United States.  Because of local, often country-wide, pandemic conditions and the resulting restrictions on operations, multiple posts simply were unable to provide *any* routine consular services, let alone CLN services in particular.  In addition, certain posts and the Department, including the Bureau of Consular Affairs in Washington, D.C., have faced, and continue to face, other crises, most notably, ongoing evacuation and resettlement efforts out of Afghanistan and humanitarian efforts related to the Russian invasion of Ukraine.  Some posts now maintain waitlists to manage significant backlogs of individuals seeking CLN

1

and other services.  Other posts are currently unable to offer routine services, including CLN services, due to their restricted operational status in light of local pandemic conditions.  But none of these circumstances amounts to an unreasonable delay or unlawful agency action.  And, due to the scope and complexity of the Department's operations around the world, any attempt by a court to redirect the Department's resource allocation decisions, as the Plaintiffs demand, could have devastating effects on the Department's crucial responsibilities of diplomacy, crisis management, and the delivery of humanitarian assistance.  For these reasons, set forth further below, the Court should grant Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment.

## BACKGROUND

I.     **The Statutory Basis for Requesting a Certificate of Loss of Nationality of the United States**

Immigration and Nationality Act (INA) Section 349(a) prescribes seven potentially expatriating acts, which, if performed voluntarily and with the intent to relinquish U.S. nationality, will result in loss of U.S. nationality upon request for and approval of a Certificate of Loss of Nationality (CLN).  INA § 349(a)(1)-(7); 8 U.S.C. § 1481(a)(1)-(7).  The Department of State administers subsections 1-5, and the Department of Homeland Security administers subsections 6-7.  Of these seven potentially expatriating acts, only two involve taking an oath of renunciation, INA § 349(a)(5), 8 U.S.C. § 1481(a)(5) (taking an oath of renunciation abroad); and INA § 349(a)(6), 8 U.S.C. § 1481(a)(6), (taking an oath of renunciation while in the United States).  Plaintiffs' suit deals solely with requests for a CLN under section 349(a)(5) of the INA, 8 U.S.C. § 1481(a)(5).  First Am. Compl. for Declaratory & Injunctive Relief ¶ 2, ECF No. 12 ("First Am. Compl.").

2

## II.     The Authority for Issuing a Certificate of Loss of Nationality

The Department oversees CLN services with respect to the potentially expatriating acts enumerated in INA § 349(a)(1)-(5), 8 U.S.C. § 1481(a)(1)-(5).  A U.S. diplomatic or consular officer in a foreign country is charged with administering the oath of renunciation under Section 349(a)(5) of the INA, 8 U.S.C. § 1481(a)(5), and providing the Department with a detailed memorandum recommending approval or denial of the request for a CLN.  INA § 358, 8 U.S.C. § 1501.  The Department reviews and determines whether to approve or deny such requests. INA §§ 104(a) and 358, 8 U.S.C. §§ 1104(a) and 1501 (permitting the Secretary of State to issue regulations, forms, instructions, and procedures related to processing requests for a CLN and to approve CLN requests).  Implementing regulations are found at 22 C.F.R. Part 50, Subpart C – Loss of Nationality, §§ 50.40-50.51; related Department of State policy and procedures are found in the Foreign Affairs Manual (FAM), 7 FAM 1200[1]; and loss of nationality forms are Forms DS-4079, Request for Determination of Possible Loss of United States Nationality; DS-4080, Oath/Affirmation of Renunciation of Nationality of United States; DS-4081, Statement of Understanding Concerning the Consequences and Ramifications of Renunciation or Relinquishment of U.S. Nationality; and DS-4083, Certificate of Loss of Nationality of the United States.

## III.    The Process for a Request for a Certificate of Loss of Nationality under Immigration and Nationality Act 349(a)(5), 8 U.S.C. § 1481(a)(5)

A U.S. citizen seeking to take the oath of renunciation under Immigration and Nationality Act Section 349(a)(5), 8 U.S.C. § 1481(a)(5), must first contact a U.S. embassy or consulate ("post") to request that service.  Post normally then provides via email links to written materials

---

[1]  The current public version of the FAM is available at https://fam.state.gov/.

(which may also be available in hard copy) that explain the process of renouncing U.S. citizenship as well as its consequences.  Ex. A, Declaration of Douglass Benning, Principal Deputy Assistant Secretary of State for Consular Affairs ("Benning Decl.") ¶ 11.  After reviewing the material, the individual would proceed by requesting an interview with a U.S. consular or diplomatic officer. *Id.*  This initial interview typically occurs in person, but may occur by phone and, in rare circumstances, by email.  *Id.*; *see* 7 FAM 1262.2(d) ("The initial interview may be conducted by telephone[,] . . . [but] the potential renunciant must be offered the opportunity to appear in person for the initial interview and to meet or speak with a consular officer, if he/she wishes."), 7 FAM 1262.2(e) (stating that a post may receive approval from the Department to conduct the initial interview through email in certain "exceptional circumstances" if it can demonstrate that post will still be "able to assess fully that the renunciation is voluntary and intentional").

After the initial interview, if the individual wishes to proceed, he or she must schedule an in-person appointment to take the oath of renunciation, which must be done "before a diplomatic or consular officer of the United States in a foreign state."  8 U.S.C. § 1481(a)(5);  Benning Decl. ¶ 12; *see* 7 FAM 1261(b) ("The oath [of renunciation] must be taken in the presence of a U.S. diplomatic or consular officer."), 7 FAM 1262.3(c) ("Renunciation procedures should always be held at post in a setting that reminds the renunciant of the gravity of the consequences."). The in-person requirement is crucial to the assessment of whether the U.S. citizen is acting voluntarily, without duress or coercion, and that he or she has the capacity to knowingly intend to relinquish U.S. citizenship.  *See* Benning Decl. ¶ 12; 7 FAM 1262.3(b); *see also Farrell v. Blinken*, 4 F.4th 124, 135 (D.C. Cir. 2021) (holding that the in-person requirement is statutorily permitted and that it "serves as a protection against involuntary expatriation, which the Constitution generally prohibits").

4

**IV.     Disruptions to State Department Services Due to the COVID-19 Pandemic**

Since early 2020, the COVID-19 pandemic has significantly affected the ability of posts to provide consular services worldwide.  *See* Benning Decl. ¶¶ 4, 14-17.  Many posts have faced obstacles including, but not limited to, dramatic staff reductions due to evacuations of staff who were at high risk for COVID-19-related complications, in-person capacity limitations, staff illnesses and quarantine periods, in-country restrictions on public movements, and significant budgetary constraints.  *See id.* ¶¶ 15-16, 18.  While posts' capacity for handling in-person consular services significantly decreased, the demand for emergency consular services, including massive repatriation efforts, spiked—diverting a high portion of posts' (and the Department's) limited resources to addressing critical situations.  *Id.* ¶ 14.  Between January and June 2020, posts and the Department orchestrated the repatriation of over 100,000 individuals who would otherwise have remained stranded abroad during the pandemic.  *See id.*  In the summer of 2021, as posts reacted to the Delta variant, many posts were also called upon to assist U.S. citizens evacuating Afghanistan, process immigrant visas for Afghans on an expedited basis, and respond to a high volume of inquiries from Congress.  *Id.*  Several posts continue to participate in the Afghan resettlement process, while others have been assisting refugees from the war in Ukraine.  *Id.*  At many posts, the challenges to providing consular services at pre-pandemic levels continue, due to budgetary fallout of the pandemic that has significantly affected hiring at overseas posts, continuing waves of highly transmissible COVID-19 variants, and emerging crises around the globe.  *Id.* ¶¶ 16-17.

A timeline of events is instructive.  On March 14, 2020, the Department authorized its overseas employees who were at higher risk of developing complications from COVID-19 to return to the United States, which caused a "dramatic reduction in overseas consular staffing."

*Id.* ¶ 18.   On March 17, 2020, the Office of Management and Budget directed all federal agencies to "take appropriate steps to prioritize all resources to slow the transmission of COVID-19, while ensuring [that] mission-critical activities continue." *See id.*   In response to this directive, the State Department suspended all routine visa services on March 20, 2020, allowing only "emergency and mission[-]critical" visa services to continue. *Id.*  It also advised posts to devote their entire consular section staff to U.S. citizen emergency services, which presented a dire need. *Id.*  In subsequent guidance in April and May of 2020, the Department instructed posts that only the staff who must appear in-person to "perform mission-critical work that cannot be performed remotely should be in Department/mission facilities." *Id.*  This guidance necessarily limited posts' ability to process requests for CLNs, which are classified as a routine (non-emergency) consular service, to requests made in circumstances that constituted a "compelling emergency." *Id.* ¶¶ 8, 18; 7 FAM 020 Appendix B.

In May of 2020, the State Department released its plan for phasing back to regular in-person operations at U.S. embassies and consulates.  Benning Decl. ¶¶ 19-20.  The plan, called the Diplomacy Strong Framework, involved three phases, and each post was tasked with assessing local health conditions and restrictions to determine which phase of services resumption was appropriate. *Id.* ¶ 20.   Posts in Phase One were instructed to offer only "emergency ACS [(American Citizens Services)] and mission critical consular services only." *Id.*, Attachment E, 20 STATE 46900 at 1.   Posts in Phase Two were permitted to offer "emergency and mission critical consular services, as well as services that do not require face-to-face interactions and limited routine appointments" for passports and Consular Reports of Birth Abroad (CRBAs) and federal benefits services. *Id.*, Attachment E at 2.   Posts in Phase Three were permitted to resume public services, other than routine visa processing, at a level the consular section chief at post

deemed appropriate based on local conditions and Department guidance. *Id.*, Attachment E at 2. The resumption of public services includes resumption of loss of nationality appointments, but posts were permitted to consider "phasing in" appointments. *Id.*, Attachment E at 2. Regardless of what phase a post was in, however, the Department has consistently required prioritization of emergency consular services for U.S. citizens during the pandemic. *See, e.g., id.*, Attachment F, 21 STATE 52112; *id.*, Attachment G, 21 STATE 57154; *id.*, Attachment H, 21 STATE 69026 (stating that American Citizens Services "emergency services must come first").

The Diplomacy Strong Framework governed posts' prioritization of American Citizens Services until September 2021, when the Department replaced the Framework with the COVID-19 Mitigation Process (CMP). *Id.* ¶ 23. Under CMP, there was no change to the prioritization of various services, but rather an adjustment to how the Department evaluated local conditions at each facility to determine its level of operations. *See id.* Essentially, the CMP shifted from a focus on limiting what percentage of employees could be present as a one-dimensional safety precaution to, instead, evaluating a variety of metrics to determine how to safely staff Department facilities, taking into account a variety of preventative and protective measures, and providing the maximum level of service to the public without compromising consular or public safety. *See id.*

The disruptions to the Department's regular consular operations during the pandemic have created significant backlogs for many consular services, including visa services, *id.* ¶ 27, and CLN services—in particular, appointments to take the oath of renunciation, *id.* ¶ 28. Although the Department does not know the exact number of individuals awaiting a loss of nationality appointment, because the administration of loss of nationality services is decentralized until the final review in Washington, D.C. and not all posts are using waitlists, loss of nationality services

dropped by 43% from fiscal year 2019 to fiscal year 2020.  *Id.*  That data indicates that there may be a significant number of individuals seeking an appointment to take the oath of renunciation.

As the Department works to return to normal operations where possible, many of its posts have resumed loss of nationality appointments.  *See id.* ¶ 32 (Paris and Marseille have resumed CLN services, and U.S. Embassy Paris plans to double the available appointments when conditions permit); *id.* ¶ 33 (U.S. Embassy Singapore has offered CLN services for significant stretches throughout the pandemic, as local conditions allowed, and has once again resumed the service); *id.* ¶ 34 (U.S. Consulate General Amsterdam has continued offering CLN services during most of the pandemic, resuming the service on October 9, 2020, and has actually increased its processing rate during this time); *id.* ¶ 36 (U.S. Embassy Bern resumed CLN services on September 1, 2021, and has since processed over 300 appointments for CLN services, which puts it on pace to exceed pre-pandemic processing levels).  Some posts have not yet resumed CLN services because of COVID-19-related reductions in operation capacity and significant competing pressures on their limited resources.  *See id.* ¶¶ 31, 35.  As relevant to this suit, this includes U.S. Consulate General Frankfurt and U.S. Embassy Helsinki.  *Id.*  Post Frankfurt has not yet resumed loss of nationality services due to limited operational capacity based on local COVID-19 restrictions and the need to divert a significant portion of its limited resources in recent months to assisting thousands of U.S. citizens and foreign nationals who were evacuated from Afghanistan.  *Id.* ¶ 31.  Post Frankfurt intends to resume CLN services in April.  *Id.*  Post Helsinki has not yet resumed loss of nationality services largely because of the very small size of post, where, until very recently, there was only one full-time consular officer handling all services.  *Id.* ¶ 35.  In addition, local Finnish maximum telework guidelines, and the historically low demand for loss of nationality services in Finland have contributed to CLNs receiving a lower priority than other services.  *Id.*  Post Helsinki has

recently hired a new staff member to process routine consular services, including requests for CLNs, and it intends to resume CLN services in April.  *Id.*

### V.    Plaintiffs' Suit

Plaintiffs include ten[2] individuals who wish to take the oath of renunciation of U.S. citizenship but allege that they have not yet been able to do so because of the temporary cessation of renunciation appointments during the pandemic at certain posts or the waitlist procedure for such appointments at other posts.[3]  In addition, Plaintiffs include an organization, L'Association des Americains Accidentels, which has a stated goal of "defend[ing] and represent[ing] the interests of persons holding American nationality, but residing outside the United States, against the harmful effects of the extraterritorial nature of the U.S. law."  First Am. Compl. ¶¶ 15-26.

Of the ten named Plaintiffs, only three seek to renounce their U.S. citizenship in countries whose posts have not yet resumed loss of nationality services—Germany and Finland.[4]  *Id.* ¶¶ 16, 23, 25; *see* Benning Decl. ¶¶ 31, 35.  The remainder of the named Plaintiffs—seventy percent of

---

[2]  The First Amended Complaint contains descriptions of the circumstances of *eleven* named individuals, but one of those individuals—Jeremiah Bornstein—is not listed as a plaintiff in the case caption.  First Am. Compl. ¶ 24.

[3]  Although loss of nationality appointments remain temporarily unavailable at the local post of some of the Plaintiffs, one Plaintiff has already received his appointment.  Plaintiff Christopher Bousigues appeared for his final interview at Post Singapore on March 21, 2022, and his renunciation packet is currently under review in Washington, D.C., in the ordinary course. Benning Decl. ¶ 33.  Two other Plaintiffs have made no attempt to obtain an appointment for CLN services at their local post, despite post being open for such services.  Plaintiff Mark Lewis seeks to renounce his U.S. citizenship in the Netherlands, First Am. Compl. ¶ 22, where Post Amsterdam has been offering loss of nationality services during the pandemic since October 9, 2020, Benning Decl. ¶ 34.  There is no indication that Mr. Lewis has made any effort to schedule an appointment during this time.  *Id.*  Plaintiff Anne Misslin seeks to renounce her U.S. citizenship in France, First Am. Compl. ¶ 20, where Post Paris and Post Marseille have both resumed CLN services, Benning Decl. ¶ 32.  There is no indication that Ms. Misslin has made any effort to schedule an appointment during this time.  *Id.*

[4]  Jeremiah Bornstein seeks to renounce his U.S. citizenship in Germany.  First Am. Compl. ¶ 24.

9

them—either seek to take the oath of renunciation in countries whose posts have resumed loss of nationality services, or, in the case of one Plaintiff, have already had their final appointment. First Am. Compl. ¶¶ 17-22, 26; Benning Decl. ¶¶ 32-34, 36.

Plaintiffs raise four claims, all of which are encompassed by the Administrative Procedure Act (APA). They argue that the temporary cessation of renunciation appointments during the pandemic at certain posts and the waitlist procedure for such appointments during the pandemic at other posts are: 1) contrary to a constitutional right; 2) not in accordance with law; 3) in excess of statutory jurisdiction and authority; and 4) constitute actions unlawfully withheld or unreasonably delayed. First Am. Compl. ¶¶ 78, 86, 94, 100, 107; *see* 5 U.S.C. § 706.

## STANDARD OF REVIEW

Courts must dismiss claims under Federal Rule of Civil Procedure 12(b)(1) when the court lacks subject matter jurisdiction over the claims. For a party to establish that it has standing to bring a claim, it must show that it has suffered an "injury in fact" that is both "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; that there is "a causal connection between the injury and the conduct complained of"; and that it is likely that a favorable decision would redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).

Courts should dismiss claims under Federal Rule of Civil Procedure 12(b)(6) when plaintiffs have failed to plead "sufficient factual matter" that, if "accepted as true," would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). As for legal conclusions pled in a complaint, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

10

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Cf. Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 90 (D.D.C. 2009) (explaining that summary judgment is appropriate in a typical APA case when the court determines "as a matter of law" that the agency's action "is supported by the administrative record and otherwise consistent with the APA standard of review").[5]

---

[5] Defendants have not filed a certified list of the contents of the administrative record, pursuant to Local Rule of Civil Procedure 7(n), because, as this Court has recognized in other cases challenging the delayed provision of State Department services during the COVID-19 pandemic, Local Rule 7(n) does "not apply [where the plaintiff] . . . is challenging the Government's inaction" because no administrative record exists. *Dastigir v. Blinken*, ---F. Supp. 3d---, 2021 WL 2894645, at *2 n.5 (D.D.C. July 9, 2021) (quotation marks, citation, and brackets omitted); *see also Mohammad v. Blinken*, 548 F. Supp. 3d 159, 163 n.2, 164, 170 (D.D.C. 2021) (finding Local Rule 7(n)'s requirement to "file a certified list of the contents of the administrative record" inapplicable because the plaintiff "challenge[d] inaction, not action," and granting the Government's motion for summary judgment based on the typical Rule 56(a) standard of review); *Palakuru v. Renaud*, 521 F. Supp. 3d 46, 50 n. 6 (D.D.C. 2021), *appeal dismissed*, No. 21-5048, 2021 WL 1440155 (D.C. Cir. Apr. 15, 2021) (same); *see also Nat'l Law Ctr. on Homeless & Poverty v. U.S. Dep't of Vets. Affs.*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) ("[I]f an agency fails to act, there is no 'administrative record' for a federal court to review.").

Further, the agency declaration and exhibits provide facts sufficient for this Court to conclude that Plaintiffs' claims fail as a matter of law. *See, e.g.*, *Mohammad*, 548 F. Supp. 3d at 163, 163 n.2, 170 (granting the State Department's motion for summary judgment on an APA unreasonable delay claim based on an agency declaration after determining no administrative record existed); *Thakker v. Renaud*, No. CV 20-1133 (CKK), 2021 WL 1092269, at *5, *5 n.10 (D.D.C. Mar. 22, 2021), *appeal dismissed*, No. 21-5079, 2021 WL 3083431 (D.C. Cir. July 14, 2021) ("find[ing] that the record . . . contain[ed] enough facts to evaluate the *TRAC* factors" even after exempting the defendants from the Local Civil Rule 7(n) requirement to file a certified index of the administrative record) (quotation marks omitted); *see also Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001) (holding that no administrative record was necessary to resolve the argument that challenged provisions violated a statute because the argument could "be resolved with nothing more than the statute").

## ARGUMENT

I.  **L'ASSOCIATION DES AMERICAINS ACCIDENTELS HAS FAILED TO SUFFICIENTLY PLEAD ASSOCIATIONAL STANDING.**

There are two ways for an association to establish standing to sue in federal court. The association may either "assert 'associational standing' to sue on behalf of its members . . . [o]r it can assert 'organizational standing' to sue on its own behalf." *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 17 (D.D.C. 2018) (citation omitted).  To establish associational standing, an association must "plausibly allege or otherwise offer facts sufficient to permit the reasonable inference (1) that the plaintiff has at least one member who would otherwise have standing to sue in her own right; (2) that the interests the association seeks to protect are germane to its purpose; and (3) that neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." *Id.* at 17-18 (citation and alterations omitted).  To establish organizational standing, an association must, "like an individual plaintiff, . . . show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (citation omitted).

Plaintiffs argue that L'Association des Americains Accidentels (AAA) has organizational standing because "AAA's members would otherwise have standing to sue in their own right," "[t]he interests AAA seeks to protect are germane to AAA's purpose," and "[n]either the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." First Am. Compl. ¶ 32.  Although they place these assertions in the organizational standing category, they fail to establish organizational standing because they do not even attempt to establish an actual or threatened injury to the association itself.  *See Equal Rts. Ctr.*, 633 F.3d at 1138.  Instead, Plaintiffs have styled these assertions as a claim for *associational* standing.

12

Plaintiffs' assertions are insufficient to establish associational standing, however. Plaintiffs have not established AAA's status as a membership organization, which includes establishing that it is a "traditional voluntary membership organization" or its functional equivalent. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). Plaintiffs also have not pled that any of the named plaintiffs are members of the organization or were members at the time the Amended Complaint was filed. Plaintiffs have also failed to sufficiently plead that a member of the association would have standing to sue in his or her individual capacity. The most that Plaintiffs plead along these lines is that "AAA's members include United States citizens who wish to renounce their U.S. citizenship, but are unable to do so because the [Department of State] has effectively suspended voluntary expatriation services." First Am. Compl. ¶ 32(a). But "[w]hen a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). Instead, the association must "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) (holding that, to establish associational standing, "[a]t the very least, the identity of the party suffering an injury in fact must be firmly established"). Because Plaintiffs "have made no effort . . . to identify a specific member [of the organization] who has suffered, or who is likely to suffer, an injury in fact" based on the loss of nationality appointment conditions that Plaintiffs challenge, AAA lacks associational standing. *Pub. Citizen, Inc.*, 297 F. Supp. 3d at 18.

13

## II.     PLAINTIFFS' STATUTORY APA CLAIMS ARE MERITLESS.

### A. Plaintiffs fail to establish jurisdiction for their unlawful withholding and unreasonable delay claim.

Plaintiffs contend that the State Department has unlawfully withheld and unreasonably delayed appointments for CLN services by temporarily suspending such appointments at some of its posts and by utilizing a waitlist for such appointments at other posts.   First Am. Compl. ¶¶ 100-108; *see* 5 U.S.C. § 706(1) (permitting courts to compel agency action that has been "unlawfully withheld or unreasonably delayed").   But the APA places strict limits on judicial review of alleged agency inaction.   Because the APA "carried forward" the common law writ of mandamus in section 706(1), the standards applicable to mandamus also apply to assessing a claim of unreasonable delay or unlawfully withheld agency action.   *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ("*SUWA*").   "[M]andamus is an extraordinary remedy [and courts] require similarly extraordinary circumstances to be present before [they] will interfere with an ongoing agency process."   *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (citation omitted).   "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists."   *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *see also SUWA*, 542 U.S. at 63-64 (mandamus is available only where a federal agency has a "ministerial or non-discretionary" duty amounting to "a specific, unequivocal command") (citations omitted).   "These three threshold requirements are jurisdictional."   *Am. Hosp. Ass'n*, 812 F.3d at 189.

Plaintiffs fail to meet these threshold requirements by failing to show that there is a clear and indisputable right to relief and that the State Department is violating a clear duty to act. Plaintiffs point out that the Department is the only agency capable of adjudicating and processing

a request for a CLN under INA § 349(a)(5), 8 U.S.C. § 1481(a)(5), but they fail to identify a statutory deadline by which the Department must offer an appointment for CLN services. Further, the processing duties that Plaintiffs cite apply only *after* the appointment has been held and the individual has taken the oath of renunciation.  *See, e.g.*, 22 C.F.R. § 50.50(a) (beginning its description of the renunciation process by stating that "[a] person desiring to renounce U.S. nationality under section 349(a)(5) of the Immigration and Nationality Act shall appear before a diplomatic or consular officer of the United States" to, among other things, take the oath of renunciation).  Thus, there is no "specific, unequivocal command" that the Department has failed to abide by in its decision to allow posts to temporarily suspend loss of nationality appointments or to use a waitlist for such appointments based on local COVID-19 conditions.  *SUWA*, 542 U.S. at 63 (citation omitted).  Additionally, as discussed in section I.C *supra*, the statute grants the Department broad discretion in determining how to provide loss of nationality services. Because Plaintiffs have not shown that there is a clear and undisputable right to receive an appointment for CLN services more quickly, and have not shown that the Department has violated a clear duty to act, they have failed to meet the threshold jurisdictional requirements.  This Court therefore lacks jurisdiction to review Plaintiffs' unlawful withholding and unreasonable delay claim.  *See SUWA*, 542 U.S. at 64 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.").

### B. The State Department has not unlawfully withheld or unreasonably delayed loss of nationality services.

Even if Plaintiffs had met the jurisdictional requirements for the unlawful withholding and unreasonable delay claims, those claims would still fail under the *TRAC* factors that this Circuit

uses to evaluate such claims.[6]  *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*").[7]  The *TRAC* factors are non-exhaustive, and relief for an agency action found to be unreasonably delayed remains discretionary at all times, "even if all [the] elements [of the *TRAC* analysis] are satisfied" in a plaintiff's favor.  *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 505 (9th Cir. 1997).

The first and "most important" *TRAC* factor, *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008), is whether "the 'rule of reason'" is met.  *TRAC*, 750 F.2d at 80.  This factor "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003).  All three of these considerations favor Defendants.  The task of interviewing an individual seeking to renounce his or her U.S. citizenship is complex, because the consular official must assess the requester's understanding of the significance of loss of U.S. citizenship and the voluntariness of the requester's stated desire, which the consular official must later memorialize

---

[6] For context, the length of the delay in this case varies by Plaintiff.  The State Department has no record of Plaintiffs Anne Misslin or Mark Lewis contacting any Department posts to request a loss of nationality appointment.  Benning Decl. ¶¶ 32, 34.  These Plaintiffs, therefore, do not have a claim for delay.  For the other Plaintiffs, the approximate delay between their first outreach to a post regarding CLN services and the filing of this brief can be summarized as follows: Lilian Pam (1 year, 11 months); Joshua Grant (1 year, 8 months); Martin Kracklauer (1 year, 6 months); Sofiann Thoulon (1 year, 2 months); Philip Boeffard (1 year); Kristopher Lazarz (7 months); and Stephen Collins (7 months).  *Id.* ¶¶ 31-32, 35-36.  Plaintiff Christopher Bousigues is excluded from this list because, after a nearly ten-month delay, he had his final interview appointment and took the oath of renunciation on March 21, 2022.  *Id.* ¶ 33.

[7] Plaintiffs' unlawful withholding claim is most sensibly analyzed under the same standard as their unreasonable delay claim because the agency fully intends to resume appointments when it is safe to do so, which has already occurred at the majority of the posts relevant to Plaintiffs.

in writing.  *See* Benning Decl. ¶¶ 11-12.  It follows that each renunciation appointment takes time and cannot be rushed.  In fact, "CLN interviews can be one of the more in-depth interviews conducted by consular officers."  *Id.* ¶ 11.  The significance and permanence of the loss of U.S. citizenship are also undeniable.  *Id.* (citing the "significant legal consequences" of losing U.S. citizenship and "the history of litigation involving requests to vacate Department determinations of loss of U.S. nationality").  The seriousness of the request and its consequences add to the time that each renunciation appointment takes.  *Id.* ¶¶ 11-12.

Finally, and most importantly, the resources available to the State Department have been significantly curtailed during the COVID-19 pandemic.  The resource limitations have come from all sides—COVID-19 conditions, local government restrictions, capacity limitations, staffing shortages, spikes in demand for emergency services that take priority for consular resources, and decreased funds due to the fee-funded nature of the Bureau of Consular Affairs' operations. *Id.* ¶¶ 4, 14-17.  With such limited resources, some posts are currently unable to devote the time and care necessary to appointments for CLN services after utilizing resources to address the more pressing services they must offer.  *See e.g.*, *id.* ¶¶ 4, 14-17, 21, 23, 29.  *Cf. Khushnood v. U.S. Citizenship & Immigr. Servs.*, CIV A. No. 21-2166 (FYP), 2022 WL 407152, at *4 (D.D.C. Feb. 10, 2022) (determining that the rule of reason supported the State Department's over eighteen-month delay in scheduling a visa interview for the plaintiff, particularly "given the impact of the pandemic").  Perhaps most significantly, "[i]t is highly relevant that [many of the relevant posts] . . . closed [for routine consular services] during some of th[e] [Plaintiffs' asserted] waiting period due to COVID-19."  *Dastagir v. Blinken*, ---F. Supp. 3d---, 2021 WL 2894645, at *4 (D.D.C. July 9, 2021); *see* Benning Decl. ¶¶ 20, 20 n.1, 31-34, 36.  In other words, for a portion of the

period that Plaintiffs claim is unreasonable, the relevant posts were not offering routine consular services of *any* variety, let alone CLN services in particular.

Another type of resource limitation is the backlog that many posts are facing. Even as posts progress on the road to normalcy where it is safe to do so, they face significant backlogs for many routine services, including requests for loss of nationality appointments. *See* Benning Decl. ¶¶ 27-28. Thus, even when a post determines it is safe and feasible to fully re-open, the speed of its consular services may not be restored to pre-pandemic levels. Instead, the pandemic-imposed "new normal" requires posts to dig out of backlogs while continuing to assess local pandemic conditions and restrictions.

The remaining *TRAC* factors also favor Defendants. With respect to the second factor, there is no statutory "timetable or other indication of the speed" by which an appointment for CLN services must be scheduled following a request. *TRAC*, 750 F.2d at 80. In the absence of such a timetable, the agency is "entitled to considerable deference" regarding any alleged delay. *Mexichem Speciality Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). And even if a strict timetable existed, courts have found that it may be impossible to meet statutory deadlines in light of "the extreme exigencies caused by the COVID-19 pandemic." *Gomez v. Trump*, 485 F. Supp. 3d 145, 201 (D.D.C. 2020), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), and *amended in part sub nom. Gomez v. Biden*, No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021), *appeal filed*, No. 20-5292 (D.C. Cir. Sept. 28, 2020).

The third *TRAC* factor—that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake"—also favors Defendants. 750 F.2d at 80. While CLN services are at least arguably directed at human welfare, human health and welfare would also be harmed by speeding up the rate of such appointments during the

18

pandemic, when the health risks of assembling large groups of people in one place are so high. *See* Benning Decl. ¶ 15 (stating that "COVID-19 introduced significant challenges to delivering [consular] services because of the paramount need to protect the health and safety of post staff, persons seeking consular services, and the general public"). Further, the Court must consider not only the welfare of the named plaintiffs, but also the welfare of other individuals awaiting various services from posts. *Pushkar v. Blinken*, Civ. A. No. 21-2297 (CKK), 2021 WL 4318116, at *9 (D.D.C. Sept. 23, 2021) (rejecting a delay claim under the third *TRAC* factor because it was "not just [the plaintiff's] 'health and welfare' that the Court must consider, but also that of others similarly situated"). Here, the Department and many posts are experiencing significant delays across many services. *See* Benning Decl. ¶¶ 27-28. Because any time spent on appointments for CLN services must, necessarily, be time that is not spent on another service, speeding up the provision of CLN services would not ultimately support the interests of human health and welfare because it would be "to the detriment of [individuals awaiting other post services] . . . who may have experienced the same or worse impacts from a delay." *Pushkar*, 2021 WL 4318116, at *9 (citation omitted). Thus, human health and welfare considerations favor the Department's current practices, despite any delays they have caused. *See Khushnood*, 2022 WL 407152, at *5 (holding that the third *TRAC* factor favored the government defendants because the delay in their services was "attributable to the government's efforts to protect the health and safety of consular and diplomatic officials during the COVID-19 pandemic").

The fourth *TRAC* factor—the "effect of expediting delayed action on agency activities of a higher or competing priority"—strongly favors Defendants. At the posts still operating in only a limited capacity with limited staffing, the Department has exercised its discretion in prioritizing those services that are most emergent or mission-critical. *See, e.g.*, Benning Decl. ¶¶ 4, 23, 31, 35.

19

Because these activities are, by necessity, of a higher priority than requests for a Certificate of Loss of Nationality of the United States, appointments for CLN services have been more limited at many posts in light of the decreased staffing and in-person capacities caused by the COVID-19 pandemic.   These competing priorities and resource constraints counsel strongly against any finding of unreasonable delay.  Forcing the State Department to prioritize appointments for CLN services at this time would serve only to create further delays in the provision of other services that the Department reasonably has determined are of an equivalent or higher priority.  *See, e.g.*, *Murway v. Blinken*, Civ. Case No. 21-1618 (RJL), 2022 WL 493082, at *4 (D.D.C. Feb. 16, 2022) ("Because [consular] processing capacity is presently a zero-sum game, granting plaintiffs' request to expedite would necessarily mean additional delays for other applicants—many of whom undoubtedly face hardships of their own.") (citations and alterations omitted).  When relief that places plaintiffs "at the head of the queue [would] simply move[] all others back one space," that relief would "produce[] no net gain" and the Court should deny it.  *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991); *see Dastagir*, 2021 WL 2894645, at *5 (declining to judicially move the plaintiff's visa application to the front of the line based on a claim of unreasonable delay because such an order would "necessarily reshuffle[] the queue of other applicants also waiting for adjudication of their cases," and there was no basis for the plaintiff to obtain "super-priority" over other applicants); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 150 (D.D.C. 2021) (finding that the fourth *TRAC* factor "heavily favor[ed] [the State Department]'s position" because "an accumulation of such individual cases being pushed by judicial fiat to the front of the [visa processing] line would erode the ability of agencies to determine their priorities"), *dismissed sub nom. Tate v. Blinken*, 2021 WL 3713559 (D.C. Cir. July 22, 2021).

The fifth *TRAC* factor, "the nature and extent of the interests prejudiced by delay" in scheduling appointments for CLN services, 750 F.2d at 80, also favors Defendants.  While the named plaintiffs have an interest in obtaining an appointment for CLN services, the Department's current plan is to resume normal operations at every post when safe and feasible, based on local COVID-19 conditions, and many posts that are experiencing a backlog of individuals seeking CLN services have employed waitlists.  *See* Benning Decl. ¶¶ 23, 29, 31-36.  Thus, any remaining prejudice is on track to be mitigated as conditions permit.  In these circumstances, because the Department's decisions regarding the delay in providing appointments for CLN services are "attributable to [its] efforts to protect the health and safety of consular and diplomatic officials during the COVID-19 pandemic[,] . . . [the] fifth *TRAC* factor[] weigh[s] in favor of Defendants." *Khushnood*, 2022 WL 407152, at *5 (citation omitted).

The final *TRAC* factor indicates that the Court "need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."  750 F.2d at 80 (citation omitted).  Plaintiffs intimate that the pace at which the Department has scheduled appointments for CLN services during the pandemic is part of an "anti-expatriation policy." First Am. Compl. ¶ 56.  This accusation is without any foundation.  As explained above and in the declaration of Douglass Benning, Principal Deputy Assistant Secretary of State for Consular Affairs, the prioritization of services offered during the pandemic has been decided based on the emergent nature of the varying services offered by posts.  *See, e.g.*, Benning Decl. ¶¶ 18-23. For example, emergency ACS services take higher priority than all routine ACS services.  *See id.* ¶¶ 8, 18, 20, 22-23.  Thus, in the resource-limited conditions under which posts and the Department have been operating during the pandemic, appointments to take the oath of renunciation necessarily have been of a lesser priority.  Moreover, "the good faith of the agency in addressing

21

the delay weighs against relief." *Tate*, 513 F. Supp. 3d at 150 (quoting *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 120 (D.D.C. 2005)).  Here, the State Department has made continued efforts to expand its services to a level that continues to move closer to pre-pandemic levels while protecting the health and safety of the general public and its own staff.  *See, e.g.*, Benning Decl. ¶¶ 31-36.  Many posts have begun working through the backlog of requests for CLN services generated during the pandemic while continuing to receive a constant influx of requests. *See id.* ¶¶ 32-34, 36.  Some posts have even been able to increase the speed at which they process requests for CLNs.  *See id.* ¶¶ 34, 36.  Thus, the Department is making a good faith effort to remedy any delays in appointments for CLN services where possible.

Assessing the totality of the *TRAC* factors, "the government's interests in balancing its own priorities and determining how to allocate scarce resources in a global pandemic outweigh [P]laintiffs' interest in immediate [scheduling] . . . of their [appointments for CLN services]." *Tate*, 513 F. Supp. 3d at 150-51 (citation omitted).  For Plaintiffs to succeed on any of their claims, including the unreasonable delay claim, this Court would be required to hold that the State Department has misallocated its limited resources during the COVID-19 pandemic and concurrent humanitarian crises.  Such a holding would conflict with the principle that "[t]he agency is in a unique—and authoritative—position to view its projects as a whole . . . and allocate its resources in the optimal way." *In re Barr Lab'ys*, 930 F.2d at 76.  For this reason, "delays stemming from resource-allocation decisions simply do not lend themselves to judicial reorderings of agency priorities." *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 309 (D.D.C. 2020) (citation and alterations omitted) (collecting cases), *appeal dismissed sub nom. Milligan v. Blinken*, 2021 WL 4768119 (D.C. Cir. Sept. 21, 2021).  Moreover, this Court and others have recognized that courts are "ill-equipped to second guess" delays caused by the COVID-19 pandemic and related local

22

government restrictions.  *Dastagir*, 2021 WL 2894645, at *4; *see also Sunny v. Biden*, ---F. Supp. 3d---, 2021 WL 5294879 (E.D.N.Y. Nov. 15, 2021), at *10 (holding that, "[g]iven [the State Department's] severely constrained resources" during the COVID-19 pandemic, "it is . . . within the State Department's discretion to determine how foreign posts set their priorities and what operations these posts should restart first").  Because this Court "ha[s] no basis for reordering agency priorities" during the pandemic and the pandemic's continuing effects on Department operations, *In re Barr Lab'ys*, 930 F.2d at 76, it should find that any delay in processing or scheduling appointments for CLN services is reasonable.

### C. The State Department's temporary cessation of appointments for Certificate of Loss of Nationality services at some posts and use of a waitlist at others falls well within the Department's statutory authority.

Plaintiffs raise a claim under the APA that the temporary suspension of appointments for CLN services at some posts and the use of waitlists at others during the pandemic is "not in accordance with the law" and "in excess of statutory jurisdiction," despite the absence of a deadline for the State Department to offer appointments for CLN services or to adjudicate requests for CLNs.  First Am. Compl. ¶¶ 92-94, 97.  Plaintiffs base their argument on the fact that "[n]owhere in the INA or the federal regulations is the [Department of State] authorized to suspend voluntary renunciation services."[8]  *Id.* ¶ 93.

Because the State Department's suspension of appointments for CLN services at some posts is a temporary measure, and the Department fully intends to resume those appointments as soon as is safely feasible, the question is whether the pandemic-related delay in appointments for

---

[8]  Plaintiffs' section heading for this count characterizes the use of waiting lists for loss of nationality appointments at certain posts as an "effective suspension of services."

CLN services at certain posts violates the law or exceeds the Department's statutory jurisdiction. For the reasons explained below, it does neither.

The INA and the Department's regulations do not impose any deadline for the Department to act on a request for an appointment for CLN services and, instead, leave the timing of such appointments to the Department's discretion.  Section 104 of the INA charges the Secretary of State with administering and enforcing the INA's provisions, which include § 349(a)(5), and authorizes the Secretary to "establish such regulations . . . issue such instructions[] and perform such other acts as he deems necessary for carrying out such provisions."  8 U.S.C. § 1104(a). Section 349(a)(5) of the INA merely describes the potentially expatriating act of taking the oath of renunciation abroad and says nothing about how the Department should administer or adjudicate requests for a CLN based on such an oath.  *Id.* § 1481(a)(5).  Section 358 of the INA sets out more specific guidelines on how a diplomatic or consular officer should evaluate potential loss of nationality, but it also does not create any deadline or timeline for action.  *Id.* § 1501.  The Foreign Affairs Manual (which contains State Department policies) elaborates on how to provide CLN services under § 349(a)(5), but does not impose any deadlines or timeframes for the service. *See* 7 FAM 1200.

As the Supreme Court has "repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."  *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007); *see also Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (holding that an "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities").  Further, "absent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of its proceedings is entitled to considerable deference . . . and . . . even where a

24

statutory timetable exists, noncompliance with it has sometimes been excused as long as the agency has acted rationally and in good faith." *Mexichem Speciality Resins*, 787 F.3d at 555 (citations and alterations omitted); *see also Long Term Care Pharmacy All. v. Leavitt*, 530 F. Supp. 2d 173, 186–87 (D.D.C. 2008) (holding that, where "Congress ha[d] established no statutory deadline[]," it had "left these matters to the agency's discretion, [and] a court may not mandate greater timeliness").

Because Congress has delegated to the State Department the responsibility of administering requests for a CLN under INA § 349(a)(1)-(5), 8 U.S.C. § 1481(a)(1)-(5), and has placed no deadlines on the provision of CLN services, the Department has the discretion to choose how best to allocate its resources  to carry out all of its statutory responsibilities. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.") (citation omitted).  Other than the broad prescriptions in the INA, Congress has only in limited circumstances, which are not applicable here, prescribed how the Secretary is to prioritize certain actions under the INA over one another.  *See, e.g.*, Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, § 233, 116 Stat. 1373 (Sept. 30, 2002).  Therefore, the Department has not exceeded its statutory jurisdiction or acted contrary to law by allowing posts to pause the provision of appointments for CLN services until it is safely feasible to resume them in light of local COVID-19 conditions and other, often pandemic-related, constraints on particularly limited resources.  *See* Benning Decl. ¶¶ 23, 29.  To the contrary, this action falls well within the Department's statutory authority.

Finally, Plaintiffs' characterization of the use of waitlists as an "effective suspension" of CLN services is meritless.  The "effective suspension" theory appears to be premised on the assumption that a government service is available only if it is available within days or weeks of an individual's expressed desire for the service.  But the statutory authority vests discretion in the State Department to determine the timing of services, including CLN services.  *See* 8 U.S.C. § 1104(a); 22 U.S.C. § 2651a.  The Secretary's balancing of the allocation of consular resources to address American Citizens Services and to process over 100 classifications of immigrant and nonimmigrant visas across over 230 U.S. missions worldwide during a pandemic—"involve[] a complicated balancing of a number of factors which are peculiarly within [an agency's] expertise" leaving "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993); *see* Benning Decl. ¶ 5, 22-23, 25.  Services are not suspended merely because a post uses a waitlist to regulate the order in which the services are administered, in line with its decision regarding allocation of its resources.

Plaintiffs' "effective suspension" theory, when coupled with their contention that the Department has acted in excess of statutory authority, also appears premised on the assumption that backlogs for government services are unlawful in the absence of a statutory provision expressly allowing for such backlogs.  This too is meritless.  For example, in the visa context, courts have recognized the reasonableness of such backlogs, particularly in light of the pandemic. *See, e.g.*, *Khushnood*, 2022 WL 407152, at *1 (finding reasonable the State Department's over eighteen-month delay in scheduling a visa interview for the plaintiff due to a substantial backlog in visa applications, and noting that the plaintiff had "ignored the chorus of cases from this jurisdiction that have found visa delays greater than eighteen months reasonable, given the impact of the pandemic").  Here, too, the orderly organization of the backlog of individuals seeking to

take the oath of renunciation according to a waitlist in no way exceeds the State Department's statutory jurisdiction or runs contrary to law.  For these reasons, Plaintiffs have failed to state a claim under 5 U.S.C. § 706(2)(C) and, in the alternative, Defendants are entitled to summary judgment as a matter of law on this claim.

## III.   PLAINTIFFS' FIFTH AMENDMENT CLAIMS ARE MERITLESS.

Under the doctrine of constitutional avoidance, courts should first consider statutory grounds for decision before reaching any constitutional grounds.  *See, e.g.*, *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988) ("[O]ur established practice is to resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue."); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.").  For that reason, the Court should not reach Plaintiffs' Fifth Amendment claims unless doing so is necessary to the outcome of the case.

Under both of Plaintiffs' Fifth Amendment claims Plaintiffs ask this Court to recognize a fundamental right to renounce one's U.S. citizenship within "a certain and reasonable timeframe on the order of days or weeks" under the Fifth Amendment's Due Process Clause.  *See* First Am. Compl. ¶ 88 (asserting that "[t]he government has a constitutional duty to ensure sufficient resources enabling its citizens to exercise their fundamental right to expatriate within a certain and reasonable timeframe on the order of days or weeks (and not months or years)").  No such fundamental right exists, however.

To sufficiently allege a substantive due process claim under the Fifth Amendment, plaintiffs "must allege that the defendant deprived them of a constitutionally cognizable liberty or property interest."  *Doe v. D.C.*, 206 F. Supp. 3d 583, 604 (D.D.C. 2016); *see Washington v.*

27

*Glucksberg*, 521 U.S. 702, 722 (1997) (describing the Court's substantive due process jurisprudence as "establishing a threshold requirement—that a challenged . . . action implicate a fundamental right" before applying strict scrutiny); *see also* U.S. CONST. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law."). The fundamental rights that the Supreme Court has recognized as being protected under the Fifth Amendment "include[] the rights to marry; to have children; to direct the education and upbringing of one's children; to marital privacy; to use contraception; to bodily integrity; and to abortion." *Glucksberg*, 521 U.S. at 720 (citations omitted). The Supreme Court has expressed "reluctan[ce]" about "expand[ing] the concept of substantive due process" beyond these categories "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). When assessing whether a right falls within the orbit of substantive due process, the Supreme Court considers whether it is a "fundamental right[] [or] libert[y] which [is], objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if the[] [right] w[as] sacrificed." *Glucksberg*, 521 U.S. at 720-21 (citations omitted); *see Hutchins v. D.C.*, 188 F.3d 531, 538 (D.C. Cir. 1999) (same). The Court also requires plaintiffs to provide "a careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (citation omitted); *see id.* at 722 ("[W]e have a tradition of carefully formulating the interest at stake in substantive-due-process cases.").

Plaintiffs have failed to adequately allege that the right to obtain an appointment for CLN services within days or weeks of requesting one is a constitutionally cognizable fundamental right. No court has ever recognized such a right under the Fifth Amendment's Substantive Due Process clause. The State Department is responsible for a vast spectrum of services for U.S. citizens,

28

including many emergency services that are, and must always be, given priority.  *See* Benning

Decl. ¶ 8.  Requiring the Department to hold an appointment for a U.S. citizen to take an oath of

renunciation of his or her citizenship within weeks of requesting one, regardless of the current

circumstances and demands on the relevant post's limited resources, would place an unreasonable

limitation on the Department's ability to allocate its resources to best meet its responsibilities.

Such a right to some amorphous "reasonable" timeframe within "days or weeks"—regardless of

the circumstances in the world—is not "objectively, deeply rooted in this Nation's history and

tradition," nor is it "implicit in the concept of ordered liberty, such that neither liberty nor justice

would exist if the[] [right] w[as] sacrificed."  *Glucksberg*, 521 U.S. at 720-21 (citations omitted).

To the contrary, liberty and justice weigh against recognition of such a right, because establishing

a right to a loss of nationality appointment within weeks would negatively affect the ability of U.S.

citizens seeking emergency consular services to obtain them as quickly as necessary.

Moreover, recognizing as fundamental the right that Plaintiffs assert would be in tension

with a long-standing line of cases that acknowledge the legality of limitations on the ability to

relinquish U.S. citizenship.  Courts have repeatedly recognized the legality of such limitations

without applying strict scrutiny to their review of those limitations.  *See, e.g.*, *Kwok Sze v. Johnson*,

172 F. Supp. 3d 112, 121-22 (D.D.C. 2016) (finding that an incarcerated plaintiff had "no right to

abandon his citizenship under the Due Process Clause" and that "courts have repeatedly—and

uniformly—held that an incarcerated U.S. citizen has no constitutional right to renounce his U.S.

citizenship during the course of his incarceration"), *aff'd sub nom. Kwok Sze v. Kelly*, 2017 WL

2332592 (D.C. Cir. Feb. 21, 2017); *Scott v. United States*, No. 1:13-CV-2030 LJO-BAM,

2014 WL 2807652, at *2 (E.D. Cal. June 20, 2014) (holding that although "[a] United States

29

citizen has the right to renounce his citizenship[,] . . . Congress has broad authority over the circumstances and the procedures a citizen must satisfy to expatriate") (citation omitted).

Because obtaining an appointment for CLN services within "days or weeks"—particularly during a pandemic—is not a fundamental right under the Fifth Amendment's Substantive Due Process Clause, this Court should analyze the constitutionality of the Department's actions under the rational basis test. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40, 44 (1973) (holding that strict scrutiny was inappropriate and instead applying rational basis review where the challenged action did not "impinge upon constitutionally protected rights"). Under rational basis review, courts uphold government actions that "bear[] some rational relationship to a legitimate state purpose." *Id.*

The Department of State's policies and authorities allowing posts to reduce or temporarily pause appointments for CLN services or use a waitlist for such appointments during the COVID-19 pandemic based on local conditions plainly bear a rational relationship to the legitimate governmental purpose of protecting health and safety. *See, e.g.*, *Simopoulos v. Virginia*, 462 U.S. 506, 519 (1983) (recognizing a state's compelling interest in protecting a woman's health and safety); *United States v. Lafley*, 656 F.3d 936, 940–41 (9th Cir. 2011) (recognizing the government's compelling interest in protecting the health and safety of prison inmates). This conclusion is best illustrated by the way the services of various posts have fluctuated based on local pandemic conditions, with posts increasing their consular services whenever it is safe and feasible to do so. *See, e.g.*, Benning Decl. ¶ 33 (describing the U.S. Embassy Singapore's resumption of all routine consular services in October 2020 based on less severe local pandemic conditions and decreasing consular services again in May 2021 based on more strict local restrictions due to the Delta variant). Indeed, as noted *supra*, the Department, in the face of

resource limitations wrought by the pandemic, had to reallocate resources away from CLN services precisely for the purpose of prioritizing its role to assist U.S. citizens in emergent situations. Because the Department's appointment procedures for CLN services amply satisfy rational basis review, this Court should reject Plaintiffs' Fifth Amendment claims.

Even conceptualizing the right that Plaintiffs assert more broadly—as a right to renounce U.S. citizenship in general—the Court need not decide whether such a broad right exists under the Fifth Amendment's Due Process Clause because the Department's current procedures for the timing of appointments for CLN services would survive strict scrutiny even assuming, *arguendo*, that such a fundamental right to expatriate existed.[9]  The Department's current practices are narrowly tailored to advance the "compelling governmental interest in allowing the [Department] to balance its competing priorities as it sees fit" in light of the severe constraints that the COVID-19 pandemic has placed on the Department, *Didban v. Pompeo*, 435 F. Supp. 3d 168, 177 (D.D.C. 2020), and the compelling governmental interest in protecting the health and safety of its personnel

---

[9]  No court has ever recognized a broad right to renunciation of U.S. citizenship as fundamental under the Fifth Amendment's Due Process Clause, nor do Defendants concede that such a right exists.  *See, e.g.*, *Farrell v. Pompeo*, 424 F. Supp. 3d 1, 23-24 (D.D.C. 2019) (noting that the Supreme Court and the D.C. Circuit have not recognized expatriation as a constitutional right and holding that, "even assuming the plaintiff ha[d] a constitutional right to expatriate, the Court cannot conclude that the defendants have acted contrary to that right"), *rev'd and remanded on other grounds Farrell v. Blinken*, 4 F.4th 124 (D.C. Cir. 2021); *Kwok Sze*, 172 F. Supp. 3d at 121 ("[T]he Supreme Court has not recognized that the right to abandon one's citizenship constitutes a *constitutional* right."); *see also Lozada Colon v. U.S. Dep't of State*, 2 F. Supp. 2d 43, 45 (D.D.C. 1998) ("[E]ven if one were to concede Plaintiff's argument that an individual has a fundamental right to expatriate, the Secretary of State still would have the discretion to determine whether an individual has adequately renounced affiliation with the United States so as to trigger that right."), *aff'd*, 170 F.3d 191 (D.C. Cir. 1999) (per curiam).  Instead, renunciation has long been understood as a right based in statute.  *See, e.g.*, *Nishikawa v. Dulles*, 356 U.S. 129, 139 (1958) (recognizing that "a citizen has the right to abandon or renounce his citizenship and Congress can enact measures to regulate and affirm such abjuration"); *Leong Kwai Yin v. United States*, 31 F.2d 738, 740 (9th Cir. 1929) (referring to the Expatriation Act as "the only means by which" a native-born U.S. citizen could expatriate).

and of individuals seeking Department services.  The Department's current practices are narrowly tailored because they are locality-specific, with each post having the discretion to determine when it is safe and feasible to resume all consular services and to set their local priorities based on the variety of factors the Chief of Mission must balance.  *See* Benning Decl. ¶ 23.  Thus, at posts that have not yet resumed appointments for CLN services or that are scheduling appointments based on a waitlist, those posts have determined, in their discretion, that they cannot safely provide the service (or cannot provide it at a higher volume) at this time without sacrificing other services of higher priority.  *See, e.g.*, *id.* ¶ 4 (noting that some posts have not yet resumed CLN services because "the conditions have not permitted resumption of those services given competing priorities"), ¶ 8 (stating that emergency American Citizens Services "are generally the ACS unit's top priority"), ¶ 23 (indicating that posts are required to prioritize emergency American Citizens Services under the latest framework for determining when a post should resume various types of consular services).  Because the pandemic-related pausing of appointments for CLN services at certain posts would satisfy even strict scrutiny, the Court need not reach the issue of whether a fundamental right to expatriate exists under the Fifth Amendment and should reject Plaintiffs' Fifth Amendment claim.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss Plaintiffs' claims or, in the alternative, for summary judgment.

Dated:  April 4, 2021                              Respectfully submitted,

                                                   BRIAN M. BOYNTON
                                                   Principal Deputy Assistant Attorney General

                                                   ANTHONY J. COPPOLINO
                                                   Deputy Director, Federal Programs Branch

                                                   */s/ Laurel H. Lum*

32

LAUREL H. LUM
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 305-8177
Email: laurel.h.lum@usdoj.gov
*Counsel for Defendants*