**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

L'ASSOCIATION DES AMÉRICAINS
ACCIDENTALS, et al.,

       *Plaintiffs*,

       v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

       *Defendants*.

Case No. 1:21-cv-02933-TNM

## DECLARATION OF PRINCIPAL DEPUTY ASSISTANT SECRETARY OF STATE

## FOR CONSULAR AFFAIRS DOUGLASS BENNING

I, Douglass Benning, do hereby state and declare as follows:

1. I am the Principal Deputy Assistant Secretary for Consular Affairs. Under the direction

    of the Secretary of State, the Bureau of Consular Affairs formulates and implements

    policy relating to international travel and consular services, initiates consular policy

    changes, and provides guidance and recommendations on related foreign policy issues to

    Department principals and U.S. embassies and consulates. The Bureau of Consular

    Affairs is responsible for the welfare and protection of U.S. citizens abroad, for the

    issuance of passports and other documentation to citizens and nationals, and for the

    protection of U.S. border security and the facilitation of legitimate travel to the United

    States. The Bureau of Consular Affairs also has a significant domestic presence, most

    notably the 26 passport agencies that deal directly with the U.S. public. Responsibility

    for these functions is vested within the Department of State in the Assistant Secretary for

1

Consular Affairs and for their implementation abroad in consular officers assigned to U.S. embassies and consulates.

2. I have been employed by the U.S. Department of State (the Department) since 1996, when I joined the foreign service, and working as the Principal Deputy Assistant Secretary for Consular Affairs since 2021. I served as Deputy Assistant Secretary for Resources and Executive Director in Consular Affairs from 2017 – 2021; as Senior Advisor in Consular Affair's Executive Office from 2016 – 2017; and Director of Domestic Operations in the Office of Visa Services in Consular Affairs in 2015. In addition, I served overseas as Consul General in Tegucigalpa, Honduras; Special Consular Services Chief in London, as well as tours in Prague and Mexico City. I also served domestically as a Deputy Executive Secretary at the National Security Council, in the Executive Secretariat, at the Foreign Service Institute, and as Director of the State Department Operations Center. I submit this declaration to describe the country-specific conditions that supported the temporary suspension of appointments for Certificate of Loss of Nationality of the United States (CLN) services during the pandemic at certain U.S. embassies and consulates ("posts") and the maintenance of a waiting list for such services at other posts, in an effort to manage the many competing demands for consular services around the world.

3. The following statements are based on my experience serving as the Principal Deputy Assistant Secretary of State for Consular Affairs and knowledge and information obtained in the course of my official duties.

4. Two of the highest priorities of the Department of State are the protection and safety of U.S. citizens abroad and national security. The facilitation of legitimate travel to and

2

from the United States for both U.S. citizens and visa holders, in line with Congressional intent expressed in the Immigration and Nationality Act, is also one of the Department's key responsibilities.  While the Department recognizes its role in administering CLN services overseas, the COVID-19 pandemic has caused significant resource constraints. The Department has made every effort to balance its obligations to provide U.S. citizens who are in danger the emergency services they require, to enforce the laws Congress has made regarding immigration, and to recover from the significant financial, practical, and personnel constraints resulting from the pandemic itself.  An unfortunate consequence is that at many U.S. embassies and consulates, CLN services were unavailable for a time, and at some U.S. embassies and consulates, the conditions have not permitted resumption of those services given competing priorities.

5.  For context, the United States has 235 embassies and consulates overseas that provide consular services.  A U.S. embassy generally is located in the capital of the host country, and U.S. consulates generally are located outside of the capital in areas where U.S. citizens reside and/or visit.  U.S. embassies and consulates are staffed by a mixture of U.S. direct hire foreign service officers, other foreign service personnel, eligible family members (EFMs), and locally employed staff (LE staff), persons who often are nationals of the host country.  In addition, there may be U.S. direct hires from other federal agencies who are posted at a U.S. embassy and who are under "Chief of Mission" authority, i.e., who are under the supervision of and take direction from the U.S. Ambassador (Chief of Mission) to the host country. 22 U.S.C. § 3927.

6.  U.S. embassies and consulates perform many functions and consist of many separate but related sections, such as the political section, the economic section, the public affairs

section, and the consular section.  As mandated by law, consular sections of U.S.

embassies and consulates around the world provide a panoply of services to serve and

protect U.S. citizens abroad and provide immigration-related services to foreign

nationals, most notably processing and adjudicating immigrant and nonimmigrant visa

applications.

7.  For purposes of this declaration, U.S. embassies and consulates will be referred to as

"post" or "posts" and the discussion of "routine" and "emergency" services will refer to

routine and emergency consular services, including visa services.  American Citizens

Services (ACS) refers to consular services unrelated to the administration of U.S.

immigration law.  "The Department" or "the Bureau of Consular Affairs" refers to those

working at the Department of State in Washington, D.C., as opposed to those at post.

8.  ACS units overseas have three main areas of responsibility:  special consular services

(SCS), routine services, and consular crisis preparedness and response.  SCS, also known

as emergency ACS services, i.e., services provided to U.S. citizens in distress, are

generally the ACS unit's top priority.  These services include, but are not limited to,

assisting U.S. citizen minors who are found abandoned overseas; locating and assisting

missing or ill U.S. citizens; providing emergency financial and medical assistance;

assisting victims of crime, hostages, and those kidnapped for ransom; services for U.S.

citizens arrested abroad; and assisting with matters related to international parental child

abduction and international adoption.  In addition, consular officers have a significant

role in cases of death of U.S. citizens overseas, including identification of and timely

notification to the next of kin, assisting the next of kin with disposition of remains,

provisional conservation of estates, and preparing documentation of the death.  Routine

American Citizen Services include non-emergency passport and Consular Report of Birth Abroad (CRBA) services, notarial and authentication services, CLN services, voting assistance, federal benefits services, consular judicial assistance, and trusts processed out of the Bureau of Consular Affairs, Overseas Citizens Services Directorate (OCS trusts). ACS units are also responsible for preparing for and responding to crises, including pandemics, civil unrest, natural disasters, and mass casualty events. Finally, ACS units also ensure that U.S. citizens overseas have access to U.S. government safety and security information.

9. To maximize efficiency and provide higher-demand services to the largest population possible while retaining capacity to widely provide other services, certain consular services may only be offered at certain posts within a mission. For example, in Mission Brazil, one of the largest U.S. missions, all immigrant visa applications are processed at Consulate General Rio de Janeiro. Mission France follows a similar model, managing all CLN services at two of its six posts, Paris and Marseille. Consolidating services at specific posts helps manage workflow, develop consular staff expertise, and, as particularly relevant in the pandemic, reduce competition for waiting room space.

10. Consular staff time is a scarce resource and must be portioned out for the various services offered at post. Consular sections vary greatly in size and staffing, from posts with only a part-time consular officer and a single consular LE staff to posts with more than 180 consular staff. Most consular sections rely heavily on LE staff to assist in administrative tasks. When demand for any particular service surges, such as visa services, for example, consular officers who may normally provide ACS services may be temporarily re-tasked to handling the visa surge. In addition, most consular sections are physically small,

meaning social distancing and congregate setting limitations impact how many persons can be present in the space (office area, visitors waiting room, or lobby) at one time.

11. As relevant to this suit, one of the many functions of consular staff is to process requests to take the oath of renunciation of U.S. citizenship.  The first step in a request for a CLN under Immigration and Nationality Act Section 349(a)(5) (taking the oath of renunciation) is a request for the service (often by email) and post's provision of links to or hard copies of written material explaining the process and the consequences of loss of U.S. nationality.  After the requester has reviewed the material, the next step is an initial interview with a U.S. consular or diplomatic officer.  This interview is typically in person; however, it is possible to conduct the first interview telephonically and, in certain exceptional circumstances, electronically (i.e., by email) as provided in the Foreign Affairs Manual, 7 FAM 1260.  The U.S. consular or diplomatic officer must confirm that the requester is a U.S. citizen to be eligible for the service.  Given the significant legal consequences and the history of litigation involving requests to vacate Department determinations of loss of U.S. nationality, consular officers are expected to undertake in-depth interviews to ensure that individuals understand the irrevocability of their actions and the import of loss of U.S. nationality.  Consular officers must also be confident that persons seeking a CLN are choosing to do so of their own free will and are not acting irrationally or exhibiting other behavior that may call into question voluntariness and/or the ability to form the requisite intent to relinquish U.S. nationality.  CLN interviews can be one of the more in-depth interviews conducted by consular officers.

12. After the first interview, the individual must then schedule an appointment to take the oath of renunciation "before a diplomatic or consular officer of the United States in a

foreign state." INA 349(a)(5). Because the consular officer must assess whether the U.S. citizen is acting voluntarily, without duress or coercion, and has the capacity to form the requisite knowing intent to relinquish U.S. nationality, every person seeking a CLN must appear in person before a consular officer for a second, in-person interview before the process can be completed. In INA 349(a)(5) (oath of renunciation) cases, the in-person nature of the interview allows the consular officer to observe the requester's demeanor, composure, and state of mind at the moment of the requester's performance of the potentially expatriating act (taking the oath of renunciation). The consular officer may observe reluctance, fear, disorientation, incoherence, or, on the other hand, satisfaction or relief. During the in-person interview, the consular officer reviews with the requester each item of the DS-4081, Statement of Understanding Concerning the Consequences and Ramifications or Relinquishment of U.S. Nationality, along with any statement the requester wishes to attach to that form. On a case-by-case basis, the consular officer provides additional information and/or asks follow-up questions to inform the evaluation of voluntariness and intent, on such topics including but not limited to maturity, mental capacity, parental coercion, economic coercion, and statelessness. The consular officer also reviews with the requester the DS-4080, Oath/Affirmation of Renunciation of Nationality of the United States, and answers any questions. Once the interview is complete and the requester decides to proceed with taking the oath of renunciation, the consular officer collects the consular services fee and administers the oath.

13. Once the oath of renunciation has been administered, the consular officer compiles the CLN package, including a memorandum recommending approval or denial of the request for a CLN, and transmits it electronically to the Department, specifically, to the Office of

7

American Citizens Services in the Directorate of Overseas Citizens Services within the Bureau of Consular Affairs (CA/OCS/ACS), for review and decision. This review is necessary to determine whether the burden of proof has been met and that a finding that the individual has voluntarily and intentionally renounced U.S. citizenship is warranted, and to ensure that the documentation of loss of nationality is correct. Once CA/OCS/ACS' review is complete, post is notified electronically and, if CA/OCS/ACS approved the request, post prepares original documents for execution and issuance, sending one original copy via secure mail pouch to the Department. CA/OCS/ACS then mails copies of the approved CLN to other federal agencies as mandated by statute and the Foreign Affairs Manual, 7 FAM 1240. This review process generally requires the reviewer to be physically present at the Department to access consular systems generally unavailable in the telework environment.

14. Since early 2020, consular sections' crisis response work and emergency services responsibilities, such as travel documents for stranded U.S. citizens, have increased exponentially, requiring posts to focus their limited resources on assisting those in critical need. For example, between January 2020 and June 2020, ACS units helped to orchestrate the repatriation of over 100,000 individuals whose travel was disrupted due to the pandemic. Consular officers further played a central role in the Afghanistan evacuation mission that took place in the summer of 2021, assisting U.S. citizens evacuating, processing immigrant visas for Afghans, and responding to enormous volumes of congressional inquiries. To this day, several posts continue to have a large role in facilitating the resettlement of Afghans who were brought to safe havens around the world, and more recently, assisting refugees from the war in Ukraine. Because of

8

these emergent needs, for several months, applying for a U.S. passport required proof of a life-or-death emergency, simply because the restrictions and pressures on posts made it impossible to offer anything more.

15. While demand for services was increasing, COVID-19 introduced significant challenges to delivering those services because of the paramount need to protect the health and safety of post staff, persons seeking consular services, and the general public.  The COVID-19 pandemic has drastically reduced the number of people who can safely be present at post on any given day.  Posts have implemented numerous safeguards intended to reduce the transmission of COVID-19, such as implementing physical distancing in post facilities (including waiting rooms and workspaces), disinfecting high-touch areas before each new group is allowed to enter a space, and staggering in-office schedules for consular personnel, all of which limits the number of applications and/or appointments that posts are able to process in a day.  Importantly, posts are generally required to respect host country local health and safety regulations, including mandatory quarantines or stay-at-home orders and restrictions on public movements, which in many cases have been more restrictive than those imposed in the United States.

16. Compounding these issues are staffing shortages brought on by the pandemic and other crises.  The Bureau of Consular Affairs' operations are largely fee-funded:  most of our consular operations overseas and domestically are paid for by revenue from the services the Bureau provides—mainly passport and visa fees.  The dramatic loss of revenue that occurred after many posts suspended routine consular operations in March 2020 led to budgetary challenges in FY 2020 and FY 2021 that adversely affected the Bureau's ability to staff posts with new officers, LE staff, and EFMs, leaving some posts with less

than 50 percent of their authorized positions filled.  In addition, the staffing levels at
many posts have been reduced by employees' illnesses, absences to care for family
members, or mandatory quarantines after possible exposure to the virus.  Other ongoing
Department and in-country consular crisis support and contingency planning in Ethiopia,
Kazakhstan, and Ukraine, among other countries – limited the Bureau of Consular
Affairs' ability to support posts via temporary duty assignments (i.e., short-term staffing
assignments of direct hires from the Department and/or from other posts).

17. As with other global operations in every sector of the economy, the logistical challenges
of onboarding new officers and other staff during the COVID-19 pandemic further
complicated efforts to resume normal operations.  Among other issues, necessary training
for new officers was delayed, and newly arrived officers were required to quarantine
pursuant to host country laws.

18. Specifically, on March 14, 2020, the Department announced Global Authorized
Departure, allowing for individuals at higher risk from COVID-19 to depart post and
return to the United States, which led to a dramatic reduction in overseas consular
staffing.  On March 17, 2020, the Office of Management and Budget ("OMB") directed
all agencies to "take appropriate steps to prioritize all resources to slow the transmission
of COVID-19, while ensuring our mission-critical activities continue."  See Attachment
A, Director, Office of Mgmt. and Budget, Federal Agency Operational Alignment to
Slow the Spread of Coronavirus COVID-19 (Mar. 17, 2020), available at
https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf (last visited
March 21, 2022).  In response to the pandemic and the OMB directive, the Department
suspended all routine visa services due to the COVID-19 pandemic on March 20, 2020,

allowing only "emergency and mission critical services" while continuing to prioritize otherwise reduced U.S. citizens services per 20 STATE 30920. *See* Attachment B. The Department advised overseas posts to "utilize the entire consular section staff" to attend to U.S. citizen emergency services at the onset of the pandemic. Additionally, the Department issued guidance on April 8, 2020, indicating that "only those members of our team [Department employees] who must perform mission-critical work that cannot be performed remotely should be in Department/mission facilities." Attachment C, 20 STATE 36876. Notwithstanding this guidance, the Department consistently emphasized the importance of emergency U.S. citizen services, including on May 1, 2020, advising posts to prioritize prison visits and access to quarantined U.S. citizens, deaths of U.S. citizens abroad, U.S. citizen victim assistance, welfare and whereabouts cases, and emergency financial and medical assistance. Attachment D, 20 STATE 43130. This same guidance reiterated that physical presence at post should be limited only to "mission-critical work that cannot be performed remotely," and referenced the Department's limited ability to process all but "compelling emergency" requests for a CLN under pandemic operating conditions. *Id.*

19. On May 1, 2020, pursuant to his delegated authorities under 22 U.S.C. 2651(a), the Under Secretary of State for Management approved and released the Diplomacy Strong Framework ("Diplomacy Strong"), which was the Department's phased approach for resuming in-person operations in a safe and secure manner. *See* Attachment E, 20 STATE 46900.

20. Using the Diplomacy Strong framework, the Department devised a plan for resuming some consular services at overseas posts and communicated the details of that plan to all

posts on May 14, 2020. *Id.* The three operational phases of Diplomacy Strong provided overseas posts considerations to balance competing workload demands for consular services against the backdrop of a global pandemic.[1] Phase One contemplated providing only emergency ACS services, Phase Two included resumption of some limited routine passport and CRBA appointments, as well as federal benefits and voting assistance, and finally, Phase Three permitted all U.S. citizen services in full to include passport, CRBA, CLN, notarial, and federal benefits services. *See id.* Ultimately, Chiefs of Mission were given the discretion to set conditions at post using the guidance offered in the Diplomacy Strong framework. *See id.*

21. Throughout 2021, while the availability of vaccines enabled some posts to resume routine services, most continued to operate under COVID-19-related restrictions that have decreased their capacity to schedule appointments due to local mitigation measures. For example, strict social distancing requirements limit posts' waiting room capacities. On May 19, 2021, the Department reminded posts to prioritize special consular services, followed by CRBA and passport appointments to ensure "U.S. citizens in-country [abroad] have valid U.S. passports, minimizing the need for emergency passport issuance in case of an evacuation or other emergency." Attachment F, 21 STATE 52112. Similar Department guidance on June 1, 2021, reiterated maximum prioritization of emergency citizen services and established a threshold that "emergency passport appointments must be available within two days, routine [passports] within six weeks." Attachment G,

---

[1]  Phase Zero of Diplomacy Strong represented a complete closure of a facility and mandatory telework for those eligible to do so thus providing no in-person services except for life and death emergencies where possible.

21 STATE 57154.  Emergency/mission critical visa services were listed as the next priority, "followed by all other visa applications and other case work." *Id.*

22.  As the pandemic advanced, the Department instituted firmer benchmarks for delivering consular services while prioritizing competing demands.  As in prior guidance, 21 STATE 69026, dated July 1, 2021, stated that "ACS [U.S. citizens] emergency services must come first.  Beyond that, the services for which we [the Department] have developed benchmark appointment wait times are routine passport and CRBA cases and certain [immigrant visa] cases.  For routine passport and CRBA adjudication, the benchmark scheduling timeframe for first-time cases is six weeks or fewer." *See* Attachment H.  Throughout this time of recalibration, the Department implemented innovations to allow posts additional flexibility for scheduling in-person appointments. For instance, 21 STATE 115378 from November 16, 2021, highlights the DS-82 Repatriation Program in which posts can transfer certain U.S. passport renewal cases to the United States for processing domestically in order to free up consular officer time for other tasks. *See* Attachment I.  These innovations and benchmark standards underscore the Department's continual earnest efforts to manage competing demands for consular services during the pandemic.

23.  While the Department in November 2020 ended the link between a particular Diplomacy Strong phase and the provision of immigration-related services, the Department continued to operate under the Diplomacy Strong framework for the purpose of prioritizing ACS services until September 2021, when the Department replaced the Diplomacy Strong framework with the COVID-19 Mitigation Process (CMP).  The CMP shifts the focus on operational status from strictly controlling what percentage of

employees can be present in the office to more holistic decision-making on workforce posture and mitigation measures by reviewing four local risk indicators: COVID-19 community transmission, employee vaccination status, local hospital capacity, and local conditions. These indicators determine the workplace posture at individual Department facilities defined as: mission-critical functions only, mission-critical and on-site dependent functions only, or all functions. Per 21 STATE 99942, "passport services" and "emergency ACS services" are explicitly listed as mission-critical. The authority to evaluate the situation at any given facility rests domestically with a committee, and overseas with the mission's leadership and is to be integrated into their Emergency Action Plans. *See* Attachment J. It should be noted, however, that the CMP did not alter the Bureau of Consular Affairs' previous guidance regarding the prioritization of ACS services – CMP is about maximizing the work that can be done safely based on a variety of metrics but does not change the priority of the work to be done.

24. The emergence of the Delta and Omicron variants caused local lockdowns and significant increases in infection rates and undermined some of the Department's progress toward a return to normal operations. Several host country governments reimposed or made more stringent their entry requirements, and some consular sections had to significantly reduce the number and type of services offered after a significant portion of consular staff contracted COVID-19.

25. In addition to providing American Citizens Services, most consular sections also provide immigration-related services, primarily by processing and adjudicating nonimmigrant (NIV) and immigrant visa (IV) applications. As noted above, providing visa services is a significant portion of workload at post, which takes both consular officer time and

waiting room space in a period when both are scarce.  Prior to the COVID-19 pandemic, one of the principal considerations for managing its visa-related workload was the ability to meet demand for the services.  Consistent with the direction provided by OMB, the Department suspended routine visa services March 2020, and announced that it was beginning a phased resumption of routine visa services in July 2020.   However, as most visa applicants generally are required to make a personal appearance before a consular officer, the Department has had limited flexibility to manage this workload, which has resulted in significant delays and increased wait times.  The Department has sought to prioritize certain applications for immediate family members to ensure family separation between U.S. citizens and their spouses and children is kept to a minimum.  To further the goal of family reunification, and consistent with explicit Congressional direction, the Department strives to adjudicate immediate relative cases and nonimmigrant K visa applications of fiancés of U.S. citizens within 30 days, and family preference cases within 60 days of the receipt of all necessary documents.  From November 2020 until November 2021, the Department instructed posts to process all visa applications and to provide other immigration-related services in accordance with a tiered-prioritization plan.

26. Additionally, COVID-19-related travel restrictions imposed by Presidential Proclamations on certain countries included an exception for individuals whose travel was in the national interest.  The responsibility to consider requests for national interest exceptions (NIEs) created a considerable new workstream for consular sections situated in countries subject to such Proclamations.  One such Proclamation, 9993 (85 Fed. Reg. 15045 (Mar. 16, 2020)), imposed entry restrictions on individuals in Schengen area countries, including Germany, France, Finland, the Netherlands, Switzerland, and

15

Liechtenstein. Consular sections abroad adjudicated hundreds of thousands of requests for NIEs, ultimately granting over approximately 450,000 NIEs while those Proclamations were in effect.

27. The COVID-19 pandemic has caused a large increase in the backlog of applicants waiting for immigrant visa appointments. In Calendar Year 2019 on average, 60,866 applicants were pending the scheduling of an IV interview each month. As of July 2021, there were approximately 531,976 documentarily qualified immigrant visa applicants awaiting interview appointments. By February 2022, that number has declined to approximately 436,666 documentarily qualified immigrant visa applicants awaiting interview appointments. The backlog figures do not account for Diversity Visa applicants for whom the Immigration and Nationality Act establishes a cap of up to 55,000 visas per fiscal year. The backlog numbers are updated and archived monthly at the following site: https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html.

28. In November 2021, the Department instructed posts that handle visa services to re-introduce routine services for nonimmigrant visa applicants, including applicants seeking work and tourism visas (21 STATE 115378). Reintroducing such a high-volume service only compounded the stiff competition for consular officer and staff time as well as waiting room space. However, resuming these routine nonimmigrant visa services after an unprecedented disruption is an important administration priority. Nonimmigrant visas generate considerable economic activity in the United States, particularly in industries hardest hit by the pandemic. To illustrate the pent-up demand for nonimmigrant visas after lengthy reductions in services, in FY 2019, the last full fiscal year prior to the

16

pandemic, the Department issued 6,470,961 nonimmigrant visas for temporary tourist or business travel or border crossing cards.  In FY 2021, preliminary statistics reveal that the total number of temporary tourist and business visas and border crossing cards issued was 1,343,787, a decrease of 79.2 percent.  Two major goals for the Department are reducing the immigrant visa backlog and increasing nonimmigrant visa processing to bring both more in line with pre-pandemic levels.  Similarly, there has been a significant increase in the backlog of individuals waiting for an appointment to take the oath of renunciation and other American Citizens Services.  Those backlogs were directly driven by the challenges of meeting demand due to COVID-19 restrictions as already discussed. In FY 2019, the Department processed approximately 529,000 DS-11 and DS-82 passport applications at our overseas posts.  In FY 2020, that number dropped to approximately 310,000, a drop of approximately 41 percent.  During the same periods, CLN services fell from 4,329 to 2,440, a roughly similar drop of 43 percent.

29. Each post must make tough prioritization and resource allocation decisions when faced with these competing demands.  Posts have been working tirelessly to recover from the backlogs created by the pandemic and, where possible, to resume routine services as appropriate based on local COVID-19 conditions and staffing capacity.

30. The following are short summaries of local conditions at the posts named by plaintiffs in this case, which illustrate how the recent resurgence of COVID-19, particularly the recent Omicron variants, has hampered the Department's efforts significantly.  Some of this information is reflected online, so links are provided to each mission's public website:

31. Germany: The U.S. Mission to Germany comprises Embassy Berlin, Consulate General Frankfurt, Consulate General Munich, Consulate Hamburg, Consulate Duesseldorf,

Consulate Leipzig. https://de.usembassy.gov/. Only the Consulate General in Frankfurt provides CLN and immigrant visa services in Germany. A subset of consular services is also available at Embassy Berlin and Consulate General Munich. Across Mission Germany, all routine ACS (U.S. citizens) services – passports, CRBAs, and CLN services – were suspended in March 2020 to comply with Department of State guidance and German health regulations. Consulate General Frankfurt reinstated routine passport and CRBA services in June 2020 alongside certain immigrant visa services in accordance with Department prioritization guidelines and Frankfurt's role as Mission Germany's sole immigrant visa processing post. At the same time, post was addressing an onslaught of requests for exception to the ban on the travel to the United States from the Schengen region, approving 42,422 National Interest Exception (NIE) requests. In December 2020, the Government of Germany imposed further restrictions and Consulate General Frankfurt was forced to revert to providing only emergency services until March 2021, at which point a reduced subset of services was again made available. Most normal services returned briefly in July, but then from August to October 2021, a significant portion of Mission Germany's consular officers were diverted from their normal duties to assist thousands of U.S. citizens and foreign nationals who had arrived at Ramstein Air Base after having evacuated Afghanistan. Post was slowly working towards normal operations when the Omicron variant again forced a reduction in services. Because of the significant competing pressures on post's resources and personnel, CLN services, including oath of renunciation services, have not yet resumed. Assuming conditions remain stable, Post intends to resume offering CLN appointments in April. According to Department records, the following Plaintiffs first made contact with Post Frankfurt

seeking CLN services on the listed dates:  Plaintiff Joshua Grant on August 17, 2020, and

Plaintiff Kristopher Lazarz on September 19, 2021.  Post Frankfurt has approximately

900 people awaiting CLN services, and they will be given appointments in the order they

were received.  Plaintiffs Lazarz and Grant are approximately in the middle of the wait

list.

32. France:  The U.S. Mission to France comprises Embassy Paris, Consulates General

Marseille and Strasbourg, and American Presence Posts in Rennes, Bordeaux, and Lyon.

https://fr.usembassy.gov/.  Only Embassy Paris and Consulate General Marseille offer

CLN services.  Paris and Marseille suspended all but emergency services in March 2020

as a result of the pandemic.  Some routine consular services began resuming in June

2020, although in very limited numbers to comply with French health guidelines, under

which Embassy Paris was limited in the number of applicants in the waiting room, as low

as a total of 10 applicants at a time for all consular services.  In Marseille, only two

applicants at a time could occupy the waiting room, limiting appointments for the array

of consular services.  Lockdowns and restrictions have been strict during the five separate

COVID-19 waves.  In Paris, ACS staffing fell significantly due to resignations,

retirements, and long-term medical leave, depleting post's resources to process all

services.  Like many other European posts, Mission France handled a crushing national

interest exception (NIE) visa workload for much of 2020.  Despite these challenges,

Embassy Paris and Consulate General Marseille have resumed CLN services.  Embassy

Paris plans on doubling the number of available appointments from two to four per week

when conditions allow, and Marseille will continue to offer 2-3 appointments per week as

emerging circumstances allow.  Staffing limitations and waiting room size, however,

require that Paris' CLN services remain restricted to ensure other vital services for U.S. citizens abroad are available.  Post Paris has a current wait list of just over 150 people seeking CLN services, and requestors are receiving appointments in the order in which the requests were received.  According to Department records, the following Plaintiffs first made contact with a post in France seeking CLN services on the listed dates: Plaintiff Sofiann Thoulon, presently 120 on the Paris wait list, on February 11, 2021; Plaintiff Lilian Pam, presently 13 on the Paris wait list, on May 19, 2020; and Plaintiff Philip Boeffard, presently 152 on the Paris wait list, on April 23, 2021.  Mr. Boeffard's initial contact with Post was through counsel and did not identify the name of the individual seeking CLN services until February 2022.  As such, despite his initial date of contact through counsel, he was not placed on the wait list until he was identified by name.  There is no record of Plaintiff Anne Misslin contacting a post in France seeking CLN services.  Post Marseille has a wait list of approximately 60 people waiting for CLN services, none of whom are Plaintiffs in this case.  Plaintiff Pam sent an initial inquiry to Consulate General Marseille in October 2020, but never responded to post's reply email, and therefore was not placed on the wait list.

33. Singapore: The U.S. Embassy in Singapore is the sole U.S. post in Singapore. https://sg.usembassy.gov/.  Post suspended all but emergency consular services from April 7, 2020, to June 1, 2020.  In June 2020, post resumed certain categories of visa services and most routine ACS services – except CLNs and notarials – pursuant to the Diplomacy Strong framework.  Post requested and received special permission to resume CLN services on August 28, 2020, to attend 70 pending CLN cases.  In October 2020, Post resumed all routine consular services under Diplomacy Strong Phase 3.  Post

reverted back to Diplomacy Strong Phase 2 in May 2021 when the Government of

Singapore tightened COVID-19 related restrictions due to the Delta variant, which meant

that CLN services were again suspended.  Certain restrictions remained in place until

November 2021.  Post also faced personnel issues with the unexpected departure of a

number of staff who were experienced with CLN work.  With the arrival of new ACS

staff, post resumed CLN services in late January 2022.  According to Department

records, Plaintiff Christopher Bousigues first made contact with post Singapore seeking

CLN services on May 26, 2021.  Mr. Bousigues completed his final interview and oath of

renunciation on March 21, 2022.

34. The Netherlands:  U.S. Mission to the Netherlands comprises U.S. Embassy The Hague

and U.S. Consulate General Amsterdam. https://nl.usembassy.gov/.  Amsterdam is the

sole consular services post for the Netherlands.  Amsterdam provides the full range of

immigrant visa, nonimmigrant visa, and ACS services, including CLN services.  Post

suspended all routine consular services from March 28 to June 1, 2020, to comply with

Dutch regulations.  During this time, post continued accepting requests for a CLN and

provided requesters with acknowledgement letters to submit to Dutch banks.  During the

pandemic, though routine NIV services were greatly reduced by various Presidential

Proclamations, Post instead processed more than 6,000 NIE requests in addition to

providing normal ACS services, processing COVID-19-related repatriations, and

assisting approximately 140 Afghans evacuated from Kabul in August 2021.  Post

resumed routine passport and CRBA services on June 1, notarial services on September

1, and CLN services on October 9, 2020.  Due to post's small waiting room and Dutch

health regulations, it was more efficient for post to prioritize passport, CRBA, notarial,

and CLN processing over non-immigrant visa processing.  As a result, CLN processing has actually increased during the pandemic.  Before the pandemic, in FY 2019 (October 1, 2018 - September 30, 2019) post processed eighty-four CLNs.  In FYs 2020 and 2021, CLNs processed grew from 129 to 181, respectively.  To address CLN demand, post has designated days to solely process CLN requests.  In December 2021, post processed seventy-one CLN cases on three consecutive days, and post intends to continue offering one dedicated CLN processing day every other month in 2022.  Post's next CLN day is Friday, March 25 for which they have 40 appointments scheduled and post continues to schedule additional CLN appointments when there is availability on the calendar.  According to Department records, Plaintiff Mark Lewis has not contacted post Amsterdam seeking CLN services.  Post Amsterdam currently has a wait list of approximately 140 people for CLN services.

35. Finland:  The U.S. Embassy in Helsinki is the sole U.S. post in Finland, and the small consular section (less than 10 employees when fully staffed) provides the full range of consular services. https://fi.usembassy.gov/.  Post suspended all visa services in March 2020 and offered extremely limited passport, CRBA, and notarial services from March 2020 until June 2020.  Local municipal regulations instituted indoor capacity guidelines periodically throughout the pandemic which influenced the number of appointments post scheduled to ensure wait room capacity did not grow beyond local guidelines.  Regular passport, CRBA, and notarial services resumed in June 2020 at limited numbers.  Post has historically had a low demand for CLN services, processing only six in 2019 before the pandemic.  CLN services were not resumed after initial suspension due to the time-intensive processing, post's historically low demand, and staffing gaps.  In such a small

section, staffing gaps can cause particular disruption, and post faced several such gaps caused by sudden departures, unexpected medical leave, delayed arrivals, and temporary assignments to Afghanistan to support evacuation operations. Consequently, Embassy Helsinki was unable to process any CLNs in 2020 or 2021. With limited staff and limiting health protocols, throughout the pandemic post prioritized U.S. passport services for U.S. citizens in Finland over renunciation and notarial services to comply with Finnish banking regulations. As a result, post processed 619 passports in calendar year 2020 and 805 in 2021, attending to a pandemic-driven backlog while prioritizing U.S. citizens' access to monetary resources in Finland. Post scaled down operations to mission critical/on site dependent at the onset of Omicron in January 2022. This followed Department guidance and local Finnish guidelines, which recommended maximum telework in January 2022. Other surges, such as Delta, affected how much staff was working on-site at the embassy. Staff was at 80% in office for most of fall 2021 then returned to 100% in office in December 2021 only to return to 50% staffing in January 2022. Post has since hired a new EFM to process, among other consular services, CLN cases. This EFM along with a single consular officer are the entire consular section staff in Helsinki currently. According to Department records, Plaintiff Martin Kracklauer first contacted post Helsinki seeking CLN services in October of 2020. Assuming current conditions persist, Post Helsinki intends to resume CLN appointments in April, at which point Mr. Kracklauer is first on the wait list to receive a CLN appointment.

36. <u>Switzerland and Liechtenstein</u>: Embassy Bern's Consular Section provides a full range of consular services for the estimated 35,000 U.S. citizens resident in Switzerland and

Liechtenstein, in addition to the estimated 13,000 U.S. citizens in Iran through the Swiss

Protecting Power. https://ch.usembassy.gov/.  Services are provided at the Embassy in

Bern and through the two consular agencies in Zurich and Geneva, and in Tehran.  Post

suspended all routine consular operations in March 2020.  In July 2020, many Swiss

restrictions were lifted, and the consular section focused on U.S. passport issuance to

ensure those needing to travel during the pandemic were able to do so.  However, with a

limited number of people allowed in waiting rooms under Swiss law, CLN services were

restricted to emergency requests.  As a result of these restrictions, Embassy Bern's CLN

appointment backlog grew to over 600 appointments.  Once demand for passports

subsided, starting on September 1, 2021, post was able to resume normal CLN services.

Although the number of people post can accommodate in their waiting room continues to

be limited by local mitigation measures, since that time, post has processed over 300

CLN appointments and is on track to exceed pre-COVID levels.  For context, post's pre-

pandemic CLN workload was 524 cases for the year 2019.  However, because there are

limited number of CLN appointments available worldwide, the number of requests for

appointments continues to increase to beyond 2019-levels.  Post has hired a part-time

locally employed staff member to assist with the CLN backlog.  According to

Department records, Plaintiff Stephen Collins first contacted post Bern seeking CLN

services on September 14, 2021.  As of March 22, Mr. Collins is number 330 of Bern's

wait list of almost 700 people awaiting appointments.  At current pace, it is estimated he

will receive an appointment in August or September of 2022.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 4th day of April, 2022.

Douglass Benning
Principal Deputy Assistant Secretary of State
for Consular Affairs
U.S. Department of State

# ATTACHMENT A



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

March 17, 2020

M-20-16

MEMORANDUM FOR THE HEADS OF DEPARTMENTS AND AGENCIES

FROM:      Russell T. Vought
           Acting Director

SUBJECT:   Federal Agency Operational Alignment to Slow the Spread of Coronavirus
           COVID-19

The Federal Government is aggressively responding to the coronavirus disease 2019 (COVID-19).  The Federal Government, in partnership with state and local governments and the private sector, is adopting a concerted near-term operations posture that will appropriately align critical resources to slow down the transmission of COVID-19, while also ensuring that Government operations continue.

The Government must thoughtfully manage all our resources in a way that aligns with our desired outcome of slowing the transmission of COVID-19.  This aggressive posture may affect Government operations as agencies work to balance the needs of mission-critical work and greater social distancing.  Consequently, while the Federal Government remains operational, agencies must take appropriate steps to prioritize all resources to slow the transmission of COVID-19, while ensuring our mission-critical activities continue.

In order to achieve this posture, consistent with The President's Coronavirus Guidelines for America, the Government must immediately adjust operations and services to minimize face-to-face interactions, especially at those offices or sites where people may be gathering in close proximity or where highly vulnerable populations obtain services.  Exceptions may be needed when continued operations and services are necessary to protect public health and safety, including law enforcement and criminal-justice functions.  Non-mission-critical functions that cannot be performed remotely or that require in-person interactions may be postponed or significantly curtailed.  Agency heads have flexibility to realign individuals or work units to higher priority activities.

Agency heads shall utilize the full extent of their legal authority and discretion to execute this realignment of non-mission-critical activities, while also ensuring that their agencies continue to serve the American people and operate in the most efficient manner possible to deal aggressively and promptly with the current situation.  Agencies shall communicate with their customers to encourage them to delay transactions which are not time-critical and to ensure that available resources can be re-prioritized to mission-critical activities.  Agencies shall communicate to the public how service levels may be impacted, and should leverage mechanisms for receiving and acting on feedback.

This Memorandum is consistent with the President's declaration of a national emergency pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5191(b), concerning the COVID-19 outbreak.

Specifically, agency plans and operations shall accomplish the following:

- Reduce and re-prioritize non-mission-critical services to free up capacity for critical services;
- Identify and resolve supply challenges that may be limiting factors or bottlenecks;
- Identify a variety of transportation limitations that could impact service delivery;
- Whenever possible and appropriate, leverage existing materials and content relating to authoritative information on COVID-19, share status of Federal actions on https://www.usa.gov/coronavirus, and provide communications in line with the National Response Framework;
- Maximize telework across the nation for the Federal workforce (including mandatory telework, if necessary), while maintaining mission-critical workforce needs;
- Assess professional services and labor contracts to extend telework flexibilities to contract workers wherever feasible;
- Consider streamlining regulations and approval processes for critical services, including issuing general waivers policies and delegating decision-making where appropriate; and
- Ensure agency policies and procedures restrict individuals infected with, or at higher risk for serious illness from, COVID-19 from accessing Federal facilities, in accordance with Centers for Disease Control and Prevention (CDC) guidelines, as well as the Privacy Act of 1974, and other legal requirements.  These agency policies must specifically include considerations not only for Federal employees, but also for contractors and visitors while balancing the needs to perform mission critical functions.  Agencies shall review CDC, as well as U.S. Department of Labor (DOL) guidance below, as well as other appropriate resources, when developing and implementing new or modified policies and processes.
  - CDC Interim Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19)
  - CDC Risk Assessment and Public Health Management Decision Making
  - CDC Interim Guidance for Businesses and Employers
  - DOL Guidance on Preparing Workplaces for COVID-19

**Next Steps**

- Within 48 hours of the issuance of this Memorandum, all agencies must review, modify, and begin implementing risk-based policies and procedures based on CDC guidance and legal advice, as necessary to safeguard the health and safety of Federal workplaces to restrict the transmission of COVID-19.

- As previously directed by the Office of Management and Budget (OMB), agency heads shall review and modify operations that maximize resources and functional areas to deliver mission-critical functions and other Government services safely and efficiently, incorporating the above factors.  Agencies shall work closely with their leads for COOP to fully leverage agencies' authorities to execute their missions during the pandemic.

# ATTACHMENT B

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 20 STATE 30920 |
| **Date/DTG:** | Mar 20, 2020 / 200027Z MAR 20 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | ███████████████████████████████ |
| **Captions:** | SENSITIVE |
| **Reference:** | 20 STATE 28420 |
| **Subject:** | (U) Suspension of All Routine Visa Services due to COVID-19 Pandemic |

1. (U) SUMMARY: All posts and AIT are directed to immediately suspend all routine nonimmigrant and immigrant visa services due to the COVID-19 pandemic. Posts and AIT should continue to provide mission-critical and emergency visa services. All posts and AIT are directed to prioritize services for U.S. citizens. END SUMMARY.

2. (U) This ALDAC instructs all posts and AIT to immediately suspend all routine visa services until further notice. Posts and AIT should continue to provide the visa services described below, to the extent that staff who are required to report to posts for the performance of mission-critical or emergency services are able to do so.

3. (U) Pending further guidance, some examples of mission-critical visa services include:
   - Adoption (only for cases where the PAP is already in-country),
   - Age-Out IV cases,
   - Diplomats and officials,
   - H-2 visas,
   - Medical emergencies,
   - SQ/SI SIV cases, and
   - Other purposes of travel identified by post's senior consular managers or COM as mission-critical.

4. (U) The exceptions to the Presidential Proclamations may also be used as a guide for additional mission-critical or emergency travelers, even in those areas not covered by the Proclamations. See current guidance in REF. In determining the use of scarce resources, posts may want to consider the purpose of travel (e.g., an alien spouse accompanying an evacuating U.S. citizen is mission-critical).

5. (U) Posts and AIT may continue processing interview waiver cases and immigrant visa 221(g) cases not requiring the applicant to come in for an interview as resources allow.

███████████████████████████████████████████████

6. (U) NVC and KCC will suspend most immigrant/diversity visa pre-processing; any immigrant visa applicants whose appointments must be cancelled should be rescheduled by post at a later date once post resumes normal operations.  NVC will continue to process age-out and adoption cases for action at post as resources are available.  Posts and AIT should not designate an alternative IV processing post at this time.  Post may request via NVCExpedite@state.gov that NVC limit expedite inquiries to those with supporting documentation of urgent medical or humanitarian circumstances.  Posts and AIT should contact NVCPost@state.gov to make other adjustments to NVC procedures as appropriate.

7. (U) █████████████████████████████████████████
████████████████████████████████████

8. (U) Posts and AIT should review expedited appointment requests through their GSS system and public email and determine whether a case meets one of the exceptions outlined in the Presidential Proclamations.  National interest exceptions should be rare – for example, in the case of urgent lifesaving medical treatment.  Contact your post liaison in VO/F immediately upon receipt of a credible request for a national interest waiver.

9. (U) **DNA Requests:**  All posts and AIT should stop scheduling and collecting DNA samples for all visa, ACS, and USCIS DNA collection requests until routine services resume.



11. (U) **GSS Posts:**  The GSS vendors stand ready to assist posts with cancelling non-emergency visa appointments.  The GSS Program Team, in concert with VO, has provided both vendors with template language for email cancellation notifications and to post on your GSS website.  You may only adapt that template with post-specific details, such as the date of reduction in service and visa classes affected.  The GSS vendors will continue to provide website and call center services, as well as to collect fees and support appointment scheduling. We suggest you lock/close appointments for several weeks and open up some appointments in the summer.  You should continue to schedule emergency appointments using the GSS standard procedure.  Please alert ███████████████@state.gov if you have any questions.

12. (U) The global template which posts and AIT may use on their GSS websites, as provided to the GSS vendors is as follows.  AIT should modify as appropriate for Taiwan.

"Information for visa applicants regarding novel coronavirus: As of x date, the United States Embassy and/or Consulates in x country/post name is/are cancelling/suspending routine immigrant and/or nonimmigrant visa appointments. [If applicable] From x date, the U.S. Embassy/Consulate is not accepting applications by/through [Interview Waiver, Renewal by Mail, Drop Box, Mail-in] for [list all categories post accepts]. We will resume routine visa services as soon as possible but are unable to provide a specific date at this time. The MRV fee is valid and may be used for a visa appointment in the country where it was purchased within one year of the date of payment. If you have an urgent matter and need to travel immediately, please follow the guidance provided at [GSS Vendors email, website link, or call center number] to request an emergency appointment.

13.



14. (U) **Prioritizing U.S. citizens:** During this period of rapid situational changes, many posts worldwide have already moved consular resources to support ACS units. Many posts have seen large increases in inquiries, both telephonically and by email. Utilize the entire consular section staff to help triage and answer inquiries. Be sure to reach out to CA should post need assistance in fielding inquiries.

15. (U) **Crisis Training:** With the global suspension of routine visa services during the COVID-19 pandemic, CA understands that posts are working at capacity to answer correspondence and provide consular services.



SENSITIVE BUT UNCLASSIFIED

| | |
|---|---|
| **Signature:** | Pompeo |

| | |
|---|---|
| **Drafted By:** | CA:Various Drafters |
| **Cleared By:** | CA:Brownlee, Ian G |
| | CA:Whiteley, John W |
| | CA:Benning, Douglass R |
| | CA/EX:Glazeroff, Josh |

CA/VO:Ramotowski, Edward J



**Approved By:**      CA:Risch, Carl C
**Released By:**      CA_FO
**XMT:**      BASRAH, AMCONSUL; CARACAS, AMEMBASSY; SANAA,
             AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK,
             AMCONSUL; ALEXANDRIA, AMCONSUL

**Dissemination Rule:**      Archive Copy

**UNCLASSIFIED**
SBU

# ATTACHMENT C

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 20 STATE 36876 |
| **Date/DTG:** | Apr 08, 2020 / 082150Z APR 20 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | ███████████████████████████████ |
| | |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 20 STATE 22940 |
| | B) 20 STATE 23560 |
| | C) 20 STATE 24978 |
| | D) 20 STATE 25656 |
| | E) 20 STATE26898 |
| | F) 20 STATE 28378 |
| | G) 20 STATE 30308 |
| | H) 20 STATE 31358 |
| | I) 20 STATE 34008 |
| | J) 20 STATE 35056 |
| | K) 20 STATE 24986 |
| **Subject:** | Workforce Guidance on COVID-19 - Guidance 10 |

1.  (SBU) **Summary:** This cable is the tenth in the series of updates to Department employees and personnel overseas under Chief of Mission (COM) authority from the office of the Under Secretary for Management (M) on guidance related to COVID-19. This cable augments and updates the workforce guidance provided in previous cables (Refs A, B, C, D, E, F, G, H and I). **End Summary.**

2.  (SBU) **On-site Presence**
    During these unprecedented and challenging times, the health and safety of our workforce are truly our priority. The Under Secretary for Management has entrusted each bureau's Assistant Secretary and every Chief of Mission with the responsibility for determining what work may be mission-critical and may require an on-site presence. As previous guidance has indicated, only those members of our team who must perform mission-critical work that cannot be performed remotely should be in Department/mission facilities. Time spent inside Department/mission facilities must be limited to only that amount of time necessary to complete essential work. To protect our workforce and their families, all other work that is telework-eligible needs to be performed remotely. This can include portable work (e.g., reading reports, analyzing documents, setting up conference calls, similar tasks that do not require a physical presence in the office). Employees on Authorized Departure (AD)/Ordered Departure

(OD) must continue to perform work wherever possible: posts and executive offices should work with the employee to find work they can do via telework while on AD/OD (unless in a foreign safe haven location). The Bureau of Medical Services requires all medical staff (MP, RMO, RMO/P, RMLS) on AD/OD to report to duty in Washington DC as they are essential emergency employees. Together our teams working domestically and abroad, at home and in the office, will continue to achieve the Department's vital mission on behalf of the American people.

3. **(U) Cases in Large Facilities like HST**



4. **(U) Contact Tracing and Medical Confidentiality**



5. **(SBU) Weather and Safety Leave while Quarantining**



6.  (SBU) **"Caught Out" While Travelling**





7.   (SBU) **Returning to work**



8.   (SBU) **DPO/Pouch Shipments**

9.  (U) **Use of Zoom for Official Purposes Not Authorized**



10. (SBU) **Returning to Post from Global AD while G/AD is in Effect**
In the interests of preserving the safety and security of persons under COM security responsibility, the Department issued 20 STATE 28418, authorizing persons who determine they are at higher risk of a poor outcome if exposed to COVID-19, or who have other commensurate reason for needing to depart post, to depart.  The Department generally expected that individuals who chose to depart would not return before G/AD terminated.  Given the current COVID-19 crisis, limitations on travel, health considerations, and demand on posts' resources, if an individual who chose to go on G/AD believes s/he has a need to return to post while G/AD remains in effect, s/he should first have a confidential consultation with the Medical Provider at post or the Regional Medical Provider who <u>must</u> concur with the request to return to post.  Having secured MED clearance, the supervisor and COM must likewise concur (without reference to any personal medical information).  Additional approval from M may also be necessary if, for example, the post's country has a State Department Level 4 Travel Advisory for COVID-19 or CDC country-specific Level 3 Travel Health Notice for COVID-19.  See Refs A-K for additional guidance on travel.

11. (U) **Masks and Face Coverings**



12. (U) **Administrative Leave for COVID-19 Purposes**
To promote the health, safety, and well-being of employees and their families, the Under Secretary for Management authorized employees to receive up to 10 hours of

administrative leave per week (20 per pay period) for dependent care and other health and safety reasons related to COVID-19. This authorization is effective immediately and retroactive to February 16, 2020. The purpose of this administrative leave is to assist employees who are in a work status (e.g., working at post, working/teleworking for a domestic office, performing TDY at a safe haven location). Employees who are not expected to work (e.g., EFM FMA on AD/OD who is on LWOP, or an employee who has requested leave for the entire work day/week) are not eligible for administrative leave. Full details are in Ref J.

13. (SBU) **Administrative Leave and Overtime**





–
–
–
–

SENSITIVE BUT UNCLASSIFIED

**Signature:**          Pompeo

**Drafted By:**
**Cleared By:**

Walters, William



CA:Benning, Douglass R

M:Bulatao, Brian J

**Approved By:**

**Released By:**

**XMT:**    BASRAH, AMCONSUL; CARACAS, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; ALEXANDRIA, AMCONSUL

**Dissemination Rule:**    Archive Copy

<u>**UNCLASSIFIED**</u>
SBU

# ATTACHMENT D

**UNCLASSIFIED**



| | |
|---|---|
| **MRN:** | 20 STATE 43130 |
| **Date/DTG:** | May 01, 2020 / 011922Z MAY 20 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | ▮▮▮▮▮▮▮▮▮▮ |
| **Reference:** | A) 20 STATE 41354 |
| | B) 20 STATE 36876 |
| | C) 20 STATE 36204 |
| | D) 20 STATE 31974 |
| **Subject:** | Providing ACS Services During COVID-19 Pandemic |

1. Summary: The Department has no greater priority than the safety and security of U.S. citizens overseas, and we realize the current COVID-19 outbreak has caused significant disruption to the normal provision of consular services overseas. This cable provides guidance to the field on providing routine and emergency ACS services during the outbreak. Posts should continue to review the Coronavirus page on InfoCentral, the Consular Affairs section of the Coronavirus Global Response Coordination Unit for the latest information, guidance, and talking points related to COVID-19.

2. Emergency ACS Services: Emergency ACS services, also known as Special Consular Services, are among the most difficult services consular officers administer under the best of circumstances. As posts seek to provide these services in altered operating environments, it is important to seek to protect the health and safety of consular officers and the vulnerable citizens we serve. Below is guidance on carrying out emergency ACS services during the COVID-19 pandemic.

- Prison Visits:





- <u>Access to Quarantined U.S. Citizens</u>:  Consular notification and access may be triggered for U.S. nationals hospitalized, isolated, quarantine or otherwise in circumstances in which they are detained pursuant to governmental authority and not free to leave.



- <u>Deaths</u>:  Posts should continue to notify the next of kin and notify CA/OCS/ACS of the death of a U.S. citizen or national abroad via ACS+ or record email consistent with 7 FAM 220.  Posts should also continue to collect local death certificates and issue CRODAs to the extent practicable.  Below are some considerations if local circumstances impact the ability to provide ACS death services:

- Inventory of Estate:

- Repatriation of Remains:

███████████████████████████████████

- <u>Victim Assistance</u>:  Incidences of child abuse or domestic violence may increase due to the stress of quarantines and orders that limit movement worldwide.  Social distancing guidelines and compromised medical facilities may also limit the ability of local law enforcement and medical practitioners to properly investigate and respond to incidences of sexual assault.  Posts should continue to monitor and report incidences of victims of crime to ████████@state.gov with a copy to your OCS country officer.  Resources can be found on CAWeb.

- <u>Welfare and Whereabouts</u>:  Post should consider welfare and whereabouts requests as mission-critical and work to resolve these cases as expeditiously as usual.  Utilize your telework resources to follow up on these requests through phone calls, emails, and other means.  If a case requires a visit by a consular officer, posts should coordinate the visit closely with its Med unit to promote the safety and security of the consular officer.

- <u>Emergency Financial and Medical Assistance</u>:  There have been several changes to how posts process emergency financial services.  The below points are updates and issues to consider when providing repatriation and EMDA II loans (Note: For guidance on processing DS-5528s for private U.S. citizen evacuees, see Reftel A.  End Note.)

- **Temporary Changes to Repatriation Loans**

  - Post's authority to approve repatriation loans without specific authorization from CA/OCS/ACS has been temporarily increased from $2,000 to $4,000.  For loans above post's authority, posts should electronically recommend approval of the loan in the ACS+ system, issue an initial loan cable, and contact their OCS country officer for approval of the loan.

  - In the interests of returning U.S. citizens to the United States as quickly as possible via commercial air options, the requirement to contact three private sources of funds prior to approving a loan has been temporarily suspended.  Loan applicants must still be destitute or temporarily destitute (unable to access funds), but posts are not required to contact three potential private sources of funds prior to approving a loan.

- **Reminders and Best Practices for Repatriation Loans**
    - If a destitute U.S. citizen's final destination is the United States, then that applicant should be considered for a repatriation loan –



- **Reminders and Best Practices for EMDA II loans**



███████████████████████

3. <u>Routine ACS Services</u>:  As noted in <u>Reftel B</u>, "only those members of our team who must perform mission-critical work that cannot be performed remotely should be in Department/mission facilities."  As consular sections resume routine ACS services, they must do so with the minimum number of staff on-site to carry out the work while maintaining proper social distancing practices.  Below is guidance on carrying out routine citizen services.

- <u>Loss of Nationality</u>:  OCS is currently limited in its ability to process Certificates of Loss of Nationality (CLNs).  Post should not schedule loss of nationality appointments as long as in person ACS services are limited at post.  If there is a compelling emergency necessitating post process a CLN, contact your OCS country officer for further action.

- <u>Passport Applications</u>:  The Arkansas Passport Center (CA/PPT/APC) and the Tucson Print Center (CA/PPT/TPC) have suspended processing and shipping overseas photo-digitized passports (OPDPs), Consular Reports of Birth Abroad (CRBAs), and Border Crossing Cards (BCCs) to posts until further notice (<u>Reftel C</u>).  Post may accept routine passport applications.  However those applications will only be processed once APC and TPC resume operations.  If necessary, process emergency passport applications in lieu of OPDP applications.

- Posts must maintain close observation of their inventory of emergency passport books and issuance foils and contact their <u>CA/EX/PAS analyst</u> (███████████) if they will need urgent replenishment.  As CA/EX has previously noted, post should maintain a 90-day supply of emergency passport supplies.  CA/EX is reviewing and prioritizing all requests for consular supplies based on a number of factors including need, cost of charter delivery and access to other options, such as neighboring posts with excess supplies.

- <u>CRBAs</u>:  As noted above and in Ref C, CRBAs are not currently being processed and shipped overseas.  For U.S. citizen children applying for their first passport there is no prerequisite to process a CRBA.  Consider these passport applications as mission-critical to ensure that U.S. citizens have the necessary documentation to depart the host country if needed.  Post must process emergency passport applications following the guidance in ████████ (██████████████) and ████████ (███████████████).

- <u>Notarials</u>:  There are very few circumstances in which a notarization would be considered mission-critical work and processing these requests should be postponed for foreign nationals, unless there is a compelling national security interest.  If a U.S. citizen requests a notarial service, post's consular management should review requests on a case-by-case basis to determine if the need is immediate and critical, which would be

extremely rare.  Processing citizenship services takes precedence over notarial services when considering how to manage your waiting room and social distancing measures.

- <u>Federal Benefits</u>:  Federal benefits recipients tend to be some of our most vulnerable citizens overseas.  Ensuring their continued access to benefits is considered an essential task and transmitting federal benefits payments to recipients should continue to the extent possible.  Standard federal benefits inquiries should be handled by telework personnel to the extent possible, and requests to submit new federal benefits applications should be scheduled at intervals to allow for proper social distancing.

- <u>Routine Messaging</u>:  Posts should focus messaging on information related to the current COVID crisis (<u>Reftel D</u>).  If posts believe their current situation allows for non-COVID messaging, such as providing voting information, they should coordinate with their Public Affairs Section, Front Office, and CA/P.  Posts are reminded to keep their COVID information pages on Embassy websites updated.  If post believes its Travel Advisory requires an urgent update, please contact your OCS desk officer to discuss further.  For further guidance on messaging, visit https://usdos.sharepoint.com/sites/CA-OCS/ACS/Guidance/Forms/AllItems.aspx.

4. (U) Post should coordinate closely with their MED, Management, and RSO sections to carry out operations in the safest and most secure manner possible.  The design of many consular offices helps promote the safety of the officers working there.  Most areas have been engineered to have positive air pressure from the workspace out to the public areas and this is coupled with an air filtration system.  Officers wiping down "high touch" surfaces with disinfecting wipes, as well as routine cleaning adds additional protection for those who work in  public areas.  CA/EX recently compiled a list of suggested best practices for managing your consular section in light of social distancing requirements:

- <u>Access Issues</u>

  - <u>Social distancing and PPE protocols should start at the first interaction with a representative of the Mission, often times that person is a member of the LGF.</u>

  - Survey waiting room size to see how many people it can accommodate while ensuring appropriate distancing measures and work with LGF guards to limit access.

  - Make use of a pass-back window in a CAC to limit how many people come into contact with LGF and other applicants in an enclosed space.

  - Enforce strict adherence to appointments.  Do not admit consular services applicants early and if arrive late, make sure to let them in only when there is sufficient space in the waiting room to allow for social distancing.

- If someone does not need to enter the waiting room, do not admit them.  Make maximum use of CAC telephones or mobile phones from outside the facility.

- Place signage at entrances directing the public to reschedule their consular services appointment if they are ill.

- If facilities are available, direct the public to wash their hands before or immediately upon entering the consular waiting area.

- Waiting Room Hacks

  - If possible, remove some chairs so that the remaining chairs are at least six feet apart.

  - Put tape on the ground to show where applicants should stand in the waiting room to enforce distancing (similar to when staging a play and marking a set).

- Behind the Hard Line

  - Split consular staff into teams (A/B) with half teleworking.

  - If there are sufficient windows, stagger the windows used so there is an empty one between each officer.

  - If post has a pass-back tray like that at a bank teller's window (fully closeable), make maximum use of that for passing documents.

  - If possible, work with post's FM to ensure out flow of air from interview windows to the waiting area.

  - Schedule applicants to coincide with days the Class B cashier is in the office to the maximum extent possible



**Signature:**          Pompeo

**Drafted By:**
**Cleared By:**

CA/OCS:King, Karin M



CA:Benning, Douglass R

CA/PPT:Arndt, Rachel M

**Approved By:**          CA:Risch, Carl C
**Released By:**
**XMT:**                  BASRAH, AMCONSUL; CARACAS, AMEMBASSY; SANAA,
                          AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK,
                          AMCONSUL; ALEXANDRIA, AMCONSUL

**Dissemination Rule:**    Archive Copy

**UNCLASSIFIED**

# ATTACHMENT E

**UNCLASSIFIED**



| | |
|---|---|
| **MRN:** | 20 STATE 46900 |
| **Date/DTG:** | May 14, 2020 / 142238Z MAY 20 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | ███████████████████ |
| **Reference:** | A) 20 STATE 43130 |
| | B) 20 STATE 42180 |
| | C) 20 STATE 36204 |
| | D) 20 STATE 39390 |
| **Subject:** | CA Authorization Process for the Resumption of Some Consular Services at Overseas Posts |

1. **Summary:**  This cable provides guidance to the field on which consular services may be resumed during each phase of Diplomacy Strong.  The health and safety of consular teams, mission colleagues, and applicants for consular services should guide every decision and action in planning for the resumption of consular services at overseas posts.  Consular section chiefs, in consultation with MED and RSO staff, will determine which CA-authorized services for each Diplomacy Strong phase should be resumed at post, based on local health and safety conditions.  Note that, as there are additional considerations relevant to the safe resumption of routine visa services, the current suspension of routine visa processing will remain in effect for all posts until rescinded, no matter a post's Diplomacy Strong phase.  Additional guidance on resumption of routine visa services will be provided separately.  In Diplomacy Strong Phase One, consular sections will offer emergency ACS and mission critical consular services only.  During Phase Two, a limited number of routine ACS appointments may be offered.  Once post reaches Diplomacy Strong Phase Three, consular sections will resume all routine CA-authorized consular services.  END SUMMARY.

2. **Diplomacy Strong Phase One:**  Consular sections may offer only emergency, mission critical, and other consular services that do not require face-to-face interaction until they move to Phase Two.  Medical and health conditions at each post will be the primary drivers of a decision process to resume consular services.  Given the unprecedented scale of the COVID-19 pandemic, CA anticipates a gradual resumption of services around the world based on local conditions, staffing, and other factors.  The resumption of consular services is linked to the Diplomacy Strong phased approach to adjusting COVID-19 mitigation.  This includes consular team work spaces, schedules, and applicant flows inside and outside the waiting room.

3. During Phase One, posts should continue offering only emergency ACS services in line with the guidance from 20 STATE 43130 (REF A).  Offsite visits to prisons or for welfare and whereabouts cases should be conducted only in extreme circumstances and in close coordination

with post's MED Unit.

4. **Diplomacy Strong Phase Two:**  Consular sections may offer emergency and mission critical consular services, as well as services that do not require face-to-face interactions and limited routine appointments, in Diplomacy Strong Phase Two.  Consular sections may resume some normal ACS services as set forth below at a level determined by the consular section chief based on local conditions and in consultation with the EAC.  Other consular services, including visa processing, remain restricted to emergency or mission critical only, in compliance with CA guidance (20 STATE 42180 REF B), unless and until otherwise directed by separate guidance.  ACS sections with consular agents should factor in local conditions when making plans.  In addition, consular sections should plan for the resumption of routine services and consider the following:  messaging, outreach, workflow review and redesign, team training on new workflows, adjusting schedules based on new workflows, etc.  1CA's tools can help consular teams in all stages of their planning.  Contact ████@state.gov if posts need guidance about where to start.

5. When posts enter Phase Two, ACS units may begin to offer limited appointments for the following services:

- CRBAs and routine passport applications.  Posts should expect a backlog for printing OPDPs, so encourage U.S. citizens to apply early.  Continue to issue EPDPs to ensure U.S. citizens have a valid passport in the interim.
- Federal benefits.  Address these inquiries by phone and email to the extent possible.

6. Keep social distancing guidelines in mind when creating appointment schedules; do not open more appointments than can safely be accommodated in your waiting room.  The Department understands and is aware that that appointment wait times may increase as a result.

7. Voting assistance can resume during Phase Two.  Ballot collection boxes should be placed outside the hardline to reduce the amount of foot traffic in post waiting rooms.  Voting outreach should be done virtually.

8. Consular staff may, on a limited basis and with the support of post management, travel offsite for special consular services such as prison visits and welfare/whereabouts checks as well as FPU site visits.  Health and safety remain the top priority when considering offsite visits, and staff should not be pressured to travel if they are uncomfortable.  Remote prison visits via telephone or video continue to be an appropriate alternative during Phase Two.

9. **Diplomacy Strong Phase Three:**  Consular sections may resume public services, other than routine visa processing, at a level determined by the consular section chief based on local conditions and in consultation with the EAC and consistent with CA guidance.  During Phase Three, ACS services can resume in full.  The global suspension on routine visa processing (REF B) will remain in effect unless and until otherwise directed by separate guidance.  All consular sections must remain in compliance with this suspension until it is rescinded, even at posts assessed at Phase Three.  Appointments for all ACS services (CRBAs, passports, CLNs, notarials, and federal benefits) can be made available, although posts may consider phasing in these appointments gradually to give staff time to adjust to new workflows and schedules.  If

local conditions allow, posts can resume prison visits and welfare/whereabouts checks requiring offsite travel.

10. **Passport Services Print Center**s:  The Arkansas Passport Center (APC) and Tucson Passport Center (TPC) remain closed.  See 20 STATE 36204 (REF C) for guidance on passport and CRBA services until operations at APC and TPC resume.  Additionally, see 20 STATE 39390 (REF D) for guidance on refiling procedures for passport applicants affected by COVID-19.

11. **Frequently Asked Questions:**

*Question:*  Face coverings.  Will CA provide face coverings or other personal protective equipment (PPE) to applicants for consular services?
*Answer:*  No.  A decision to require consular services applicants to wear PPE, including face coverings, should be made at post in consultation with MED and RSO staff and should be based on local health conditions and in compliance with host country restrictions. ████████████████████████
████████████████████████████████████████████████

*Question:*  Medical screening.  Will consular sections perform medical screening on applicants for consular services?
*Answer:*  No; consular staff do not medically screen applicants.  Local guard personnel are not responsible for medical screening.  Consular managers must work with RSO and MED personnel at post to establish screening and admissions criteria for consular services applicants based on local health conditions and in compliance with host country restrictions.  Consular staff, including GSS greeters, are not authorized to conduct medical screening of consular services applicants.  If post assesses the temperature screening of consular services applicants is necessary, normal consular services must not resume, because this indicates a continued high prevalence of COVID-19 in the local population.

*Question:*  U.S. Passport Services Print Centers.  What happens if post EAC assesses we move to Diplomacy Strong Phase Three before the Passport Services Print Centers are opened?
*Answer:*  Post may process routine passport applications but should explain to applicants that delays will continue until U.S. Passport Print Centers resume operations and process their backlogs.

12. **Health and Safety Resources and Operational Checklists:**  Diplomacy Strong is the framework for safely transitioning consular professionals around the world from maximum telework to regular, office-based operations.  CA establishes a path for overseas consular sections to resume public services, other than routine visa services, built on the Diplomacy Strong principles.  Diplomacy Strong prioritizes the safety and health of our colleagues, while balancing our operations to achieve the mission and mitigate risk and relying on local expertise while aligning with federal guidelines.  Post should coordinate closely with their MED unit, Management, and RSO sections to carry out operations in the safest and most secure manner possible.  The design of many consular offices helps promote the safety of the officers working there.  Many of these areas have been engineered to have positive air pressure from the workspace out to the public areas and this is coupled with an air filtration system.  Officers wiping down "high touch" surfaces with disinfecting wipes, as well as routine cleaning, add additional protection for those who work in public areas.  A repository of suggested best practices and operational checklists for managing your consular section in light of social distancing requirements is available on the ACS COVID-19 Guidance site.  Additionally, posts

should continue to review the [Coronavirus page on InfoCentral](#) and the [Consular Affairs section](#) of the [Coronavirus Global Response Coordination Unit](#) for the latest information, guidance, and talking points related to COVID-19.

**Signature:**          Pompeo



**Drafted By:**
**Cleared By:**

CA:Benning, Douglass R

CA/OCS:King, Karin M

CA/C:Zakrajsek, John R

CA/PPT:Arndt, Rachel M

**Approved By:**      CA:Risch, Carl C
**Released By:**

| | |
|---|---|
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; ALEXANDRIA, AMCONSUL |
| **Dissemination Rule:** | Archive Copy |

**UNCLASSIFIED**

# ATTACHMENT F

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 21 STATE 52112 |
| **Date/DTG:** | May 19, 2021 / 191559Z MAY 21 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | ██████████ |
| **Captions:** | SENSITIVE |
| **Reference:** | 20 STATE 110220 |
| **Pass Line:** | TO FRONT OFFICES FROM ACTING A/S BROWNLEE |
| **Subject:** | (SBU) CA BUREAU EXPECTATIONS REGARDING VISA WAIT TIMES |

1. (U) Summary:  The Department recognizes the extraordinary work performed by consular staff worldwide and reinforces the importance of delivering consular services safely, keeping paramount the health and safety of everyone in our facilities.  We also thank Chiefs of Mission, DCMs, and Principal Officers for your support of these priorities during this unusual time.  We understand, because of staffing constraints and public health requirements, visa backlogs have increased worldwide.  Prioritization of cases as outlined in REF A remain in place, with the provision of American Citizens Services as the priority among consular services.  Thereafter, posts may make visa appointments available in accordance with the prioritization schedule detailed in REF A.  The Department recognizes wait times for routine services may increase during this period, but we ask posts to stay the course with our support, and we will continue to message about visa wait times to Department colleagues, Congress, and the public.  End summary.

2. (SBU) The Department and CA are aware of the difficulties posts still face as you balance tight resources, constantly changing COVID-related restrictions, and the competing demands for priority attention.  REF A, which notes the primacy of ACS service provision, including

passport adjudication, before all visa services, remains the definitive guidance on consular prioritization. Consular sections must use limited staffing and consular section capacity to focus on the most important U.S. citizen services first, and then additional consular work should be included as posts' circumstances allow. After emergency Special Consular Services (SCS), passport and Consular Report of Birth Abroad (CRBA) adjudication should be the consular section's highest priority. Given the unpredictable nature of this pandemic (and crises in general), we must do all we can to provide U.S. citizens in-country have valid U.S. passports, minimizing the need for emergency passport issuance in the case of an evacuation or other emergency.

3. (SBU) This cable lays out a clear path of prioritization for visa services, allowing posts the flexibility to determine based on local conditions and staffing how far along on that path they can be. The health and safety of post personnel and of the applicants coming in to seek services is paramount and should guide the decision-making process as consular sections work with colleagues, including MED and RSO, to determine the volume of cases post is able to process.



4. (SBU) We recognize and expect that many IVs and NIVs will not be processed in the near to mid-term, and that backlogs and pent-up demand will grow. Mindful of both the need to protect consular staff resilience and health, as well as financial constraints facing the Bureau, posts may not extend work hours (overtime, 'Super Saturdays') to address backlogs.

5. (U) We carry this message to stakeholders here and will continue to manage expectations with the public, Congress, and within the USG about the services you can safely provide.  CA leadership has engaged extensively with Congress and the public to be as transparent as possible, and to inform them of the significant challenges posts worldwide continue to face.  On March 1, Acting Deputy Assistant Secretary Julie Stufft held a Media Briefing where she highlighted these challenges.  (A transcript is available at https://www.state.gov/briefing-with-consular-affairs-acting-deputy-assistant-secretary-for-visa-services-julie-m-stufft-on-the-current-status-of-immigrant-visa-processing-at-embassies-and-consulates/).  A compilation of visa backlog materials, including press guidance and social media outreach materials, is available on CAWeb at ██████████████ ████████████████████████████████ Acting Assistant Secretary Brownlee and CA leadership hold nearly weekly "Four Corners" briefings with House and Senate Judiciary, Foreign Affairs/Relations, and Appropriations committees on visa operations and policy.  Staff-level congressional briefings also take place on a nearly weekly basis.

6. (U) In addition to regular briefings, there have been approximately two updates a month over the past year to the travel.state.gov "Visas Newsroom" highlighting changes and updates in visa policy.  Finally, to further support efforts to be as transparent as possible about the status of our visa operations, VO now publicly posts the exact number of the immigrant visa backlog each month at the following: https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html.  We urge you to consider complementary messaging and are poised to assist in this regard.

7. (U) Your consular sections are an integral element of your mission team, providing assistance to U.S. citizens including prospective

adoptive parents, supporting U.S. economic interests, fostering person-to-person ties, protecting U.S. borders, and presenting the face of the United States to the world.  Their work (and yours in their support), advances the interests and security of the American people every day, and the Department thanks you and your staff for your extraordinary efforts.

| | |
|---|---|
| **Signature:** | Blinken |

| | |
|---|---|
| **Drafted By:** | ██████████████ |
| **Cleared By:** | CA/VO:Ramotowski, Edward J |
| | ████████████ |
| | CA:Benning, Douglass R |
| | ██████████████████ |
| **Approved By:** | CA:Brownlee, Ian G |
| **Released By:** | ████████████████ |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL |

| | |
|---|---|
| **Dissemination Rule:** | Archive Copy |

**UNCLASSIFIED**

SBU

# ATTACHMENT G

UNCLASSIFIED
SBU



| | |
|---|---|
| **MRN:** | 21 STATE 57154 |
| **Date/DTG:** | Jun 02, 2021 / 020049Z JUN 21 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | █████████████ |
| **Captions:** | SENSITIVE |
| **Subject:** | IN CASE YOU MISSED IT: CONSULAR NEWS, TIPS, AND TRICKS (MAY 2021) |

**Notes from Acting Assistant Secretary Brownlee**



2. █████████████████████████████████████

**Guidance and Reminders**

3. (U) Provision of Special Consular Services must be posts' top priority, followed by passport and CRBA adjudications. Emergency passport appointments must be available within two days, routine within six weeks. Emergency/mission critical visa services are the next priority, followed by all other visa applications and other case work. (OCS)

4. (U) Per 7 FAM 092, posts are required to provide services to all U.S. citizens

seeking consular assistance, regardless of their normal consular district.  (OCS)



**Action Requests**



**Leadership, Management, and Professional Development**

**Resources, Tips, and Tricks**

SENSITIVE BUT UNCLASSIFIED

| | |
|---|---|
| **Signature:** | Blinken |
| **Drafted By:** | Various CA Drafters |
| **Cleared By:** | CA/VO:Ramotowski, Edward J |
| | CA/VO:Stufft, Julie M |
| | CA:Benning, Douglass R |
| | CA/OCS:King, Karin M |
| | CA/PPT:Arndt, Rachel M |
| **Approved By:** | CA:Brownlee, Ian G |
| **Released By:** | |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL |
| **Dissemination Rule:** | Archive Copy |

**UNCLASSIFIED**

SBU

# ATTACHMENT H

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 21 STATE 69026 |
| **Date/DTG:** | Jul 01, 2021 / 012024Z JUL 21 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | ███████████████████████ |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 21 STATE 52112 |
| | B) 20 STATE 110220 |
| | C) 20 STATE 98390 |
| **Subject:** | Introducing Benchmarks to Assess CA Resource Needs |

1. (U) Please see action request in paragraph 5.

2. (SBU) As referenced in the June 24 CA Expanded meeting, we know that even as many of you continue to grapple with severe COVID outbreaks and logistical constraints in your host countries, public pressure to return to pre-COVID passport and visa processing levels is mounting.  CA is keenly aware that in many cases, despite even the most creative management efforts, posts will be unable to reconcile these competing realities without additional resources (Ref A).  It is critical that CA be able to quantify these resource needs so that we can continue to undertake a robust metrics-based analysis for aligning our resources, seeking additional budgetary support, if necessary, and setting realistic stakeholder expectations.

3. (SBU) As posts assess their resource needs in a fast-changing environment, CA is establishing some baseline figures posts should consider in developing resource requests.  Posts should view the benchmarks below as guidelines for when a request for additional resources might be indicated.  These benchmarks should not/not be viewed as pressure to do more with less, violate health protocols, etc.

We are providing these because we want you to tell us what resources you would need to address rising demand.

4. (SBU) ACS emergency services must come first.  Beyond that, the services for which we have developed benchmark appointment wait times are routine passport and CRBA cases and certain IV cases.  For routine passport and CRBA adjudication, the benchmark scheduling timeframe for first-time cases is six weeks or fewer.  Based on congressional guidance for documentarily complete Immediate Relatives (IR1, IR2, IR/IH3, IR/IH4, and IR-5 applicants), the Department's goal for  scheduling timeframe is 30 days and for  family preference  categories (F1, F2A, F2B, FX, F3, F4 applicants)) the Department's goal is scheduling within  60 days.  Even though Congress has not provided a policy goal for scheduling other categories of immigrant visa cases, such as employment-preference or diversity visa cases, and while we are not proposing a benchmark, the Department still aspires to schedule those cases within 60 days of becoming documentarily qualified and current.   Apart from Tier 1 non-immigrant visa cases (Ref B), other visa categories and notarial services should be scheduled only after your post has met the timeframes for benchmarked services.

5. (SBU) Action Request:  If your post is not currently able to reach the above benchmarks, and you have not already been in touch with your regional PAS analyst about your resource needs, please contact your CA/EX/PAS analyst by July 9 to discuss backlog volumes, current staffing, COVID restrictions on office and waiting room capacity, and percentage of time devoted to various other services.  Be prepared to either identify what resources would be required to reduce backlogs or specify what other impediments there are to meeting benchmarks.  Such additional resources could include TDY help, overtime funding, or EFM or LE staff salary funding (for frozen positions).  CA recognizes that other factors, such as limited waiting room capacity and other health-related restrictions, may render it difficult to meet benchmarks even if additional resources are made available.

6. (SBU) Given the resource constraints under which CA is currently operating (Ref C), CA cannot guarantee that we will be able to fill all requests. However, identifying needs in terms of these global benchmarks will permit CA to align our resources appropriately and put forward data-driven resource requests, as circumstances require. This exercise will also help us to explain why, in certain circumstances or absent additional available revenue, longer appointment wait times will be unavoidable.

7. (U) As always, please stay in communication with your CA/EX/PAS analyst if you have any questions related to resource needs.

SENSITIVE BUT UNCLASSIFIED



| **Signature:** | Blinken |
| **Drafted By:** | CA/EX:Glazeroff, Josh |
| **Cleared By:** | CA:Ramotowski, Edward J |
| | CA:Benning, Douglass R |
| | CA/OCS:King, Karin M |
| | CA/PPT:Arndt, Rachel M |
| | CA/VO:Stufft, Julie M |
| **Approved By:** | CA:Brownlee, Ian G |
| **Released By:** | |

| | |
|---|---|
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL |

| | |
|---|---|
| **Dissemination Rule:** | Archive Copy |

**<span style="color:green">UNCLASSIFIED</span>**
SBU

# ATTACHMENT I

**UNCLASSIFIED**
SBU



| | |
|---|---|
| **MRN:** | 21 STATE 115378 |
| **Date/DTG:** | Nov 16, 2021 / 162235Z NOV 21 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | ████████████████ |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 20 State 110220 |
| | B) 21 State 14702 |
| | C) 21 State 88936 |
| | D) 21 State 94990 |
| | E) 21 State 62434 |
| | F) 21 State 53968 |
| | G) 21 State 39786 |
| **Pass Line:** | Pass to Department of Homeland Security |
| **Subject:** | Recalibration of Consular Services Prioritization at Posts Abroad |

1. **(SBU) SUMMARY:**

   - This cable rescinds mandatory prioritization guidance in Ref A, B, and C.  Consular chiefs should determine the priority order of consular services processed at post with the caveats listed in para 6 including ensuring post prioritizes special consular services in the American Citizens Services unit.
   - Post should work to reintroduce routine nonimmigrant visa (NIV) appointment types into its workload, update publicly available wait times on travel.state.gov, and share resource requirements with CA/EX.
   - To the extent possible and while maintaining a focus on the security of the visa process, post must take advantage of process innovations offered in para 3 and ensure there is a robust system for identifying emergency and priority travel for NIV applicants. **END SUMMARY.**

2. (SBU) The Department commends consular sections' resilience,

dedication, and creativity during the last year and a half as the global pandemic disrupted the work of diplomacy across the world, taking a particular toll on consular sections. We recognize many posts still have COVID-related occupancy restrictions on space and significant staffing challenges. However, as global travel recovers and resources begin to increase, post should begin to rebalance workload across consular services to meet the demand of the rebounding travel sector. For posts that have not done so yet, this includes reintroducing routine NIVs for work and tourism into the workload. This is the first in a series of cables dedicated to providing post with information and instructions to help address these challenges.

3. **(SBU) A Balancing Act:** CA remains focused on providing all possible flexibilities and resources to post to support and streamline processing and to preserve waiting room space for those applicants who must appear in person. Expanded NIV interview waiver (IW) authorities are detailed in 9 FAM 403.5-4(A)(1)(a) and Ref C. The DS-82 Repatriation Program (Ref E) now processes passports in four to six weeks. The GSS Program Team is standing by at ████████████████ @state.gov to discuss increased greeter needs to match expanded interview scheduling. Additionally, LE staff and EFM hiring freezes are lifted for CA positions. However, while adjudicator hiring will be doubled in 2022, it will be many months before most posts return to pre-pandemic staffing. CA/VO and CA/EX are similarly working to expand the Remote Processing Unit (RPU) and remote adjudication options with a view to providing more posts assistance with IW adjudication, but it will be some months before this is in place. We urge post to examine the efficiencies offered and to implement as many of them as possible. Further, post should maximize adjudicator time on tasks that only adjudicators can do and that must be performed at post.

4. **(SBU) Wait Times:** We are aware when routine visa processing is introduced at posts that have not been able to schedule appointments, many posts will face extended visa interview wait times driven by pent-

up demand.  We do not expect you will immediately work through these backlogs.  However, we do expect consular managers will use all tools and resources available to maximize processing efficiencies, including those outlined in para 3.  Post should also have a robust system to identify and expedite priority travel across all visa categories.  Please review and refresh your Referral Program and ensure it is well understood throughout your mission (9 FAM 601.8) and make sure all mission members are aware of how to identify and refer to the consular section applicants whose travel is in the U.S. national interest.

**5. (SBU) Security:**



**6. (SBU) Scheduling Framework:**  Please bear the following in mind as you prioritize your work.  CA understands there will be many competing demands on consular sections' time and space.  Managing them all will require agility and flexibility.

- Special Consular Services must remain a priority.
- Consistent with Congressional direction, post should strive to process immediate relative cases and nonimmigrant K visa applications of fiancÃ©s of U.S. citizens within 30 days, and family preference cases within 60 days of the receipt of all necessary documents.  This includes adoption cases.
- It is the Department's policy to use as many of the 55,000 diversity visas available each fiscal year as possible.
- Posts should also prioritize cases raised by the Visa Office (e.g., cases related to litigation).
- Seasonal priorities such as H-2 applicants, students, U.S. government-funded exchange visitors, and Summer Work and Travel applicants must also be a factor.

**7. (SBU) Communication:**



**8. (SBU) Health and Safety First:** Consular managers must be mindful of the health and safety of their staff and those in U.S. government facilities. This means post's FO, MGMT, MED, RSO, Facilities Maintenance Offices, and other sections must jointly determine how best to maximize numbers of people appearing for consular services, while also conforming to public health practices and local laws, such as masking and social distancing. Consular managers also should pay close attention to the psychological well-being of their colleagues; confronting escalating demand for consular services in the wake of a pandemic can exact a toll on even the most effective and collegial consular teams.

**9. (SBU) Innovation:** CA is working hard on providing resources and innovation to ease post's transition back to more regular order. See Ref. F for more information on AutoHotKey and Ref. G for IV processing tips. We urge consular managers to consistently make a safe space for innovative ideas presented by the professionals closest to the process. CA is committed to collecting these ideas, developing them, and sharing them. Please send them on to ██████@state.gov.

**10. (SBU) Resource Help:** We also encourage you to advocate for resources and support at your mission as we face this challenge

together.  You will certainly have the Bureau's support as you do so.

11. (SBU) Visas and travel to the United States for work and tourism are crucial to continued U.S. economic recovery and to President Biden's promise of a foreign policy for the middle class. ███████ ████████████████████████████████████████████ ████████████████████ Our recovery and return to pre-pandemic operations will not be easy but it is an exciting moment.  It is also necessary.  CA is 100 percent focused on supporting you and addressing these challenges together.

SENSITIVE BUT UNCLASSIFIED

| Signature: | Blinken |
|---|---|

| **Drafted By:** | |
| **Cleared By:** | CA:Benning, Douglass R |
| | ███████████████ |
| | CA/VO:Stufft, Julie M |
| | ████████████████████ |
| | CA:Bonner, Jennifer V |
| | ████████████████████ |
| | CA/OCS:King, Karin M |



**Approved By:**        CA:Bitter, Rena
**Released By:**
**XMT:**           BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL

**Dissemination Rule:**        Archive Copy

**<u>UNCLASSIFIED</u>**
SBU

# ATTACHMENT J

**UNCLASSIFIED**



| | |
|---|---|
| **MRN:** | 21 STATE 99942 |
| **Date/DTG:** | Sep 28, 2021 / 281935Z SEP 21 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *IMMEDIATE* |
| **E.O.:** | 13526 |
| **TAGS:** | ███████████████████████████ |
| **Subject:** | Diplomacy Strong Replacement: COVID-19 Mitigation Process (CMP) for Domestic Facilities and Overseas Posts |

**Key Points**:
- This is an action request, please see paragraph 3.
- The COVID-19 Mitigation Process (CMP) replaces Diplomacy Strong as the Department's framework for determining an appropriate onsite work posture and correlated mitigation actions. See the CMP Quick Reference Guide for an overview.
- Through the CMP, post and domestic facility leadership will use the COVID-19 Priority Risk Indicators Dashboard (to review four primary local *risk indicators* in order to determine the appropriate onsite *workforce posture* (Mission Critical Only; Mission Critical and Onsite-Dependent Functions; or All Functions).
- Post and facility managers reporting and tracking in Diplomacy Strong will be discontinued effective immediately, and COVID-19 mitigation plans should be considered part of posts' Emergency Action Plans (EAPs).
- See paragraph 7 for domestic CMP implementation guidance; See paragraph 8 for overseas implementation guidance.
- For additional information and FAQs, please visit the Reentry and Future of Work SharePoint page.

**Message from the Acting Under Secretary for Management**:
1. As difficult as the past 18 months have been, this period has prompted the Department to reimagine its operations and provided an opportunity to apply lessons learned. While Diplomacy Strong has served as an invaluable tool to get us this far, we've incorporated feedback from the field to build its replacement, the COVID-19 Mitigation Process (CMP), to guide the next stage of an eventual re-entry to the workplace. Our goals with the CMP are to reduce post workloads by eliminating some previous reporting requirements, as well as to simplify decision-making and allow greater flexibility domestically and overseas. With the CMP, risk indicators will now be centrally tracked and made available on the COVID-19 Priority Risk Indicators Dashboard and CMP SharePoint site. Leadership at overseas posts and domestic facilities can use these indicators to determine the appropriate onsite workforce posture and mitigating actions that promote employee safety while

ensuring a safe return to the workplace.  Domestically, it will be a standalone
document.  Overseas, it should be integrated into posts' EAPs.

**How the CMP Fits into the Department's Overall Re-Entry Plan**

2. There are three primary tools guiding the Department's reentry process:

- The **Workplace Safety Plan (WSP)** is the overarching plan that articulates how
  the Department will keep the workforce—U.S. direct hires, contractors, eligible
  family members, and locally employed staff—safe through updated safety
  protocols that focus on minimizing risk.
- The Department's **Reentry Date** governs when overseas and domestic facilities
  may adjust onsite workforce posture in accordance with the COVID-19
  Mitigation Process guidance. An announcement of the respective domestic and
  overseas Reentry Dates is forthcoming.  As of the Reentry Date, Department
  facilities may begin an increased return to the workplace in accordance with the
  COVID-19 Mitigation Process guidance.
- The **COVID-19 Mitigation Process (CMP)** supports the WSP and will be
  applied both domestically and overseas by determining who the Department
  brings back onsite based on function and mission.
- ████████████████████████████████████████ Overseas, the CMP should be
  applied at posts alongside the Overseas Telework Toolkit, which will be
  distributed soon.

3. Effective immediately, the CMP has replaced Diplomacy Strong; all domestic
   facilities and overseas posts should now use the CMP to inform decision-making on
   workforce posture and mitigation measures.  It supersedes ALDAC 20 STATE
   49094 and will be updated as new information about COVID-19 mitigation
   measures, including Centers for Disease Control and Prevention (CDC) and White
   House guidance become available (Ref A).  Post emergency action committees and
   the Domestic Posture COVID-19 Council (formerly known as the Domestic
   Diplomacy Strong – DDSC) should convene as soon as possible to review and apply
   the updated guidance.  Please visit the Reentry and Future of Work SharePoint site
   for the most up-to-date information, including Frequently Asked Questions (FAQs)
   on understanding the CMP framework and how to apply it for COVID-19 mitigation
   and workforce posture.

**CMP Overview**

4. Through the CMP, post and domestic facility leadership will use the COVID-19
   Priority Risk Indicators Dashboard to review four main local *risk indicators* in order
   to determine the appropriate onsite *workforce posture* (mission-critical functions
   only; mission-critical and onsite-dependent functions only; or all functions).  The
   CMP also provides guidance on mitigation practices based on a location's given
   workforce posture.

**Risk Indicators**

5. Risk Indicators describe a measure used to identify events that present an increased

risk for COVID-19 exposure and require deliberation.  Risk indicators should be considered in the aggregate (see CMP Quick Reference Guide).  The CMP uses four main risk indicators, each tracked on the COVID-19 Priority Risk Indicators Dashboard:

- **Community Transmission (CT)** – CDC metric based on the total number of new cases per 100,000 persons in the past 7 days broken down across four levels:
  Low (0 - 9.99) x 100k,
   Moderate (10 - 49.99) x 100k,
  Substantial (50 - 99.99) x 100k, and
   High (greater than or equal to 100) x 100k.
   Overseas posts will use WHO-provided data and extrapolate the number of active cases  to determine trends in transmission, when CT is unavailable.
- **Employee Vaccination Status** – Bureau or mission rates of vaccination (including overseas eligible family members and locally employed staff). Rates are broken down by three levels:
   High rate of vaccination: >90%;
  Moderate rate of vaccination: >80%; and
  Low rate of vaccination: <80%.
- **Local Hospital Capacity** – Ability of hospitals, clinics, and/or local emergency response entities to provide support during a crisis; defined as a minimum of 20% ICU bed availability plus ventilators, PPE, etc.  This data is provided by the MED Bureau.
- **Local Conditions** – Host government-level responses to local conditions, including:
  - Stay At Home Requirements:  Public health authorities' guidance on shelter-in-place or other in-person restrictions that promote safety.
  - Local Schools, Workplace, and Public Venue Closings:  Capacity for normal operations.
  - Public Transportation: Availability of public transportation.
  - Restrictions on Internal Movements or Internal Travel Controls: Capacity to travel between regions/cities, including travel screenings and/or restrictions.

**Workforce Posture**

6. Workforce Posture (WFP) is the determination of the type of functions that are to be performed onsite.  WFP and onsite presence should be determined based on the aggregate assessment of COVID-19 risk indicators and balanced with telework flexibilities, as permitted.  Three postures are to be considered (defined below). These workforce postures are listed from most restrictive to least restrictive— expanding onsite presence as local conditions allow and mission needs require. Please see definitions, questions to consider, and examples below.

**Mission Critical Only:**  Employees and/or contractors performing functions essential to the continuity of government or operations, including mission-critical

work that protects national security and/or public health, required to be performed onsite. **Employees/contractors are permitted onsite only to the extent necessary to perform mission-critical and functions.**

Questions to help assess job functions as mission critical:
- Is the individual's function essential to the continuity of government or operations, or does the individual's functions include mission critical work to protect national security or public health?
  **AND**
- Does the individual's function require onsite work (e.g., does the individual need to access classified information to do their job) during the time the employee would perform them?

Examples of mission-critical functions include:

- Passport services
- Emergency American Citizen services
- Emergency and diplomatic visa services
- Watch and crisis operations
- Security and law enforcement functions
- Facilities and real property functions
- Key general services functions, including executive transport

**Mission Critical and Onsite-Dependent Functions:** Includes Mission Critical employees and employees and/or contractors performing tasks that require onsite presence to perform functions or use information from systems or resources that cannot be accessed remotely or via an approved DOS mobile device. **Employees/contractors are permitted onsite only to the extent necessary to perform mission-critical and onsite-dependent functions.** During this workforce posture, supervisors will assess whether there is a current need for an employee to perform their job functions onsite. ████████████████████████████████
████████████████████████████████████████████████

Onsite-dependent job functions are determined by a current need for:
- Classified information or resource access that requires in-office secure communications
- Unclassified systems, applications, or data not available via approved DOS mobile systems (e.g. some financial systems, Consular systems, etc.)
- Unclassified information access that is not available over approved DOS mobile systems (e.g. paper files, etc.)

- Resource or equipment located/available only at a DOS location (e.g. vehicles, mail processing equipment, etc.)
- Functional requirement for in-person collaboration with DOS interlocutors
- Functional requirement for in-person collaboration with DOS interagency / other interlocutors (e.g. classified discussion, personnel sensitive discussion, law enforcement sensitive discussion, etc.)

Additional questions to help assess job functions that are onsite-dependent:
- Would the failure to perform the work in a timely and efficient manner have negative consequences to the mission?
- Would a failure to perform the job functions or to do so in a timely fashion create potential liability for the Department due to non-compliance with a policy, regulation, or mandate?
- Are there time-sensitive functions or a backlog of overdue activities that need to be addressed urgently and require onsite presence (e.g., deferred maintenance)?

Examples of onsite-dependent functions include:

- Certain in-person diplomatic engagements
- Certain in-person public engagements, such as limited conferences or representational events
- Certain in-person meetings that are internal to the Department
- Certain in-person training activities
- Functions that require use of classified material
- Facilities maintenance
- Onsite contractor oversight
- Onsite support for principals

**All Functions:**  All personnel, including federal employees and contractors, may be required to be onsite to perform duties. Management has full flexibility for onsite presence consistent with remote/mobile work schedules to achieve mission objectives.

**Domestic CMP Guidance**
7. More detailed guidance for domestic implementation can be found in the Domestic CMP.  In the National Capital Region (NCR), the Under Secretary for Management will use the CMP to make the onsite posture determination for the Department's NCR offices.  At Department facilities elsewhere in the United States, facility leaders, in consultation with bureau leadership, should review the Domestic CMP document and COVID-19 Priority Risk Indicators Dashboard to determine the appropriate onsite posture and must notify the Domestic Posture COVID-19 Council (DPCC) (formerly known as DDSC).  If consensus is not reached among the leadership components at a given domestic facility, the Under Secretary for

Management will make the final determination. The CMP does not prescribe any specific percentage of employees who need to be onsite, but instead notes what functions are allowed onsite.

**Overseas CMP Guidance**

8. Overseas, posts should follow the detailed guidance below for implementing the CMP.

- ***STEP 1:  Review Risk Indicators***—Post's Emergency Action Committee (EAC) reviews current levels of risk indicators using the Department's COVID-19 Priority Risk Indicators Dashboard.  Posts should look at risk indicators in the aggregate (e.g., a lower vaccination rate may carry less weight if other local conditions are considered more relevant, such as Community Transmission or number of active cases).

  - Please note:  Posts will no longer be required to report on any risk indicators, including host nation posture, phase progression and regression, travel restrictions, or to submit weekly reporting from medical personnel.  The Bureau of Medical Services (MED) will continue to provide data updates on ICU bed capacity and MEDEVAC capabilities. Remaining indicators are populated using World Health Organization (WHO) data, John Hopkins University data, and Oxford's COVID-19 Government response tracker.  Please refer to the Sources Page of the Country View of the COVID-19 Priority Risk Indicators Dashboard for more information.

- ***STEP 2:  Apply Risk Indicators to Determine Recommended Workforce Posture and Mitigating Actions***—Post's EAC makes a recommendation to Post's leadership as to which workforce posture is appropriate based on the aggregate of the key risk indicators. (e.g., active cases and vaccination status carry more weight than local conditions.  Posts should use their discretion in determining workforce posture recommendations based on these indicators.)

- ***STEP 3:  Post Leadership Makes Final Workforce Posture Determination***— The Chief of Mission makes the final workforce posture determination and reports in an EAC cable.

**Additional Information**

9. For additional information and FAQs, please visit the Reentry and Future of Work SharePoint page.

**Signature:**              Blinken

**Drafted By:**
**Cleared By:**



CA:Benning, Douglass R
CA/PPT:Arndt, Rachel M

CA/EX:Glazeroff, Josh
CA/C:Zakrajsek, John R

**Approved By:**          M:Perez, Carol Z
**Released By:**
**XMT:**                  BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU,
                          AMCONSUL; KABUL, AMEMBASSY; SANAA, AMEMBASSY; ST
                          PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL;
                          YEKATERINBURG, AMCONSUL

**Dissemination Rule:**   Archive Copy

<u>**UNCLASSIFIED**</u>