## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| L'ASSOCIATION DES AMÉRICAINS ACCIDENTELS, *et al.*<br><br>*Plaintiffs*<br><br>*v.*<br><br>UNITED STATES DEPARTMENT OF STATE,<br>*et al.*<br><br>*Defendants.* | Civil Action No. 21-cv-2933-TNM<br><br>**ORAL ARGUMENT REQUESTED PER LCvR 78.1** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

*/s/ L. Marc Zell*
L. Marc Zell
ZELL & ASSOCIATES INTERNATIONAL
ADVOCATES, LLC
1345 Ave. of the Americas
2nd Floor
New York, NY 10105
(202)-971-1349
*Email: mzell@fandz.com*

*/s/ Noam Schreiber*
Noam Schreiber, *of counsel*
34 Ben Yehuda St.
15th Floor
Jerusalem, Israel 9423001
011-972-2-633-6300
*Email: schreiber.noam@gmail.com*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ...................................................................... II

I.    PRELIMINARY STATEMENT ........................................................... 1

II.   THE GOVERNMENT'S MOTION TO DISMISS AND PLAINTIFFS'
OPPOSITION AND CROSS-MOTION FOR SUMMARY JUDGMENT .................... 5

III.  STATUTORY AND REGULATORY SCHEME ...................................... 7

IV.   STANDARD OF REVIEW ................................................................. 7

V.    ARGUMENT ................................................................................... 8

  A.  L'ASSOCIATION DES AMÉRICAINS ACCIDENTELS HAS
ASSOCIATIONAL STANDING ................................................................. 8

  B.  THE SUSPENSION AND DELAY OF RENUNCIATION SERVICES
VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT....... 10
    1.  The right to expatriate is deeply rooted in the nation's history .................. 13
    2.  The right of expatriation is implicit in the concept of ordered liberty  ........ 17
    3.  The right to voluntarily renounce citizenship is carefully described .......... 20
    4.  The suspension of renunciation services does not survive strict scrutiny ... 21
    5.  The policy to delay renunciation services
indefinitely does not survive strict scrutiny ........................................................ 24

  C.  PLAINTIFFS ARE ENTITLED TO RELIEF AGAINST THE SUSPENSION
AND DELAY UNDER APA §706(1) ......................................................... 28
    1.  The government has a mandatory and discrete
duty to provide renunciation services ................................................................. 29
    2.  The TRAC factors weigh in favor of Plaintiffs................................................ 31

  D.  THE SUSPENSION VIOLATES 5 U.S.C. §706(2) ......................... 41

VI.   CONCLUSION................................................................................. 42

i

# TABLE OF AUTHORITIES

## Supreme Court Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  140 S. Ct. 2082 (2020) ................................................................. 33
*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
  141 S. Ct. 2485 (2021) ................................................................ 23
*Boyd v. Nebraska,*
  143 U.S. 135 (1892) .................................................................... 16
*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  468 U.S. 837 (1984) ...................................................................... 2
*Duncan v. Louisiana,*
  391 U.S. 145 (1968) .................................................................... 12
*Griswold v. Connecticut,*
  381 U.S. 479 (1965) .................................................................... 10
*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) .................................................................... 33
*Lawrence v. Texas,*
  539 U.S. 558 (2003) .................................................................... 10
*Loving v. Virginia,*
  388 U.S. 1 (1967) ....................................................................... 11
*Lyng v. Castillo,*
  477 U.S. 635 (1986) .................................................................... 22
*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ............................................................. 11, 21
*Norton v. Southern Utah Wilderness Alliance,*
  542 U.S. 55 (2004) ..................................................................... 28
*Obergefell v. Hodges,*
  576 U.S. 644 (2015) .................................................................... 12
*Palko v. Connecticut,*
  302 U.S. 319 (1937) .................................................................... 12
*Pierce v. Society of Sisters,*
  268 U.S. 510 (1925) .................................................................... 10
*Reno v. Flores,*
  507 U.S. 292 (1993) .................................................................... 21
*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  141 S. Ct. 63 (2020) ......................................................... 3, 22, 23
*Savorgnan v. United States,*
  338 U.S. 491 (1950) .................................................................... 14
*Skinner v. Oklahoma ex rel. Williamson,*
  316 U.S. 535 (1942) .................................................................... 11
*Tandon v. Newsom,*
  141 S. Ct. 1294 (2021) ........................................................... 3, 24

*Timbs v. Indiana,*
  139 S.Ct. 682 (2019) ........................................................................... 11, 20
*Trop v. Dulles,*
  356 U.S. 86 (1958) ..................................................................................... 19
*United States v. Playboy Entm't Grp., Inc.,*
  529 U.S. 803 (2000) ................................................................................... 11
*United States v. Wong Kim Ark,*
  169 U.S. 649 (1898) ................................................................................... 15
*Washington v. Glucksberg,*
  521 U.S. 702 (1997) ........................................................................... *passim*
*Zablocki v. Redhail,*
  434 U.S. 374 (1978) ........................................................................... 22, 25

## Cases

*Serv. Emps. Int'l Union Loc. 32BJ v. Preeminent Protective Servs., Inc.,*
  2018 WL 2135011 (D.D.C. May 9, 2018) ..................................................... 7
*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach,*
  495 F.3d 695 (D.C. Cir. 2007)............................................................ 11, 17
*Aboutalebi v. Dep't of State,*
  2019 WL 6894046 (D.D.C. Dec. 18, 2019)................................................ 32
*Air Excursions, LLC. v. Yellen,*
  2022 WL 1091222 (D.D.C. Apr. 12, 2022) .................................................. 7
*Alaska v. United States Dep't of Agric.,*
  17 F.4th 1224 (D.C. Cir. 2021) ................................................................... 3
*Am. Hosp. Ass'n v. Burwell,*
  812 F.3d 183 (D.C. Cir. 2016)............................................................. 30, 37
*Am.-Arab Anti-Discrimination Comm. v. City of Dearborn,*
  418 F.3d 600 (6th Cir. 2005) ..................................................................... 33
*Browne v. Dexter,* 66 Cal. 39 (1884) ........................................................... 15
*Calvary Chapel Dayton Valley v. Sisolak,*
  982 F.3d 1228 (9th Cir. 2020) ................................................................. 3, 4
*Charles Green's Son v. Salas,*
  31 F. 106 (C.C.S.D. Ga. 1887) .................................................................. 15
*Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States,*
  78 F. Supp. 3d 208 (D.D.C. 2015)............................................................... 9
*Church of Am. Knights of Ku Klux Klan v. City of Gary, Indiana,*
  334 F.3d 676 (7th Cir. 2003) ..................................................................... 33
*Cottage Health Sys. v. Sebelius,*
  631 F. Supp. 2d 80 (D.D.C. 2009)............................................................... 8
*Dastagir v. Blinken,*
  2021 WL 2894645 (D.D.C. July 9, 2021) ........................................... 31, 32
*Didban v. Pompeo,*
  435 F. Supp. 3d 168 (D.D.C. 2020)........................................................... 26

*Ebanks v. Shulkin*,
  877 F.3d 1037 (Fed. Cir. 2017)...................................................................... 38

*Est. of Lyons v. Comm'r*,
  4 T.C. 1202 (1945) ........................................................................................ 16

*Farrell v. Blinken*,
  4 F.4th 124 (D.C. Cir. 2021) ......................................................................... 32

*Farrell v. Pompeo*,
  424 F. Supp. 3d 1 (D.D.C. 2019) .................................................................. 19

*Geneme v. Holder*,
  935 F.Supp.2d 184 (D.D.C. 2013) ................................................................ 31

*Godsey v. Wilkie*,
  31 Vet. App. 207, 228 (Vet. App. 2019) ....................................................... 38

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C.)............................................................ 26, 37, 40

*Hall v. Barr*,
  2020 WL 6743080 (D.D.C. Nov. 16, 2020) .................................................. 11

*Hurd v. Dist. of Colum.*,
  864 F.3d 671 (D.C. Cir. 2017)......................................................................... 7

*In re Barr Lab'ys, Inc.*,
  930 F.2d 72 (D.C. Cir. 1991).......................................................................... 37

*Jones v. Perry*,
  215 F. Supp. 3d 563 (E.D. Ky. 2016)............................................................ 24

*Kawakita v. United States*,
  190 F.2d 506 (9th Cir. 1951) ......................................................................... 16

*Khushnood v. U.S. Citizenship & Immigr. Servs.*,
  2022 WL 407152 (D.D.C. Feb. 10, 2022) ..................................................... 32

*Kirwa v. United States Dep't of Defense*,
  285 F.Supp.3d 257 (D.D.C. 2018)................................................................. 12

*Kwok Sze v. Johnson*,
  172 F. Supp. 3d 112 (D.D.C. 2016)............................................................... 19

*L. Xia v. Tillerson*,
  865 F.3d 643 (D.C. Cir. 2017)......................................................................... 7

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
  2020 WL 7039516 (D.D.C. Nov. 30, 2020) .................................................... 8

*Lozada Colon v. U.S. Dep't of State*,
  2 F. Supp. 2d 43 (D.D.C. 1998)..................................................................... 20

*Make the Rd. New York v. McAleenan*,
  405 F. Supp. 3d 1 (D.D.C. 2019),.................................................................. 10

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003)................................................................ 29, 33

*Milligan v. Pompeo*,
  502 F. Supp. 3d 302 (D.D.C. 2020)............................................................... 41

*Murway v. Blinken*,
  2022 WL 493082 (D.D.C., Feb. 16, 2022)............................................... 31, 38

*N.A.A.C.P., W. Region v. City of Richmond,*
  743 F.2d 1346 (9th Cir. 1984) .............................................................. 33
*Palakuru v. Renaud,*
  521 F. Supp. 3d 46 (D.D.C. 2021)......................................................... 29
*Pushkar v. Blinken,*
  2021 WL 4318116 (D.D.C. Sept. 23, 2021) ......................................... 35
*Ramirez de Ferrer v. Mari Bras,*
  144 D.P.R. 141, 1997 WL 870836 (S. Ct. P.R., Nov. 18, 1997) .............. 19
*Roman Cath. Archbishop of Washington v. Bowser,*
  531 F. Supp. 3d 22 (D.D.C. 2021).......................................................... 3
*Saavedra Bruno v. Albright,*
  197 F.3d 1153 (D.C. Cir. 1999)............................................................. 32
*Sabra as next friend of Baby M v. Pompeo,*
  453 F. Supp. 3d 291 (D.D.C. 2020)......................................................... 2
*Scales v. I.N.S.,*
  232 F.3d 1159 (9th Cir. 2000) .............................................................. 2
*Scott v. United States,*
  2014 WL 2807652 (E.D. Cal. June 20, 2014).......................................... 20
*Sierra Club v. EPA,*
  292 F.3d 895 (D.C. Cir. 2002)................................................................. 8
*Simon v. Republic of Hungary,*
  2021 WL 6196995 (D.D.C., Dec. 30, 2021) ........................................... 13
*Sobin v. District of Columbia,*
  480 F.Supp.3d 210 (D.D.C. 2020)......................................................... 12
*Sunny v. Biden,*
  2021 WL 5294879 (E.D.N.Y. Nov. 15, 2021) ....................................... 31
*Tate v. Pompeo,*
  513 F. Supp. 3d 132 (D.D.C. 2021)........................................................ 31
*Telecomms. Research & Action Ctr. v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984).................................................... 6, 30, 35, 37
*Tutora v. U.S. Att'y Gen. for E. Dist. of Pennsylvania,*
  2017 WL 2126321 (E.D. Pa. May 16, 2017)........................................... 20
*United States v. Allen,*
  2022 WL 1532371 (9th Cir. May 16, 2022).........................................23, 24, 27

## Constitutional Provisions

U.S. CONST. amend. V .................................................................... 10
U.S. CONST., amend. xiv, cl. 1.......................................................... 18

## Statutes

1868 Act Concerning the Rights of American Citizens in Foreign States,
 ch. 249, 15 Stat. 223 (1868) .................................................................. 14

5 U.S.C. §706(1) .................................................................. 2, 6, 28, 41

5 U.S.C. § 706(2) .................................................................. 42

5 U.S.C. §706(2)(C) .................................................................. 2, 6

8 U.S.C. §1481.................................................................. *passim*

Foreign Account Tax Compliance Act,
 enacted as part of the Hiring Incentives to Restore Employment Act (HIRE),
 Pub. L. No. 111-147, §§ 501-531, 124 Stat. 71 (2010) .............................................. 4

## Regulations

22 C.F.R. §50.50 .................................................................. 2

22 C.F.R. §50.50(a) .................................................................. 30

22 C.F.R. §50.50(b) .................................................................. 30

## Legislative History and Congressional Debates

*Cong. Globe*, 40th Cong., 2nd Sess. 1103 (1868) ........................................................ 14

## Foreign Affairs Manual and Handbook

7 FAM 1261 .................................................................. 2

7 FAM 1261(e) .................................................................. 35

7 FAM 1261.3 .................................................................. 30

7 FAM 1262.1 .................................................................. 30

7 FAM 1262.2 .................................................................. 30

7 FAM 1262.2(C) .................................................................. 31

7 FAM 1290(e) .................................................................. 17

7 FAH-1 H-263.8 .................................................................. 23

7 FAH-1 H-280 .................................................................. 23

## Other Authorities

Colin J. Carlson, Gregory F. Albery, Cory Merow, Christopher H. Trisos, Casey M.
 Zipfel, Evan A. Eskew, Kevin J. Olival, Noam Ross, Shweta Bansal, "Climate
 Change Increases Cross-species Viral Transmission Risk,"
 NATURE, 2022; DOI: 10.1038/s41586-022-04788-w (April 28, 2022) .................. 3, 32

Minoru Kiyota, *Beyond Loyalty: The Story of a Kibei*,
University of Hawaii Press (1997) ......................................................... 20


U.N. Secretary General, Rep. on Human Rights and Arbitrary Deprivation of
Nationality, U.N. Doc. E/CN.4/1999/56 (Dec. 28, 1998) ........................................ 17

## Treatises

John Bassett Moore,
A DIGEST OF INTERNATIONAL LAW AS EMBODIED IN DIPLOMATIC DISCUSSIONS,
TREATIES AND OTHER INTERNATIONAL AGREEMENTS, INTERNATIONAL AWARDS, THE
DECISIONS OF MUNICIPAL COURTS, AND THE WRITINGS OF JURISTS
(Gov't Printing Office, 1906) ............................................................. 13, 17

## Law Review Articles

Glenda Burke Slaymaker,
*The Right of the American Citizen to Expatriate*,
37 AM. L. REV. 191 (1903) ................................................................. 13, 18
Kenji Yoshino,
*A New Birth of Freedom?: Obergefell v. Hodges*,
129 HARV. L. REV. 147 (2015) .............................................................. 12
Mark P. Strasser,
*Obergefell's Legacy*,
24 DUKE J. GENDER L. & POL'Y 61 (2016) ................................................... 12
Michelle Leigh Carter,
*Giving Taxpatriates the Boot-Permanently?: The Reed Amendment
Unconstitutionally Infringes on the Fundamental Right to Expatriate*,
36 GA. L. REV. 835 (2002) ................................................................. 14
Peter J. Spiro,
*Citizenship Overreach*,
38 MICH. J. INT'L L. 167 (2017) ........................................................... 9, 25
Richard S. Myers,
*Obergefell and the Future of Substantive Due Process*,
14 AVE MARIA L. REV. 54 (2016) ........................................................... 12
Stephen C. Robin,
*Healing Medicare: Enforcing Administrative Law Deadlines in Medicare Appeals*,
95 N.C. L. REV. 1293 (2017) ............................................................... 40
William Thomas Worster,
*The Constitutionality of the Taxation Consequences for Renouncing U.S.
Citizenship*,
9 FL. TAX REV. 11 (2010) .................................................................. 20

## I.      PRELIMINARY STATEMENT

The U.S. government does not like when its citizens expatriate. That is understandable. When a U.S. national renounces her citizenship, she may be expressing her disappointment with the way her country has treated her. Or she may be voicing her protest against the government's discriminatory practices towards U.S. citizens residing abroad. Or she may simply be fed up with the burdens U.S. citizenship imposes on her ability to conduct her financial affairs and support her own and her family's way of life.

For all these reasons and more, the rate of voluntary expatriation is on the rise, and it appears that this trend will continue in the near future.[1] Yet, instead of dealing with the reason for the ever increasing renunciation rate – namely, the discriminatory treatment of U.S. citizens residing abroad [*see* First Amended Complaint, ECF 12 ("FAC"), ¶¶45-53] — the U.S. government apparently prefers to prevent its overseas citizenry from exercising their natural and constitutional right to voluntarily renounce their citizenship. How so? First, by levying the world's highest fee on renunciation (*i.e.*, $2,350)[2] and then by either suspending renunciation services altogether, or by placing renunciants on indefinite waiting lists.[3] Without

---

[1] *See, e.g.,* Tom Burroughes, "Trend of US Citizenship Renunciation to Rise 'Dramatically,'" WEALTH BRIEFING (April 22, 2021), https://www.wealthbriefing.com/html/article.php?id=190932#.Ym1-v9pBwWU, last accessed, May 17, 2022.

[2] The renunciation fee is being challenged in a parallel proceeding in this Court, *L'Association Des Americains Accidentels, et al. v. United States Department of State, et al.*, 1:20-cv-03573-TSC (D.D.C.) ("Renunciation Fee Litigation.").

[3] Under the Immigration and Nationality Act ("INA"), 8 U.S.C. §1481(a)(5), to voluntarily renounce citizenship, an applicant must make a "formal renunciation of

being able to appear before a consular official, the citizen cannot expatriate.  FAC, ¶¶7, 39-40.

This lawsuit challenges the government's suspension of and subsequent delay in scheduling appointments to take the oath of voluntary renunciation under 8 U.S.C. §1481(a)(5).  L'Association Des Americains Accidentels ("AAA")*,* together with Plaintiffs have sued under the Due Process Clause of the Fifth Amendment (Counts I and II) and under the Administrative Procedure Act ("APA"), 5 U.S.C. §706(1) (Count IV) and 5 U.S.C. §706(2)(C) (Count III).

When this lawsuit was first commenced on November 8, 2021, U.S. posts

_____

nationality before a diplomatic or consular officer of the United States in a foreign state in such form as may be prescribed by the Secretary of State." The statute says nothing about physically appearing before a consular official or taking an oath. The regulations, 22 C.F.R. §50.50, are to the same effect. The prescribed method of renunciation – including the physical appearance requirement and the oath of renunciation – is set forth in the Foreign Affairs Manual ("FAM"), 7 FAM 1261, the "comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department […]" www.fam.state.gov. The FAM does not have the force of law and does not require deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 468 U.S. 837 (1984). *See Scales v. I.N.S.*, 232 F.3d 1159, 1166 (9th Cir. 2000), *accord, Sabra as next friend of Baby M v. Pompeo*, 453 F. Supp. 3d 291, 320 (D.D.C. 2020).

Throughout its brief, the government refers to the services at issue as "CLN services." *See* MTD, at 1. This is a mischaracterization. The services at issue are not merely those that are needed for administrative *recognition* of an expatriating act in the form of a Certificate of Loss of Nationality. *Farrell v. Blinken*, 4 F.4th 124 (D.C. Cir. 2021) (noting in relation to *CLN* services, "[…] *recognition* of expatriation is inextricably bound with expatriation.") [emphasis added].). Rather, the services subject to this litigation are those that are necessary to *expatriate* in the first place. Unlike the plaintiff in *Farrell* whose past expatriation occurred automatically under 8 U.S.C. §1481(a)(1) and who sought only to receive a CLN, the current lawsuit involves expatriation under 8 U.S.C. §1481(a)(5). Expatriation under this latter statute can only happen if and when a renunciant appears before a consular official to formally renounce.

around the world uniformly suspended renunciation services. FAC, ¶58. Approximately four months later, the government began rebranding its suspension policy. Now, while many U.S. missions are no longer *explicitly* suspending renunciation services,[4] potential renunciants are forced to wait, on average, over a year to receive an interview.[5] During this lengthy wait, the renunciant sustains

---

[4] This Court should still rule on the legality of the suspension notwithstanding the fact that most U.S. missions have recommenced renunciation services. The government can easily reinstate the suspension, whether it be for public health concerns, including COVID-19, or security-related issues, like the Afghanistan crisis or the Russo-Ukrainian War. *See* MTD, at 1, 5. Applicants for voluntary renunciation are under constant threat that the government will return to its suspension policy under the guise of a global crisis. Recently, in an article published in the prestigious scientific journal, NATURE, researchers at the Georgetown University Medical Center, explained that a coronavirus pandemic could occur at any time due to climate change. Colin J. Carlson, Gregory F. Albery, Cory Merow, Christopher H. Trisos, Casey M. Zipfel, Evan A. Eskew, Kevin J. Olival, Noam Ross, Shweta Bansal, "Climate Change Increases Cross-species Viral Transmission Risk," NATURE, 2022; DOI: 10.1038/s41586-022-04788-w (April 28, 2022); *see also* "Shanghai escalates Covid lockdown restrictions," BBC (April 22, 2022), available at https://www.bbc.com/news/world-asia-china-61137649 (last accessed on May 17, 2022) (describing massive lockdown measures imposed by the Chinese government following a recent outbreak of COVID-19 in Shanghai); "Coronavirus wave this fall could infect 100 million, administration warns," Washington Post (May 6, 2022), available at https://www.washingtonpost.com/health/2022/05/06/fall-winter-coronavirus-wave (last accessed on May 17, 2022).

Therefore, absent direction from this Court, the government is likely to renew its suspension policy should COVID-19 resurge. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (adjudicating COVID-19 restrictions not moot because applicants remain under constant threat); *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (same); *Alaska v. United States Dep't of Agric.*, 17 F.4th 1224, 1229 (D.C. Cir. 2021), *citing Roman Cath. Diocese* ("actions that can be reversed at the stroke of a pen or otherwise face minimal hurdles to re-enforcement can thwart mootness."); *Roman Cath. Archbishop of Washington v. Bowser*, 531 F. Supp. 3d 22, 30 (D.D.C. 2021), *citing Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1230, fn. 1 (9th Cir. 2020) (COVID-19 restriction challenge not moot even though the restriction was no longer in effect because it could "just as easily" be restored.).

[5] As of the filing of this document, the average waiting time for the named Plaintiffs to receive an appointment to renounce is 14.6 months:

injury on a daily basis. FAC, ¶¶45-53.  Thanks to FATCA[6] and other similar legislation, routine bank and credit card transactions; securing finance to purchase a residence or for business; maintaining or opening a bank account have all become nightmares for American citizens residing abroad. *Id.*

Predictably, the government now seeks to dismiss the lawsuit, reflexively invoking COVID-19 as justification for its suspension and waitlist policy.  "COVID-19," however, is not some talismanic invocation to which this Court must or should simply bow when evaluating the legality of agency delay. *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2614 (2020) (COVID-19 is not a "blank check" for

| Named Plaintiff | Waiting Period |
|---|---|
| Lilian Pam | 23 months |
| Joshua Grant | 20 months |
| Martin Kracklauer | 18 months |
| Sofiann Thoulon | 15 months |
| Philip Boeffard | 13 months |
| Stephen Collins | 8 months |
| Kristopher Lazarz | 9 months |
| Christopher Bousigues | 11 months |
| **Avg.** | **14.6 months** |

This average waiting period will only increase. *See* Government's Statement of Facts, ¶25 (noting Plaintiff Stephen Collins is number 330 on Bern, Switzerland's 700-person waitlist); *id.*, ¶24 (noting Plaintiff Kristopher Lazarz is in the middle of Frankfurt, Germany's 900-person waitlist); *id.*, ¶19 (same, as for Plaintiff Joshua Grant).

[6] FATCA stands for the Foreign Account Tax Compliance Act, enacted as part of the Hiring Incentives to Restore Employment Act (HIRE), Pub. L. No. 111-147, §§ 501-531, 124 Stat. 71 (2010) (codified in scattered sections of the Internal Revenue Code). FATCA is a bulk data collection program requiring foreign financial institutions to report to the IRS detailed information about the accounts of U.S. persons living abroad. FATCA has caused many foreign financial institutions to curtail their business dealings with U.S. citizens living abroad because the costs associated with compliance are simply not worth the trouble. *See* Plaintiffs' Statement of Facts, ¶¶7-15.

the government).  The government failed to take into account the fact that extended delay and suspension directly infringe upon a citizen's natural and fundamental right to expatriate.

The government's reliance on COVID-19 is a thinly disguised attempt to deny overseas Americans their right to renounce.  Even public health considerations are subject to the rule of reason and fairness. On closer examination, the government's decision to suspend and delay renunciation services is neither reasonable nor fair. For example, the government rushed to renew visa services for aliens, while at the same time maintaining the suspension of renunciation services for U.S. citizens, and continues to postpone renunciation procedures by placing U.S. citizen applicants on indefinite waiting lists; thus, blatantly favoring foreign nationals over American citizens.   Such policies and procedures are plainly incompatible with the government's constitutional and statutory obligations to its own citizens.

## II.    THE GOVERNMENT'S MOTION TO DISMISS AND PLAINTIFFS' OPPOSITION AND CROSS-MOTION FOR SUMMARY JUDGMENT

The government's Motion to Dismiss[7] ("MTD") can be summarized as follows. Plaintiffs' Fifth Amendment Due Process claims are meritless, the government argues, because even assuming, *arguendo*, that the right of voluntary renunciation is a fundamental right (a point the government contests, mischaracterizing the nature and scope of the right, MTD, at 27-30), the suspension/waitlist policy survives strict scrutiny. MTD, at 31-32.

---

[7] The government filed a motion to dismiss or, in the alternative, for summary judgment. We refer to the government's motions, collectively, as "MTD."

Regarding Plaintiffs' APA claims (Counts III and IV), the government contends that renunciation services have not been "unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1). The government claims that the so-called *TRAC* factors – employed when assessing the propriety of delayed agency action – weigh in favor of the government. *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984). The government also argues that Plaintiffs' claim under 5 U.S.C. §706(2)(C) [requiring the set aside of agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"] should be dismissed because it "has the discretion to choose how best to allocate its resources to carry out all of its statutory responsibilities." MTD, at 23-27.

For the reasons explained below, the government's MTD should be denied and summary judgment should be entered in favor of Plaintiffs.  First, with regard to Counts I and II, history and precedent show that the right to voluntarily expatriate is fundamental, worthy of the protections afforded by the Fifth Amendment Due Process Clause.  As such, any limitation or restriction on the exercise of that right should and must be stricken unless it is necessary to further a compelling governmental interest (strict scrutiny).  Here, the government has failed to show that a compelling interest necessary to justify the outright blanket suspension of voluntary renunciation services and the subsequent waitlist policy.

As for Plaintiffs' APA claims (Counts III and IV), the *TRAC* factors weigh heavily against the government with respect to both its suspension and waitlist policies.  Moreover, under the circumstances alleged in the FAC, the government has

6

no authority to suspend voluntary renunciation services.

## III.   STATUTORY AND REGULATORY SCHEME

The statutory scheme for voluntarily renouncing one's U.S. citizenship is summarized in the FAC (¶¶38-44) and the MTD (at 1-3). The suspension of renunciation services due to COVID-19 has also been detailed in the FAC (¶¶45-72) and the MTD (at 5-9). The analytical and factual background is largely undisputed by the parties and, therefore, need not be repeated here.

## IV.   STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Air Excursions, LLC. v. Yellen*, 2022 WL 1091222, at *3 (D.D.C. Apr. 12, 2022), *quoting Hurd v. Dist. of Colum.*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up). The court accepts the complaint's factual allegations as true and grants the plaintiff "all inferences that can be derived from the facts alleged." *Id.*, *quoting L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up).

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Serv. Emps. Int'l Union Loc. 32BJ v. Preeminent Protective Servs., Inc.*, 2018 WL 2135011, at *2 (D.D.C. May 9, 2018). This standard is equally applicable in cases where challenges are brought against agency action under the APA. MTD, at 11, *citing Cottage Health*

*Sys. v. Sebelius*, 631 F. Supp. 2d 80, 90 (D.D.C. 2009); *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 2020 WL 7039516, at *8 (D.D.C. Nov. 30, 2020) (APA challenge "ordinarily presents a pure question of law.").

## V.   ARGUMENT

### A.   L'ASSOCIATION DES AMÉRICAINS ACCIDENTELS HAS ASSOCIATIONAL STANDING[8]

An association has standing to sue on behalf of its members if: "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  AAA easily satisfies this test.

First, AAA's members would otherwise have standing to sue in their own right. AAA's members include United States citizens who wish to renounce their U.S. citizenship but are either unable to do so because the government has suspended voluntary expatriation services or because they are being placed on indefinite waitlists. Plaintiff Sofiane Thoulon is a member of AAA. *See* Sofiane Thoulon Decl., ¶15. *See also* Fabien Decl., ¶12-13. *See also* non-party AAA members Olivier Vaury Decl.; Carole Noyer Decl.; Nina Nelson Decl.; Dominique Dumant Decl.; Flore Dupoux Decl.[9]  *Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States*,

---

[8] The FAC inadvertently referred to AAA's standing in the Complaint as "organizational" standing. AAA's standing is based on "associational" standing.
[9] The government also contends that AAA has failed to establish that it is a

78 F. Supp. 3d 208, 217 (D.D.C. 2015) (lack of sufficient evidence of standing in the record permits the submission of extra-record evidence, including declarations, to establish standing). *See also*, FAC, ¶68.

Second, the interests AAA seeks to protect are germane to AAA's purpose. AAA's purpose is to further the interests of overseas Americans, including Accidental Americans – *i.e.*, those individuals who are deemed United States citizens due to place of birth but have no or inconsequential connections with the United States.[10] Fabien Decl., ¶4.  In furthering the interests of Accidental Americans, AAA also campaigns against the suspension and delay of voluntary expatriation services by the government. *Id.*, ¶7.  AAA also campaigns against the $2,350 renunciation fee and is prosecuting the Renunciation Fee Litigation, currently pending in this Court. *Id.*, ¶6.

Last, neither the claim asserted, nor the relief requested, requires the participation of individual AAA members in the lawsuit.  The relief sought by AAA is to compel the government to fulfill its duties to restore voluntary expatriation services immediately so that Plaintiffs may exercise their fundamental right to expatriate in a timely manner.  The question undergirding this lawsuit is, for the most part, legal and does not require the participation of the individual members of

---

"traditional voluntary membership organization." MTD, at 13. *See*, however, Fabien Decl., ¶¶8-11; *see also* https://www.americains-accidentels.fr/page/258598-comment-adherer, describing the procedure for joining AAA as a member.  Tellingly, the government did not challenge this issue in the Renunciation Fee Litigation, where AAA was also a plaintiff, invoking associational standing.

[10] *See* Peter J. Spiro, *Citizenship Overreach*, 38 Mich. J. Int'l L. 167, 167 (2017) (defining "accidental Americans" as "those born with U.S. citizenship but lacking meaningful social connections to the United States in adulthood […]").

AAA. The government does not contend otherwise.

Accordingly, AAA has established associational standing. *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 32 (D.D.C. 2019), *rev'd and remanded sub nom. on other grounds*, *Make The Rd. New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) (associational standing established under similar circumstances).

### B. THE SUSPENSION AND DELAY OF RENUNCIATION SERVICES VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

Under the Fifth Amendment Due Process Clause, no "person shall be […] deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Supreme Court has stated that the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), including rights not explicitly mentioned in the Constitution, such as the right to direct the education and upbringing of one's children [*Pierce v. Society of Sisters*, 268 U.S. 510 (1925)], to consensual sexual privacy [*Lawrence v. Texas*, 539 U.S. 558 (2003)], to use contraception [*Griswold v. Connecticut*, 381 U.S. 479 (1965)], to interracial marriage [*Loving v. Virginia*, 388 U.S. 1 (1967)], to bodily integrity [*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942)]. Government restrictions on fundamental rights are subject to strict scrutiny and will be stricken if they are not narrowly tailored to promote a compelling government interest. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).

A core question presented in this lawsuit is whether the right to voluntarily renounce American citizenship is a constitutionally-protected fundamental right.  In *Glucksberg*, the Supreme Court described its "established method of substantive-due-process analysis" as having two primary features:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest.

*Accord, McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (Second Amendment right to bear arms is incorporated into Fourteenth Amendment); *see also Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007) (applying *Glucksberg* analysis to the question whether patients have a fundamental right to experimental drugs); *Hall v. Barr*, 2020 WL 6743080, at *6 (D.D.C. Nov. 16, 2020), *aff'd*, 830 F. App'x 8 (D.C. Cir. 2020) (applying *Glucksberg* analysis to the question whether right to ninety days' notice before execution is a fundamental right.); *Timbs v. Indiana*, 139 S.Ct. 682, 686-687 (2019) (Eighth Amendment's prohibition against excessive finds is "fundamental to our scheme of ordered liberty" with deep roots in our history and tradition and is incorporated by the Fourteenth Amendment Due Process Clause); *see also Obergefell v. Hodges*, 576 U.S. 644, 663 (2015)[11] (applying a more flexible substantive due process analysis to

---

[11] The *Obergefell* majority deviated from the *Glucksberg* analysis in several aspects. *Obergefell* transformed the role assigned to history and tradition in substantive due process analysis and did not rely on the "careful description" analysis from *Glucksberg*. *See*, in general, Kenji Yoshino, *A New Birth of Freedom?: Obergefell v.*

the right of same-sex marriage); *see also Duncan v. Louisiana*, 391 U.S. 145, 148 (1968) (whether a "right is among those fundamental principles of liberty and justice which lie at the base of our civil and political institutions."); *Palko v. Connecticut*, 302 U.S. 319, 327 (1937) (requiring "a principle of justice so rooted in the traditions and conscious of our people as to be ranked as fundamental.").

Under *Glucksberg*, the Court must determine whether the right to voluntarily renounce American citizenship is **(1)** deeply rooted in the history and traditions of the American people; and **(2)** implicit in the concept of ordered liberty.

---

*Hodges*, 129 HARV. L. REV. 147 (2015). There is some debate among scholars regarding the effects (if any) of *Obergefell* on *Glucksberg*. *See* Mark P. Strasser, *Obergefell's Legacy*, 24 DUKE J. GENDER L. & POL'Y 61, 61 (2016); Richard S. Myers, *Obergefell and the Future of Substantive Due Process*, 14 AVE MARIA L. REV. 54, 65-69 (2016). However, this debate is largely irrelevant for the present lawsuit because Plaintiffs do not wish to have the Court recognize a new right that has little or no tradition in American history. The right to expatriate, as we demonstrate below, has strong roots in American history and jurisprudence. Since, as we show, the right to expatriate meets the more stringent standard laid down in *Glucksberg* and *McDonald,* it easily passes muster under the more flexible analysis adopted in *Obergefell.* For the approach taken by courts in the D.C. Circuit to substantive due process after *Obergefell, compare Kirwa v. United States Dep't of Defense,* 285 F.Supp.3d 257, 275 (D.D.C. 2018) (D.C. Circuit has yet to address the substantive due process inquiry since *Obergefell*) *with Sobin v. District of Columbia,* 480 F.Supp.3d 210, 222 (D.D.C. 2020) (applying *Glucksberg* analysis to substantive due process claim).

1. **The right to expatriate is deeply rooted in the nation's history[12]**

The right to voluntarily expatriate has long been recognized in America as a natural and fundamental right. Glenda Burke Slaymaker, *The Right of the American Citizen to Expatriate*, 37 AM. L. REV. 191, 192 (1903) (hereinafter: "Slaymaker").[13] Actions by the legislative, judicial and executive branches of the government, since the founding of the Republic until this day, demonstrate that the right to voluntarily expatriate is deeply rooted in our society as "old as the American nation itself." *Cong. Globe*, 40th Cong., 2nd Sess. 1103 (1868) (statement by Rep. Godlove Orth).  *See also* Michelle Leigh Carter, *Giving Taxpatriates the Boot-Permanently?: The Reed Amendment Unconstitutionally Infringes on the Fundamental Right to Expatriate*, 36 GA. L. REV. 835, 853 (2002) (stating that "the strongest argument for endorsing expatriation as a fundamental right is the history and tradition of expatriation in the

---

[12] Due to page limitations, LCvR 7(e), this brief contains an abbreviated discussion of the nature of the right to voluntarily renounce U.S. citizenship. A more comprehensive discussion of this right was submitted in the Renunciation Fee Litigation. *L'Association Des Americains, et al. v. United States Department of State, et al.*, 1:20-cv-03573-TSC (D.D.C.), ECF/CM Dkt. No. 14 (June 17, 2021), "Memorandum of Points and Authorities in Opposition to Defendants' Motion for Partial Dismissal and Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment." That brief also includes pre-Expatriation Act (*see* immediately below) sources. The Court is respectfully referred to that document. *Cf. Simon v. Republic of Hungary*, 2021 WL 6196995, at *18 (D.D.C. Dec. 30, 2021), *appeal pending*, 22-7010 (D.C. Cir.) (judicially noticing a brief submitted in another related proceeding).

[13] For a comprehensive review of American judicial decisions, legislation and state practice prior to 1906, *see generally* 3 John Bassett Moore, A DIGEST OF INTERNATIONAL LAW AS EMBODIED IN DIPLOMATIC DISCUSSIONS, TREATIES AND OTHER INTERNATIONAL AGREEMENTS, INTERNATIONAL AWARDS, THE DECISIONS OF MUNICIPAL COURTS, AND THE WRITINGS OF JURISTS, §431 *et seq.* (Gov't Printing Office, 1906) (hereinafter: "Moore").

United States.").

Congress first codified the natural and fundamental right to expatriate in 1868 in the "Act Concerning the Rights of American Citizens in Foreign States," ch. 249, 15 Stat. 223 (1868), *codified* as a Note to 8 U.S.C. §1481 (the "Expatriation Act"). The preamble of the Act declares unequivocally:

> **Whereas the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness [...] Therefore any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental principles of the Republic.**

(Emphasis added).

The preamble, added to the draft bill, was no innovation. Rather it reflected the longstanding view that voluntary expatriation was a natural and fundamental right of humankind. Congress merely acknowledged the pre-existing fundamental and inherent right of Americans to renounce their citizenship.

The judiciary has also recognized the right to voluntarily expatriate as a fundamental right and has consistently interpreted the Expatriation Act to reflect the status of the right. In *Savorgnan v. United States*, 338 U.S. 491 (1950), the Supreme Court specifically stated that the language of the Expatriation Act is "broad enough to cover, *and does cover*, the corresponding natural and inherent right of American citizens to expatriate themselves." *Id.*, fn. 11 (emphasis added). The Court observed that "[t]raditionally the United States has supported the right of expatriation as a natural and inherent right of all people. Denial, restriction,

14

impairment or questioning of that right was declared by Congress, in 1868, to be inconsistent with the fundamental principles of this Government"). *See also United States v. Wong Kim Ark*, 169 U.S. 649, 704 (1898) ("the right of expatriation [...] must be considered [...] a part of the fundamental law of the United States" [referring to the 1868 Expatriation Act and the renunciation of American citizenship]); *see also Charles Green's Son v. Salas*, 31 F. 106, 112–13 (C.C.S.D. Ga. 1887) (citing the 1868 Expatriation Act and stating, in relation to a native-born American's expatriation, that "[i]n this country expatriation is a fundamental right."); *In re Look Tin Sing*, 21 F. 905, 907-908 (D. Cal. 1884) (applying the Expatriation Act to U.S.-born citizens);[14] *Browne v. Dexter*, 66 Cal. 39, 40 (1884) (same).[15]

---

[14] *In re Look Tin Sing* dealt with the interpretation of the Fourteenth Amendment in relation to a Chinese petitioner who was born in California. In its opinion the court declared:

> The United States recognize the right of everyone to expatriate himself and choose another country. This right would seem to follow from the greater right proclaimed to the world in the memorable document in which the American colonies declared their independence and separation from the British crown, as belonging to every human being,— God-given and inalienable,— the right to pursue his own happiness. The English doctrine of perpetual and unchangeable allegiance to the government of one's birth, attending the subject wherever he goes, has never taken root in this country, although there are judicial dicta that a citizen cannot renounce his allegiance to the United States without the permission of the government under regulations prescribed by law; [...] But a different doctrine prevails now.

*Id.*, at 906-907.

[15] *See also Boyd v. Nebraska*, 143 U.S. 135, 161 (1892) ("We do not understand the contention to involve, directly, a denial of the right of expatriation, which the political departments of this government have always united in asserting [...]"); *United States v. Husband*, 6 F.2d 957, 958 (2d Cir. 1925) (same); *Est. of Lyons v. Comm'r*, 4 T.C.

The Executive Branch of the federal government has also consistently viewed the Expatriation Act as being declarative of the natural right to expatriate, applying with equal force to U.S.-born as well as naturalized American citizens.  For example, Attorney General George Williams, speaking for the Grant Administration, shortly after the Expatriation Act was enacted, opined that the "affirmation by Congress, that the right of expatriation is a 'natural and inherent right of all people' includes citizens of the United States as well as others and the executive should give to it that comprehensive effect." 14 *Opinions of the Attorney General*, 295, 296 (1873).[16]

The contemporary practice of the State Department is consistent with over two centuries of United States expatriation policy.  In 1998, for example, the U.S. government submitted responses to the United Nations' Commission on Human Rights, pursuant to its resolution 1998/48 of 17 April 1998, entitled "Human rights and arbitrary deprivation of nationality." In its response, the State Department stated that the "United States, however, has recognized the right of expatriation as an inherent right of all people." U.N. Secretary General, Rep. on Human Rights and Arbitrary Deprivation of Nationality, ¶ 39, U.N. Doc. E/CN.4/1999/56 (Dec. 28, 1998)

---

1202, 1205 (1945) (applying the Act to renunciation of U.S. citizenship); *Kawakita v. United States*, 190 F.2d 506, 511 (9th Cir. 1951), *aff'd*, 343 U.S. 717 (1952) (same).

[16] *See also* Letter from Thomas F. Bayard, Sec. of State, to Col. Frey, Swiss min., May 20, 1887, *quoted* in 3 Moore at 584:

> This Government maintaining the doctrine of voluntary expatriation has always held that its citizens are free to divest themselves of their allegiance by emigration and other acts manifesting an intention to do so [...] This doctrine applies as well to native-born as to naturalized citizens [...]

(citing response from the United States (Oct. 9, 1998). *See also* 7 FAM 1290(e), App'x "A", "Later Twentieth Century Developments," (where the State Department states unequivocally: "The United States has recognized the right of expatriation as an inherent right of all people.").

### 2. The right of expatriation is implicit in the concept of ordered liberty

Not only is the right to voluntarily expatriate deeply rooted in our society, but liberty and justice mandate that this right be deemed fundamental. The Due Process Clause "specially protects those fundamental rights and liberties which are, [...] implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Abigail Alliance*, 495 F.3d at 702, *quoting Glucksberg*, 521 U.S. at 720–21.

The right of an individual to voluntarily dissolve his allegiance with the United States serves to protect an individual's personal liberty. This concept was articulated well by Slaymaker over a century ago, at 192:

> The function of society is to overcome defects in individual existence, and when social, political or other environment ceases to conduce to the good of the individual, then it is that the individual may seek the society which can afford him what the conditions of his welfare and his happiness demand. It is a natural right, included within the larger right of the - pursuit of happiness which the fathers of this nation have declared to be inalienable. (internal quotations omitted).

The right to expatriate serves as a daily reaffirmation of this political and social association.

In *Afroyim v. Rusk*, 387 U.S. 253 (1967), the Supreme Court, speaking through Mr. Justice Black, explained the central importance of citizenship under the

17

Constitution and, in particular, under the Citizenship Clause of the Fourteenth Amendment, U.S. CONST., amend. XIV, cl. 1.[17]

> There is no indication in these words of a fleeting citizenship, good at the moment it is acquired but subject to destruction by the Government at any time. Rather the Amendment can most reasonably be read as defining a citizenship which a citizen keeps unless he voluntarily relinquishes it. Once acquired, this Fourteenth Amendment citizenship was not to be shifted, canceled, or diluted at the will of the Federal Government, the States, or any other governmental unit.

*Afroyim*, 387 U.S. at 262.

Citizenship is the bedrock upon which all other fundamental rights protected by the Constitution are predicated. As Chief Justice Warren stated in *Trop v. Dulles,* 356 U.S. 86, 102 (1958) "the expatriate has lost the right to have rights." "Citizenship," as the *Afroyim* Court declaimed, "is no light trifle [...]." The United States Constitution grants a citizen a constitutional right "to remain a citizen in a free country, *unless he voluntarily relinquishes that citizenship*." *Afroyim*, 387 U.S. at 268 (emphasis added). Logically, the government can no sooner deprive a citizen of her fundamental right to renounce citizenship than it can deprive her of citizenship in the first place. For without the right to relinquish citizenship – that is, the right to associate with the American political system and social fabric – the right to citizenship itself (the "mother of all rights"), loses all meaning.

The right to voluntarily expatriate is also inherently linked to other fundamental rights such as the individual's right to free speech. Historically,

---

[17] The Citizenship Clause provides in relevant part: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."

expatriation has been used as an expressive act, reflecting the renunciant's position regarding her association with a body politic.   For example, many Japanese Americans who were placed in internment camps throughout the West during World War II elected to renounce their U.S. citizenship as an "expression of momentary emotional defiance in reaction to years of persecution." Minoru Kiyota, BEYOND LOYALTY: THE STORY OF A KIBEI (University of Hawaii Press 1997), at 129.[18]

Ordered liberty requires, therefore, that this Court treat the right of voluntary expatriation as an integral aspect of "life, liberty, and the pursuit of happiness." Accordingly, the constitutionality of a suspension of voluntary renunciation services or any delay thereof must be scrutinized through the lens of the fundamental right to voluntarily expatriate. *See* William Thomas Worster, *The Constitutionality of the Taxation Consequences for Renouncing U.S. Citizenship*, 9 FL. TAX REV. 11 (2010) (arguing that voluntary expatriation is a fundamental right).[19]

---

[18] Similarly, Juan Mari Brás' renunciation of U.S. citizenship in 1994 was an exercise of freedom of speech. By rejecting United States citizenship, "Mari Brás sought to spread his very own view of his pro-independence ideal for Puerto Rico, to express his objection to a citizenship he believes was unlawfully imposed, and to affirm his belief that Puerto Rico is a nation and his sole homeland." *Ramirez de Ferrer v. Mari Bras*, 144 D.P.R. 141, 1997 WL 870836 (S. Ct. P.R., Nov. 18, 1997) (translated from the Spanish).

[19] In footnote 9 of its MTD, the government cites several authorities ostensibly supporting its position that the right to voluntary renounce citizenship is not a fundamental right. Upon closer inspection, however, these authorities do not support the government's contention.  *First*, most of the cases cited by the government deal with claims by prisoners who sought to expatriate while incarcerated, challenging the in-person interview requirement. *Farrell v. Pompeo*, 424 F. Supp. 3d 1, 23-24 (D.D.C. 2019), *rev'd and remanded on other grounds Farrell v. Blinken*, 4 F.4th 124 (D.C. Cir. 2021);  *Kwok Sze v. Johnson*, 172 F. Supp. 3d 112, 121 (D.D.C. 2016), *aff'd sub nom. Kwok Sze v. Kelly*, 2017 WL 2332592 (D.C. Cir. Feb. 21, 2017); *Scott v. United States*,

### 3. The right to voluntarily renounce citizenship is carefully described

*Glucksberg* and related decisions require that the liberty interest at issue be carefully described. 521 U.S. at 721; *Reno v. Flores,* 507 U.S. 292, 302 (1993); *McDonald,* 561 U.S. at 797 – 799 (Scalia, J. concurring, elaborating upon the "careful description" requirement). The government argues that the proper description of the right at issue is the right to renounce within days or weeks. MTD, at 28-29. In so narrowly delimiting the right to expatriate, the government transgresses the late Justice Stevens' admonition in his *McDonald* dissent that "we must [not ]define the asserted right at the most specific level, thereby sapping it of a universal valence and a moral force it might otherwise have." *Id.*, at 882.

The right to voluntarily renounce U.S. citizenship need not be more precisely defined than Plaintiffs' description in the FAC. FAC, ¶ 75. *See Timbs v. Indiana,* 139 S.Ct. 682 (2019) (describing the right against excessive fines as fundamental without further description). Neither *Glucksberg* nor its progeny requires such a narrow description of the right as the government suggests. The proper description of the right at issue is the right to expatriate voluntarily *vel non.* The suspension and

2014 WL 2807652 (E.D. Cal. June 20, 2014); *Tutora v. U.S. Att'y Gen. for E. Dist. of Pennsylvania,* 2017 WL 2126321 (E.D. Pa. May 16, 2017). These courts have simply held that an incarcerated U.S. citizen has no constitutional right to renounce his U.S. citizenship *during* his imprisonment. That should come as no surprise considering that convicted felons and prisoners are traditionally denied a wide range of fundamental constitutional rights.

*Lozada Colon v. U.S. Dep't of State,* 2 F. Supp. 2d 43, 45 (D.D.C. 1998), cited by the government, is also irrelevant. The court there did not question whether the citizen had a right to expatriate, but simply denied that the citizen had effectively done so.

delay in renunciation services is a restriction on the fundamental right to expatriate which, as we show below, must be examined under the strict scrutiny standard.

### 4. The suspension of renunciation services does not survive strict scrutiny

Because the right to voluntarily expatriate is a fundamental right, any restriction on that right must be stricken unless it is narrowly tailored to promote a compelling government interest. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). The government's decision to *suspend* voluntary expatriation services is clearly unconstitutional because it is far from *necessary* to achieve a compelling government interest.[20] The government invokes COVID-19 to justify the global suspension of renunciation services, arguing that its practices are "narrowly tailored [...] in light of the severe constraints that the COVID-19 pandemic has" generated. MTD, at 31.

A ***blanket suspension*** of voluntary renunciation services, however, can hardly be classified as *necessary* to battle the spread of COVID-19 or to protect "the health and safety" of the Department's "personnel and of individuals seeking Department services." *Id.*, 31-32.[21] "Under our system of constitutional government,

---

[20] In determining the applicable level of scrutiny, this Court must decide whether the restriction "directly and substantially" interferes with the constitutional right at issue. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986); *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978). Under the government's procedures, a U.S. citizen's ability to renounce is preconditioned upon appearing before a diplomatic or consular official. 8 U.S.C. §1481(a)(5). It follows, that suspending those services altogether by definition not only "directly and substantially" interferes with that right, but precludes its exercise altogether. FAC, ¶¶39-40. Consequently, strict scrutiny is the applicable standard of review.

[21] For purposes of this brief, we assume, but do not concede, that fighting the spread

21

an emergency – whether health-related, economic or created by an event threatening national security – does not endow the federal government with new powers.  Nor does it remove or diminish the restrictions imposed by the Constitution upon the exercise of powers duly granted." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021) (while the public has a strong interest in combating the spread of the COVID–19, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends."); *Roman Cath. Diocese*, 141 S. Ct. at 70 (concurring opinion of *Gorsuch, J.*)   (Constitution is not cut "loose during a pandemic.").

The government's suspension of voluntary renunciation services fails to satisfy strict scrutiny because, first, there is not an iota of evidence that the provision of these services would have contributed to the spread of COVID-19. *See Roman Cath. Diocese*, 141 S. Ct. at 67 (restriction failed to satisfy strict scrutiny when there was no evidence that the underlying activity contributed to the spread of the pandemic).

Second, the government can continue to provide renunciation services without endangering staff or the public, as it does with other services that it has not suspended.  Safety and health procedures have become standard operations in all U.S. missions around the globe and would apply to renunciation services as well, even before the COVID-19 pandemic.  All U.S. embassies and consulates separate their staffs from the public behind a thick, bullet-proof glass wall, that permits

---

of COVID-19 is a "compelling interest." *Roman Cath. Diocese*, 141 S. Ct. at 67. Consequently, the issue before the Court is whether the government's response to COVID-19 through the suspension and waitlist is narrowly tailored to further the fight against the spread of the pandemic.

communications solely by way of a two-way microphone.  Interviews are held with the renunciant on the other side of the wall.  Moreover, remote communications with applicants are available.[22]  *Roman Cath. Diocese*, 141 S. Ct. at 67 (restriction on fundamental right not necessary when less restrictive rules are available to combat the spread of COVID-19); *Tandon*, 141 S. Ct. at 1297  (narrow tailoring requires the government to show that measures less restrictive could not address its interest in reducing the spread of COVID-19); *United States v. Allen*, 2022 WL 1532371, at *7 (9th Cir. May 16, 2022) (a total ban on public access to courtroom due to COVID-19 is not narrowly tailored because video streaming would have been less restrictive).

Last, the government's continued provision of non-immigrant visa services to foreigners wishing to enter the U.S. for pleasure and business (FAC, ¶¶69-70) while contemporaneously maintaining the suspension belies the contention that it was ever *necessary* to suspend the latter services due to COVID-19. *Roman Cath. Diocese*, 141 S. Ct. at 69 (Gorsuch, J., concurring) (restriction on freedom of religion is not necessary when the restriction does not apply equally to businesses); *Tandon*, 141 S. Ct. at 1297 (government must show that the activity at issue is more dangerous than other activities when the same precautions are applied).  To paraphrase Justice Gorsuch's concurring opinion in *Roman Cath. Diocese*, the government apparently

---

[22] *See*, *e.g.*, 7 Foreign Affairs Handbook ("FAH")-1 H-263.8 and 7 FAH-1 H-280, *et seq*. (setting forth State Department standards for physical space at overseas missions, including specifications for interview windows). *See also* Kracklauer Decl., ¶8.

believes that it is unsafe to renounce U.S. citizenship, "but it is always fine" to apply to seek a visa for travel to the United States for pleasure.

Accordingly, the government's *suspension* of voluntary renunciation services fails to "strike the appropriate balance" to satisfy the strict scrutiny standard. *United States v. Allen, supra*, at *7.  The government's MTD with regard to Count I should be denied, and Plaintiffs' Cross Motion for Summary Judgment should be granted.

### 5. The policy to delay renunciation services indefinitely does not survive strict scrutiny

At the moment many U.S. missions are no longer suspending renunciation services. *See* Government's Statement of Facts, ¶¶8-17.  As to these missions, the question becomes whether the over-a-year-long delay in scheduling renunciation interviews *substantially burdens* Plaintiffs' fundamental right to voluntarily expatriate.  If the answer is in the affirmative, the government's delay policy is subject to strict scrutiny. *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978); *cf. Grace v. D.C.*, 187 F. Supp. 3d 124, 143 (D.D.C. 2016) (law that substantially burdens Second Amendment right subject to strict scrutiny); *Jones v. Perry*, 215 F. Supp. 3d 563, 572 (E.D. Ky. 2016), *citing Zablocki* (substantial burden on the right to marry triggers strict scrutiny).

The waitlist policy substantially burdens Plaintiffs' right to expatriate because it prevents them and those similarly situated from exercising their natural right to renounce. Without an appointment to take the oath of renunciation, a U.S. citizen is unable to shed her U.S. citizenship, nor receive administrative recognition – via a CLN – of her act of renunciation.  The accidental citizen-against-her-will must wait,

on average, over 365 days to discard her American citizenship that was imposed upon her, in the first place, without her knowledge or say in the matter. *See* FAC, ¶32(b); *See* Peter J. Spiro, *Citizenship Overreach*, 38 MICH. J. INT'L L. 167, 167 (2017) (describing the disproportionate renunciation requirements for accidental Americans). During this time period, Plaintiffs are subject to daily burdens and travails caused by their U.S. citizenship. *Id.*, ¶¶45-53; burdens that are not shared by American citizens residing in the United States. *See also* Lazarz Decl., ¶¶5-7 (describing Plaintiff Lazarz's futile efforts to secure credit to purchase residence in order to provide sick daughter with stable living); Sofiane Thoulon Decl., ¶¶11-20 (describing multiple account freezes and obstacles in maintaining bank accounts and securing financing); Nina Nelson Decl., ¶¶6-9 (describing the daily stress of being an American abroad and stating: "Daily, routine transactions, have become complicated and costly for people like me."); *see also* Plaintiffs' Statement of Facts ¶7-15; *see also* https://www.americains-accidentels.fr/page/222264-temoignages (testimonials of accidental Americans). The government does not even attempt to dispute this.

The current waitlist policy is no mere routine processing delay. It is a daily deprivation, and a direct and substantial burden on a U.S. citizen's right to voluntarily renounce. The policy, therefore, is subject to strict scrutiny. *See Salloum v. Kable*, 2020 WL 7480549 (E.D. Mich. Dec. 18, 2020) (delays in the right to travel constituted a deprivation of that right and triggered strict scrutiny).

The waitlist policy does not survive strict scrutiny because it is not necessary to further a compelling government interest. The government claims that it has two

25

compelling interests that it is furthering through its waitlist policy. First, the government argues that it has a compelling interest in protecting the health and safety of its personnel. However, public health concerns, while perhaps relevant for the suspension policy, are certainly no longer an issue today. Many U.S. missions around the globe have resumed renunciation services, as well as visa services. Moreover, as we have noted, consular personnel are adequately protected from the general public by effective physical separation installations.

Moreover, the current delay stems from the government's initial suspension policy, which, as we have shown, was unconstitutional. The government cannot now rely on its wrongful suspension which was illegal in the first place as a justification for its current waitlist policy.

The government also argues that it has a compelling interest to "prioritize as it sees fit." MTD, at 31, *citing and relying* on *Didban v. Pompeo*, 435 F. Supp. 3d 168, 177 (D.D.C. 2020). The statement in *Didban*, however, was made in the context of a *TRAC* analysis and did not involve a Fifth Amendment challenge to a restriction of a fundamental right.  No court to our knowledge has ever recognized prioritization as a compelling interest when a fundamental right was at issue. Moreover, the government has not proffered any evidence that it made any attempt to consider the right to expatriate in carrying out its alleged prioritization of its services.  Under these circumstances, it is as if the government never engaged in a proper prioritization of it resources and interests in adopting its waitlist policy. Put differently, the government's alleged prioritization is illusory *post hoc* rationalization.

26

Moreover, while the government may have some limited authority to prioritize, that prioritization is still subject to reason and fairness. *Gomez v. Trump*, 485 F. Supp. 3d 145, 197 (D.D.C.), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and amended in part sub nom. Gomez v. Biden*, 2021 WL 1037866 (D.D.C. Feb. 19, 2021) (government failed to provide explanation why certain type of visa is given "low priority.").  For example, the government failed to provide any explanation as to why non-immigrant visa applications receive significantly higher priority than voluntary renunciation services. The government gave priority – without explanation – to the recommencement of non-immigrant visa services over and to the detriment of renunciation services for American citizens (*see* FAC, ¶¶8, 69-70). It continues this astonishing and unfair prioritization by providing significantly shorter wait times for aliens applying for a non-immigrant visa than U.S. citizens waiting for a renunciation interview.   (Frankfurt, visitor visa, 67 days; other non-immigrant visas, 10 days, **Exhibit A**; Paris, visitor visa, 217 days; other non-immigrant visas, 12 calendar days, **Exhibit B**; Bern, Switzerland, visitor visa, 129 days; other non-immigrant visas, 65 days, **Exhibit C**).

Last, as discussed above, the government's waitlist policy is not narrowly tailored because it fails to take into consideration other alternatives that would make the renunciation process more efficient, such as remote renunciation appointments. *See United States v. Allen*, *supra*, at *7 (video feed narrowly tailored to meet health concern in a criminal trial).

27

The government's waitlist policy substantially burdens Plaintiffs' fundamental right to renounce. Because the government has failed to demonstrate why it was necessary to implement the policy to further a compelling interest, the policy violates the Due Process Clause of the Fifth Amendment.[23] The government's MTD should be denied as to Count II and Plaintiffs' Cross-Motion for Summary Judgment should be granted.

### C.   PLAINTIFFS ARE ENTITLED TO RELIEF AGAINST THE SUSPENSION AND DELAY UNDER APA §706(1)

The APA empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1). Section 706(1) requires a plaintiff to establish two elements. First, a plaintiff must show that the agency action being challenged is "a *discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original).

After showing that the agency was required to act, the §706(1) plaintiff must establish that the agency unlawfully withheld or unreasonably delayed the action. The D.C. Circuit applies a six-factor test (sometimes referred to as the *TRAC* factors) to determine whether agency action has been unlawfully withheld or unreasonably delayed, as discussed below.

---

[23] For these same reasons, the waitlist policy also violates 5 U.S.C. §706(2), Count III of the FAC.

1. **The government has a mandatory and discrete duty to provide renunciation services**

As the agency responsible for processing voluntary renunciation applications, the Department necessarily has a mandatory, nondiscretionary duty to fulfill this role and to provide renunciation services, including appointments, to its citizens to formally renounce.  This duty stems from **(1)** the Constitution as implemented by the INA, **(2)** the regulations, and **(3)** general principles of administrative law.

The duty to allow for U.S. citizens to appear before a U.S. officer to formally renounce stems, first and foremost, from the fundamental nature of the right to expatriate, as discussed above.  In enacting 8 U.S.C. §1481(a)(5), Congress recognized the fundamental and inherent right of U.S. citizens to expatriate and imposed a condition, namely, that the renunciant formally renounce before a U.S. diplomatic or consular official. By necessary implication, the government has a discrete duty to allow its citizens to appear before these officials, whether by timely scheduling appointment or allowing for remote appearance, in order to make the required renunciation. It also follows, as a matter of common sense, that the government must make necessary arrangements for applicants to schedule a time for making the requisite appearance.

The government argues that its duties are triggered "only after the appointment has been held [...]". MTD, at 15. But that not only flies in the face of Plaintiffs' natural, inherent and constitutional right, but also undermines the congressional mandate of §1481(a)(5). The moment a U.S. citizen requests to renounce, the government's duty to schedule an appointment for the applicant to

appear is immediately triggered. Otherwise, the government, by inaction, can nullify the right to expatriate by withholding or postponing the appointment indefinitely. Any other interpretation would render the statute and the constitutional right nugatory.

The regulations also make clear that the government has a mandatory duty to schedule appointments for formal renunciation [22 C.F.R. §50.50(a)] and process voluntary renunciation applications. 22 C.F.R. §50.50(b). *See also* 7 FAM 1262.2 and 7 FAM 1261.3 (discussing interview process).

In addition to the statutory and constitutional duty to provide voluntary renunciation services, the APA imposes a "general but nondiscretionary duty" upon an administrative agency to pass upon a matter presented to it. *Palakuru v. Renaud*, 521 F. Supp. 3d 46, 49 (D.D.C. 2021), *appeal dismissed,* 2021 WL 1440155 (D.C. Cir. Apr. 15, 2021), *quoting Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003) [*quoting* 5 U.S.C. §§555(b), 706(1)]. As the Department instructs its consular officers, a renunciation "matter" is presented to the government the moment "an individual approaches you attempting to renounce U.S. citizenship." 7 FAM 1262.1. At that juncture, the government has a duty to "[i]nform the individual to think over whether he or she truly wishes to renounce U.S. nationality, and, if so, *to schedule an appointment for the renunciation ceremony*." 7 FAM 1262.2(C) (emphasis added). Accordingly, under general principles of administrative law, the Department has a duty to schedule the appointment within a reasonable time.

### 2.  The *TRAC* factors weigh in favor of Plaintiffs

In this Circuit, the court applies the following six *TRAC* factors to determine whether agency action has been unlawfully withheld or unreasonably delayed:  (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) whether human health and welfare are at stake; (4) the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.  *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).  All six *TRAC* factors weigh in favor of the Plaintiffs, both with respect to the suspension and to the waitlist policy.

### (i)    The rule of reason and timetable factors weigh in favor of Plaintiffs

Courts typically consider *TRAC* factors one and two together. *Dastagir v. Blinken*, 2021 WL 2894645, at *3 (D.D.C. July 9, 2021), *per* McFadden, J.  "In the absence of an explicit timeline" in the relevant statute – as is the case here with respect to §1481(a)(5) – the "APA's general reasonableness standard applies." *Geneme v. Holder*, 935 F.Supp.2d 184, 193 (D.D.C. 2013).  With no set timeline, a court looks to case law for guidance.  *Dastagir v. Blinken*, at *3.

The record shows that, as of today, the average time to have a renunciation appointment scheduled is roughly in excess of one year (*see, supra*, fn. 5). This does not include the time to process a renunciation application. There is no indication that this average waiting period will change in the near future. In fact, the opposite is true. The government admits that due to a variety of circumstances, a "significant backlog" has developed for renunciation services. MTD, at 7, 18. Moreover, there is reason to suspect that COVID-19 surges will recur and other pandemics due to such geopolitical, environmental and other factors, which the government may use as a pretext for suspending or delaying renunciation services. *See*, *supra*, footnote 4.

There is no case law that addresses delays in voluntary renunciation services that could provide guidance as to whether over-year-long waiting periods are reasonable. The government relies exclusively on case law that addresses delays with *visa*-related services. *Tate v. Pompeo*, 513 F. Supp. 3d 132, 147 (D.D.C. 2021), *dismissed sub nom*, 2021 WL 3713559 (D.C. Cir. July 22, 2021) (O visas); *Murway v. Blinken*, 2022 WL 493082 (D.D.C., Feb. 16, 2022) (K-1 visas); *Sunny v. Biden*, 2021 WL 5294879 (E.D.N.Y. Nov. 15, 2021) (F visas); *Dastagir v. Blinken*, 2021 WL 2894645 (D.D.C. July 9, 2021) (K visa); *Khushnood v. U.S. Citizenship & Immigr. Servs.*, 2022 WL 407152 (D.D.C. Feb. 10, 2022) (worker visa).

There is a profound difference between cases involving aliens seeking entry into the U.S. and the present case where U.S. citizens are seeking to renounce their American citizenship. A U.S. citizen has a natural, fundamental, and constitutional right to voluntarily expatriate. An alien, on the other hand, has "no constitutional

32

right of entry" to the United States. *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). Indeed, so long as they remain outside the territorial boundaries or control of the U.S., aliens are not entitled to constitutional protections. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) ("[t]he Court has not allowed foreign citizens outside the United States or such U. S. territory to assert rights under the U. S. Constitution."). Moreover, adjudications of consular officials of visa applications for aliens are not subject to judicial review under the doctrine of consular non-reviewability. *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999); *Aboutalebi v. Dep't of State*, 2019 WL 6894046, at *3 (D.D.C. Dec. 18, 2019).   On the other hand, decisions of consular officials regarding renunciation by U.S. citizens are fully reviewable in United States courts.   *See Farrell v. Blinken*, 4 F.4th 124 (D.C. Cir. 2021) (judicial review of government's refusal to issue CLN).

The fundamental nature of the right to renounce, coupled with the daily suffering of Accidental Americans abroad because of their U.S. citizenship, warrants a different standard of reasonability when it comes to suspensions and delays. *See Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600 (6th Cir. 2005) (striking down a thirty-day advance notice requirement First Amendment activities); *Church of Am. Knights of Ku Klux Klan v. City of Gary, Indiana*, 334 F.3d 676, 681 (7th Cir. 2003) (striking down a forty-five-day advance notice requirement for First Amendment activities); *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984) (striking down a twenty-day advance notice requirement

First Amendment activities); *Salloum v. Kable*, 2020 WL 7480549 (E.D. Mich. Dec. 18, 2020) (holding unconstitutional unreasonable delays in the right to travel).

A U.S. citizen wishing to voluntarily expatriate – like an individual who wishes to exercise her right to free speech or travel – should be able to do so within weeks or, at the very most, a few months. Not years.

Unyielding, the government relies on *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003), for the proposition that the (1) complexity of renunciation, (2) the significance of the outcome, and (3) the available resources, suggest that the "rule of reason" is met under *TRAC* factors one and two. *TRAC*, 750 2d at 80.  MTD at 16.

The government contends that due to the complexity of renunciation, "each renunciation appointment takes time and cannot be rushed." MTD, at 17; *see also* Benning Decl., ¶11 ("CLN interviews can be one of the more in-depth interviews conducted by consular officials.").   However, voluntary expatriation is not complicated.  Renunciation interviews are generally straightforward and simple, requiring the government to do one thing, and one thing only: Verify that the renunciant is taking the oath voluntarily with the intent to expatriate. This is not a difficult task and does not warrant a time-consuming interview. This is especially true for voluntary renunciation under 8 U.S.C. §1481(a)(5), where questions of intent and voluntariness are usually a non-issue because "execution of the Oath of Renunciation usually is sufficient evidence of intent to lose U.S. nationality." 7 FAM 1261(e).  In practice, the renunciation interview usually does not last more than 5-10

minutes.  *See* Martin Kracklauer Decl., ¶7 (five-minute interview at U.S. mission in Milan, Italy); Garret Russell Anderson Decl., ¶3 (five-minute interview at U.S. mission in Paris, France); John Warren Heestand Decl., ¶3 (five-minute interview at U.S. mission in Yerevan, Armenia);   Diana Lee Barden Decl., ¶3 (five-minute interview at U.S. mission in Naples, Italy); Frederique Boyer Decl., ¶3 (five-minute interview at U.S. mission in Marseille, France);   Patricia Anne O'Conner Gorlier Decl., ¶3 (five-minute interview at U.S. mission in Paris, France); Daniel Edward Neary Decl., ¶3 (five-minute interview at U.S. mission in Kuala Lumpur, Malaysia); Esther Jenke Decl.,  ¶3 (ten-minute  interview  at  U.S.  mission  in  Frankfurt, Germany);  Bruce Evans Newman Decl., ¶3 (ten-minute interview at U.S. mission in Novia Scotia, Canada);   Cumpston Bird Decl., ¶3 (ten-minute interview at U.S. mission in Melbourne, Australia); Jane Rachel Heller Decl., ¶3 (ten-minute interview at U.S. mission in Amsterdam, the Netherlands); Deborah Lee Soloway Decl., ¶3 (eight-minute interview at U.S. mission in Montreal, Canada).

The government asserts that the consequences of renunciation "add to the time that each renunciation appointment takes." MTD, at 17.  While no one disputes that renunciation has significant effects, the government does not provide any explanation as to why each interview is time-consuming. As we have already pointed out, renunciation interviews are, in fact, short.

The government next argues that the "rule of reason" favors the government because – due to COVID-19 – it lacks the resources needed to provide a speedy and efficient renunciation service. MTD, at 17.  However, that can hardly be a reason to

impose a blanket suspension of renunciation services or indefinite waiting lists lasting more than a year. As discussed above, COVID-19 does not give the government a blank check and untethered discrimination to suspend or place individuals on indefinite waiting lists to voluntarily renounce.

The government's "rule of reason" argument also fails because it does not provide any explanation as to why renunciation services for U.S. citizens are a lower priority than non-immigrant visa services for foreign nationals. As discussed above, the waiting times to receive an appointment for non-immigrant visas are significantly shorter.

In light of all these reasons, the first and second *TRAC* factors weigh in favor of Plaintiffs. At a minimum, these factors do not clearly weigh in favor of the government.

### (ii)   The nature of the interest prejudiced and human welfare factors weigh in favor of Plaintiffs

The third and fifth factors are often considered together and require a court to consider the "nature and extent of interests prejudiced by delay" and whether "human health and welfare are at stake." *TRAC*, 750 F.3d at 80; *Pushkar v. Blinken*, 2021 WL 4318116 (D.D.C. Sept. 23, 2021).

As we have shown, the inability to renounce U.S. citizenship directly affects the general welfare of Plaintiffs and those similarly situated. Plaintiffs' inability to renounce their U.S. citizenship has caused and causes them harm daily. Routine bank transactions have become nightmares; opening and maintaining a bank account has become nearly impossible; annual compliance costs create financial hardship on

36

the millions of U.S. citizens living abroad.  The inability to access funds or secure credit has negatively impacted the lives of thousands of Americans living abroad. *See also* Lazarz Decl., ¶¶5-7; Sofiane Thoulon Decl., ¶¶11-20; Nina Nelson Decl., ¶¶6-9; *see also* Plaintiffs' Statement of Fact, ¶¶7-15.    *See* also Alex J. Rouhandeh, "Americans Wishing to Renounce Citizenship Can't Get U.S. to Process Applications," NEWSWEEK (Dec. 31, 2021), available at https://www.newsweek.com/americans-trying-renounce-citizenship-having-issues-processing-applications-1664752 (reporting on Marie Sock, the first woman to run as a presidential candidate in The Gambia, who was forced to drop out of the race because she could not renounce her U.S. citizenship in time.); see also Plaintiffs' Statement of Facts, ¶¶7-15. Even the government appears to concede that renunciation-related services affects general welfare. *See* MTD, at 18-19.

The government argues that "human health and welfare" would "be harmed by speeding up the rate of such appointments." MTD, at 19. However, the government does not explain why this is so, nor can it do so.

Moreover, the government again fails to address the fact that U.S. missions that had suspended renunciation services or have implemented long indefinite waiting lists are able somehow to continue providing non-immigrant visa services for foreign nationals and provide those services more efficiently and faster. *See* FAC, ¶¶69-70. *See See Gomez*, 485 F. Supp. 3d at 197 (fifth *TRAC* factor satisfied when government failed to provide explanation why certain type of visa is given "low priority.").

Given the extensive impact U.S. citizenship has on the ability of overseas Americans to conduct their daily affairs and provide for themselves and their families, the third and fifth *TRAC* factors weigh heavily in favor of Plaintiffs.

**(iii)   Processing renunciation services without delay will not affect higher priority agency activities**

The fourth factor concerns "the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80.  This factor will weigh in favor of the government where "a judicial order putting [plaintiffs] at the head of the queue simply moves all others back one space and produces no net gain." *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75–76 (D.C. Cir. 1991).

Regarding the government's suspension of renunciation services, this factor obviously weighs in favor of Plaintiffs.  *Gomez*, 485 F. Supp. 3d at 197 ("blanket withholding of processing worldwide" is not justified under the fourth *TRAC* factor.).

The government's waitlist policy shares a similar fate under the fourth *TRAC* factor because Plaintiffs are challenging the system *as a whole.  See Am. Hosp. Ass'n*, 812 F.3d at 192 (broad, systematic relief, not precluded under *TRAC* factor). Plaintiffs are not asking to "jump ahead in the line of other individuals waiting for the Government to take action" on renunciation applications. *Murway v. Blinken*, 2022 WL 493082 at 5 (D.D.C. Feb. 16, 2022). Plaintiffs' request that the Court rule that any delay in processing voluntary renunciation applications – for *all* renunciation applicants – must be reasonable. *See* FAC, at 33-34 ("Prayer for Relief").  The present case, therefore, is distinguishable from the authorities relied upon by the government. *Murway v. Blinken*, *Dastagir v. Blinken*, and *Tate v. Pompeo*, all address

38

§706(1) lawsuits of individual applicants whose visa applications have been delayed. In those cases, granting the plaintiffs the relief they sought would have put them at the head of the queue for other visa applicants. Here, granting Plaintiffs the relief they seek – a declaration that the wait-list policy for voluntary renunciation is illegal – will not place them or anyone at the head of the line, at the expense of other renunciation applicants. Plaintiffs seek to achieve a "net gain" whereby renunciation applicants around the world will benefit from a more speedy and efficient process. *See Godsey v. Wilkie*, 31 Vet. App. 207, 228 (Vet. App. 2019) (fourth *TRAC* factor favors plaintiffs when lawsuit seeks resolution of systematic/class delay claims); *Ebanks v. Shulkin*, 877 F.3d 1037, 1040 (Fed. Cir. 2017) (same); Stephen C. Robin, *Healing Medicare: Enforcing Administrative Law Deadlines in Medicare Appeals*, 95 N.C. L. REV. 1293, 1303 (2017) (by focusing on the whole system – rather than on one claimant – a court can "disregarded the common line-jumping or resource allocation arguments.").

Moreover, even assuming that prioritizing renunciation services as a whole would require the government to reallocate resources at the expense of other consular services – such as visa services – the fourth *TRAC* factor would still tilt in favor of Plaintiffs. Because they facility in the exercise of a fundamental right, voluntary renunciation services should take priority over services that do not further any constitutional right whatsoever, such as non-immigrant visa services.

**(iv)   The agency impropriety factor weighs in favor of Plaintiffs**

While the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed, here it appears that such impropriety exists.  The government's suspension program of renunciation services reflects a more general anti-expatriation policy, having its roots in a discriminatory attitude towards U.S. citizens residing abroad.  As mentioned, the government has already actively discouraged and prevented its nationals from renouncing by placing a $2,350 price tag on the exercise of that right.  Now, the government tells its citizens that they must wait over a year to renounce, while at the same time providing *visa* services to *non*-U.S. nationals at light speed (relative to renunciation services).  What is more, the government insists, as it does in the Renunciation Litigation, that voluntary renunciation services are "complex" and require "in depth" interviews. But, as we have shown, this is false. There is nothing complicated about voluntary renunciation services and, in practice, renunciation interviews are short and straightforward.

These facts, coupled with the government's representation that the waiting times for renunciation services will continue in the near future, cast doubt upon the propriety government's actions.  Obviously, the U.S. government does not want its citizens to expatriate. However, it is illegitimate – indeed improper – to actively discourage/prevent expatriation by means of levying astronomical fees and placing renunciants on indefinite waitlists, to achieve lower expatriation rates. If the U.S. government wants the expatriate community of approximately 9 million to remain

U.S. citizens, it would be better advised to achieve that goal by beginning to place them on an equal footing with their fellow citizens stateside.  Preventing them from leaving the Republic is not the answer.

Accordingly, the *TRAC* factors weigh in favor of the Plaintiffs and the government's suspension and waitlist policy should be declared as unlawful under 5 U.S.C. §706(1).

### D.    THE SUSPENSION VIOLATES 5 U.S.C. §706(2)

Section 706(2) of the APA authorizes a court to hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.  The government lacks authority to *suspend* renunciation services under 8 U.S.C. §1481(a)(5). *See* FAC, ¶¶91-98 (Count III).  Nowhere in the INA or the federal regulations is the government granted authorization to *suspend* voluntary renunciation services, even temporarily.[24] Therefore, the government's suspension was "not in accordance with law" and "in excess of statutory […] authority." 5 U.S.C. § 706(2). *Gomez*, 485 F. Supp. 3d at 194 (suspension of visa processing services was "not in accordance with law" and "in excess of statutory [...] authority."); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 315 (D.D.C. 2020), *appeal dismissed sub nom. Milligan v. Blinken*, 2021 WL 4768119

---

[24] According to the government, because the "suspension of appointments for CLN services at some posts is a temporary measure, and the Department fully intends to resume those appointments as soon as is safely feasible, the question is whether the pandemic-related delay in appointments for CLN services at certain posts violates the law or exceeds the Department's statutory jurisdiction." MTD, at 22-23.  The government conveniently mischaracterizes the issue at bar by attempting to convert the "suspension" into a mere "delay."

(D.C. Cir. Sept. 21, 2021) (same, with regard to K-1 visas).

## VI.    CONCLUSION

For all the reasons set forth above, the Court is respectfully requested to:

1.  Deny Defendants' motion to dismiss;

2.  Deny Defendants' motion for summary judgment;

3.  Grant Plaintiffs' cross-motion for summary judgment.


<u>Dated</u>: May 17, 2022



Respectfully submitted,



*/s/ L. Marc Zell*                                      */s/ Noam Schreiber*
L. Marc Zell                                             Noam Schreiber, *of counsel*
ZELL & ASSOCIATES INTERNATIONAL       34 Ben Yehuda St.
ADVOCATES, LLC                                    15th Floor
1345 Ave. of the Americas                        Jerusalem, Israel 9423001
2nd Floor                                               011-972-2-633-6300
New York, NY 10105                               *Email: schreiber.noam@gmail.com*
(202)-971-1349
*Email: mzell@fandz.com*

*Counsel for Plaintiffs*