# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

L'ASSOCIATION DES AMÉRICAINS
ACCIDENTALS, et al.,

    *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
STATE, et al.,

    *Defendants*.

Case No. 1:21-cv-02933-TNM

## SUPPLEMENTAL DECLARATION OF PRINCIPAL DEPUTY ASSISTANT SECRETARY OF STATE FOR CONSULAR AFFAIRS DOUGLASS BENNING

I, Douglass Benning, do hereby state and declare as follows:

1. I am the Principal Deputy Assistant Secretary for Consular Affairs. I am providing this supplemental declaration to (1) update the Court on the progress the U.S. embassies and consulates (collectively, "posts") named in Plaintiffs' complaint have made in increasing the availability and scheduling of appointments to take the oath of renunciation under Immigration and Nationality Act (INA) Section 349(a)(5), 8 U.S.C. § 1481(a)(5); (2) provide further detail on the process to issue Certificates of Loss of Nationality of the United States (CLNs) in light of the Plaintiffs' assertion that providing CLN services is neither time consuming nor resource intensive; and (3) provide additional details regarding the different classes of nonimmigrant visa services offered by the Department of State ("Department") at the height of the pandemic.

2. In sum, out of the 10 named Plaintiffs, two apparently have not yet contacted post to request an appointment for CLN services, four have taken the oath of renunciation and been issued their CLNs, one is scheduled for an interview over the summer, and the remaining three are on the waiting list at their respective posts, with two of them projected to have their interviews by the end of the calendar year.

3. Germany: Plaintiff Joshua Grant has a CLN appointment scheduled for August 5 at Post Frankfurt. Plaintiff Kristopher Lazarz is currently number 400 on the wait list and is expected to receive an appointment in the fourth quarter of 2022. Post Frankfurt resumed offering CLN services appointments on April 8 and is no longer operating under any COVID-related restrictions which limit appointment availability. Since April 8, Post Frankfurt has reduced its backlog of 980 CLN requests to approximately 700 and is offering between five and 10 CLN appointments per week as it is able. Post Frankfurt has also found that many individuals who requested CLN services are now turning down appointments when offered, often citing the war in Ukraine.

4. France: Plaintiff Lilian Pam had her final interview in Paris and her CLN was issued on April 12, 2022. Plaintiff Philip Boeffard had a final appointment and executed his oath of renunciation on May 20, 2022, at Post Marseille. At Post Paris, Plaintiff Sofiane Thoulon is presently 102 on the wait list. Plaintiff Anne Misslin apparently has not contacted post to request a CLN appointment. No Plaintiff is on the Post Marseille wait list. Although French posts are currently operating at all functions and not subject to COVID-related restrictions, French regulations about self-quarantine after a positive COVID test can lead to unexpected and protracted absences of staff.

Consular services generally are seeing increased backlogs due to pent-up demand, staff vacancies, and intermittent absences due to COVID. Post Paris estimates it has approximately 135 people on its CLN wait list and is currently processing requests for CLN appointments at a rate higher than before the pandemic. On average, Paris was offering two appointments per week pre-pandemic, and is now offering up to four. Seasonal demand for other consular services continues to increase as the summer travel season arrives. Post Paris does not have additional resources currently to dedicate to CLN appointments without significantly impacting provision of other equally important services. Post Marseille has 62 people on its wait list and is offering two to three appointments per week.

5. Singapore: No plaintiffs are awaiting an appointment for CLN services at Post Singapore. Plaintiff Christopher Bousigues had his final appointment on March 21, 2022, and collected his CLN on April 1, 2022. The Government of Singapore has been slowly relaxing local COVID-mitigation measures and has only recently removed social distancing and capacity requirements which limited Post Singapore's ability to use its full waiting room. As such, all services are currently available at Post Singapore, and are expected to tend towards pre-pandemic levels. Post Singapore previously had a CLN wait list of approximately 120 persons in February, which has now been reduced to approximately 20 who have submitted all their documents and are awaiting an interview. Post Singapore has been scheduling up to eight appointments per week.

6. The Netherlands: No plaintiffs are awaiting an appointment for CLN services at Post Amsterdam. Plaintiff Mark Lewis apparently has not contacted Post Amsterdam at

any time to request a CLN appointment. Post Amsterdam has resumed offering all routine services but has limited appointment availability due to staff shortages. Despite these limitations, as of May 20, 2022, the wait list for appointments at Post Amsterdam had been reduced from 140 in April to 85.

7. Finland: No plaintiffs are awaiting an appointment for CLN services at Post Helsinki. Post Helsinki contacted Plaintiff Martin Kracklauer in April of 2022 to schedule an appointment and learned that he had taken his oath of renunciation at the U.S Consulate General in Milan on March 29, 2022, and was issued a CLN on March 31, 2022. Post Helsinki is currently at full operating status. Post Helsinki has approximately 24 individuals on a wait list for CLN services and is offering an appointment each week to the best of its ability.

8. Switzerland and Liechtenstein: Plaintiff Stephen Collins is currently 135 on the wait list and is projected to receive an appointment in August or September. Post Bern is currently operating at full capacity without any COVID restrictions impacting provision of consular service appointments. Post Bern has reduced its CLN backlog to approximately 577 people awaiting appointments, down from 700 in March, and is offering about 20 CLN appointments each week.

9. Turning to the CLN process, Plaintiffs have submitted several affidavits noting that certain individuals have had brief in-person interviews of 5-10 minutes with a consular officer. While this is may be true in some cases, many cases require more time according to their complexity and, in all cases, time spent with a consular officer is reflective of only a portion of the total time for processing a CLN.

10. As described in my declaration of April 4, 2022, in support of Defendants' motion to dismiss or for summary judgment, in processing a request for a CLN under INA § 349(a)(5), 8 U.S.C. § 1481(a)(5), post responds to a request for information on taking the oath of renunciation by conducting an initial screening of eligibility for the service, including determining whether the person is a U.S. citizen. This process involves running a namecheck and other records searches for prior loss of nationality, passport issuance, and consular services received. In addition, if the person was born abroad, does not have a U.S. birth certificate, and has never been issued a U.S. passport, Consular Report of Birth Abroad of a U.S. Citizen, or other documentation of U.S. citizenship, the consular officer must request secondary evidence and determine whether the person's parent or parents were U.S. citizens who met the statutory requirements to transmit U.S. citizenship to the person at birth or at some point thereafter.

11. The consular officer must also discern whether there are any apparent "flags" to inform the handling of the case, such as evidence of mental incapacity, cognitive impairment and/or that the person is a minor, which requires preliminary follow-up with the requester either by phone or in person prior to initiating the CLN service. Often these flags require the consular officer to work in close coordination and consultation with the Department; depending on the complexity of the issue, guidance may take some time. Cases in which loss of nationality would result in statelessness also likely require follow-up with the person and consultation with the Department. Other issues may arise with individuals who do not read or write English – the

consular officer and/or staff may be required to provide informal translations of the forms to help ensure the requester is acting voluntarily and with knowing intent.

12. If the flags appear to be addressed and the consular officer believes the requester is eligible to proceed (and the requester wishes to proceed), post sends links to information on the consequences and ramifications of loss of nationality along with Form DS-4080, Oath/Affirmation of Renunciation of Nationality of United States; Form DS-4081, Statement of Understanding Concerning the Consequences and Ramifications of Relinquishment or Renunciation of U.S. Citizenship; and, if necessary, Form DS-4079, Request for Determination of Possible Loss of United States Nationality with instructions that the requester review all information and to complete but not sign the forms.

13. The requester must gather supporting documentation to be submitted along with the forms for consular officer review before or at the first interview, which may be telephonic, in person, or via email (according to post practice).

14. If there appear to be no flags after the first interview and no further information and/or need to consult with the Department appears to be required, the individual may request to be scheduled for a second, in-person, and, generally, final interview. The individual must bring all original supporting documentation and the completed but not signed forms. The consular officer carefully reviews the documentation and goes over the questions and responses on the forms with the individual. During the interview, the consular officer takes detailed notes and assesses the individual's demeanor and state of mind—in particular, whether the individual appears to be acting voluntarily (of his or her own free will) and with the intent to relinquish U.S.

nationality, which includes a coherent understanding of the consequences of loss of nationality. The amount of time this assessment takes can vary according to the circumstances the individual presents and the individual's responses to interview questions.

15. If all appears to be in order, the individual signs the forms and takes the oath of renunciation in the presence of the diplomatic or consular officer who must execute the forms. (The fee is collected immediately before signing the oath.)

16. After the consular officer administers the oath of renunciation, he or she must upload the interview notes into a case file, personally prepare a memorandum that includes a recommendation as to whether to approve or deny the request for a CLN as well as supporting observations from the interviews. Post then assembles the CLN package for scanning and transmission to the Bureau of Consular Affairs, Overseas Citizens Services Directorate, Office of American Citizens Services (the program office) for review and final determination. The CLN package includes the executed forms, the consular officer's memorandum, the CLN listing the effective date of expatriation (if approval is recommended), and the date and place of the oath of renunciation.

17. Because of the irrevocable nature of a finding of loss of nationality and the need for safeguards against involuntary and/or unintentional loss, the Department carefully reviews and evaluates every case to determine whether there is a legal basis to approve a request for a CLN. The program office must ensure there are no substantive, procedural, or clerical errors by running its own namechecks and carefully reviewing the CLN package and case notes. The program office may need to request additional information or clarification, which may require additional

follow-up with the requester and/or a further interview of the requester at post. If the case presents legal issues, and in every case involving a denial of a request for a CLN, the program office consults with the Office of the Legal Adviser for Consular Affairs, which often conducts research and analysis before providing guidance.

18. If the Department approves the request for a CLN, post marks the approval date on two original copies of the CLN and contacts the requester to arrange pick-up or delivery of the approved CLN. The program office also provides notification of the approved CLN to the Federal Bureau of Investigation, the Internal Revenue Service, and U.S. Citizenship and Immigration Services, as required by statute.

19. Finally, I wish to address Plaintiffs' assertion that the Department has improperly prioritized visa services, in particular non-immigrant visas (NIVs), over CLN services. Throughout the pandemic, the Department carefully calibrated its prioritization and resumption of visa services, first focusing on categories that would reunite families, protect our national security, and provide critical services to the U.S. citizen public. Foremost of the visa services priorities were immediate relative and family preference immigrant visas (IV) and special immigrant visas for Afghans and Iraqis consistent with congressional timelines on the processing of these cases. In other words, visa services focused on the reunification of U.S. families, *e.g.*, spouses and children of U.S. citizens and lawful permanent residents, and Afghans and Iraqis who supported the U.S. mission in Afghanistan and Iraq. For NIVs, the Department directed that only certain visas would be prioritized: humanitarian emergencies; diplomatic visas; visas associated with food production or medical professionals; visas for individuals traveling to the United States as air or sea crew;

medical emergencies; and visas that provide particular benefit to the U.S. economic recovery, because they are central to operations of U.S. businesses (*e.g.*, repair and maintenance of capital equipment). Importantly, NIV issuance was a critical component of the national response to mitigate the impact of the COVID-19 pandemic and to the economic recovery of the United States.

20. As noted at https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/all-visa-categories.html, and in more detail in 9 FAM 402.1 (https://fam.state.gov/FAM/09FAM/09FAM040201.html), there are more than 80 different categories of NIVs, including but not limited to: diplomatic staff, seasonal workers, victims of violent crime participating in a criminal case, NATO personnel, health care workers, exchange visitors, crewmembers, and tourists. NIVs issued to members of foreign diplomatic missions to the United States and to the United Nations (UN) are critical to the United States relationships with foreign nations. For example, under the UN Headquarters Agreement, the United States is legally obligated to issue visas as promptly as possible to those covered by that Agreement, including representatives of UN Member States and UN staff. Further, NIVs issued to seasonal workers are crucial to the agricultural and transportation sectors of the U.S. economy. NIVs issued to health care workers are vital to the ability to staff U.S. medical facilities and to continue the fight against the COVID-19 pandemic. In addition, NIVs issued to crewmembers are necessary to continue the movement of goods and people. Lastly, because of the principles of comity and reciprocity, the United States' issuance of NIVs is important for ensuring, in turn, that foreign

countries also issue visas to U.S. citizens, which facilitates U.S. business activities abroad and the international movement of U.S. goods.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 9th day of June, 2022.

_____
Douglass Benning
Principal Deputy Assistant Secretary of State
for Consular Affairs
U.S. Department of State