## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

L'ASSOCIATION DES AMÉRICAINS
ACCIDENTELS, *et al.*,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

      Defendants.

Civil Action No. 1:21-cv-02933-TNM

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

I.     PLAINTIFFS' STATUTORY APA CLAIMS ARE MERITLESS. ................................... 2

        A.     Plaintiffs fail to establish jurisdiction for their unlawful withholding and unreasonable delay claim. ..................................................................................... 2

        B.     The Department of State has not unlawfully withheld or unreasonably delayed CLN services. ............................................................................................ 4

        C.     The Department of State's temporary cessation of appointments for Certificate of Loss of Nationality services at some posts and use of a waitlist at others falls well within the Department's statutory authority. ............. 16

II.    PLAINTIFFS' FIFTH AMENDMENT CLAIMS ARE MERITLESS. ........................... 19

CONCLUSION ........................................................................................................................... 29

i

# **TABLE OF AUTHORITIES**

## **Cases**

*Air Line Pilots Ass'n, Int'l v. C.A.B.,*
   750 F.2d 81 (D.C. Cir. 1984) .......................................................................................... 13-14

*Dastagir v. Blinken*,
   557 F. Supp. 3d 160 (D.D.C. 2021) ................................................................................... 6

*Didban v. Pompeo*,
   435 F. Supp. 3d 168 (D.D.C. 2020) .............................................................................. 23, 25

*Ebanks v. Shulkin*,
   877 F.3d 1037 (Fed. Cir. 2017) ....................................................................................... 13

*Franklin Nat'l Bank v. New York*,
   347 U.S. 373 (1954) .......................................................................................................... 4

*Godsey v. Wilkie*,
   31 Vet. App. 207 (Vet. App. 2019) ................................................................................ 13

*Gomez v. Trump*,
   485 F. Supp. 3d 145 (D.D.C. 2020); *amended in part*,
   486 F. Supp. 3d 445 (D.D.C. 2020), and *amended in part sub nom.*
   *Gomez v. Biden*, No. 20-CV-01419 (APM), 2021 WL 1037866
   (D.D.C. Feb. 19, 2021), *appeal filed*, No. 20-5292 (D.C. Cir. Sept. 28, 2020) ................. 10, 18

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) .......................................................................................................... 19

*In re Barr Lab'ys*,
   930 F.2d 72 (D.C. Cir. 1991) .......................................................................................... 16

*Khushnood v. U.S. Citizenship & Immigr. Servs.*, CIV A.,
   CIV A. No. 21-2166 (FYP), 2022 WL 407152 (D.D.C. Feb. 10, 2022) ......................... 5-6, 11

*Liberty Fund, Inc. v. Chao*,
   394 F. Supp. 2d 105 (D.D.C. 2005) ................................................................................ 15

*Lozada Colon v. U.S. Dep't of State*,
   2 F. Supp. 2d 43 (D.D.C. 1998) ...................................................................................... 22

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
   336 F.3d 1094 (D.C. Cir. 2003) ........................................................................................ 5

*Massachusetts v. EPA,
  549 U.S. 497 (2007) ................................................................................................. 18

*Mexichem Specialty Resins, Inc. v. EPA,
  787 F.3d 544 (D.C. Cir. 2015) ................................................................................ 10

Milligan v. Pompeo,
  502 F. Supp. 3d 302 (D.D.C. 2020); appeal dismissed sub nom.
  Milligan v. Blinken, 2021 WL 4768119 (D.C. Cir. Sept. 21, 2021) .................................. 16, 18

Norton v. S. Utah Wilderness All.,
  542 U.S. 55 (2004) ..................................................................................................... 3

Pushkar v. Blinken,
  Case No. 21-2297 (CKK), 2021 WL 4318116 (D.D.C. Sept. 23, 2021) ................................ 11

Roman Cath. Diocese of Brooklyn v. Cuomo,
  141 S. Ct. 63 (2020) ................................................................................................. 25

San Antonio Indep. Sch. Dist. v. Rodriguez,
  411 U.S. 1 (1973) ..................................................................................................... 21

Scott v. United States,
  Case No. 1:13-CV-2030 LJO-BAM, 2014 WL 2807652 (E.D. Cal. June 20, 2014) ............... 21

Sierra Club v. Thomas,
  828 F.2d 783 (D.C. Cir. 1987); abrogated on other grounds .................................... 11

Simopoulos v. Virginia,
  462 U.S. 506 (1983) ................................................................................................. 21

Tandon v. Newsom,
  141 S. Ct. 1294 (2021) ............................................................................................. 25

*Tate v. Pompeo,
  513 F. Supp. 3d 132; appeal dismissed sub nom., Tate v. Blinken,
  Case No. 21-5068, 2021 WL 3713559 (D.C. Cir. Jul. 22, 2021) ...................................... 15, 16

*Telecomms. Rsch. & Action Ctr. v. FCC,
  750 F.2d 70 (D.C. Cir. 1984) .................................................................... passim

United States v. Lafley,
  656 F.3d 936 (9th Cir. 2011) ................................................................................... 21

*United States v. Wells Fargo Bank*,
   485 U.S. 351 (1988).............................................................................................. 19

*Washington v. Glucksberg*,
   521 U.S. 702 (1997).............................................................................................. 20

**<u>Statutes</u>**

8 U.S.C. §§ 1189........................................................................................................ 4

8 U.S.C. §§ 1372........................................................................................................ 4

**<u>Other Authorities</u>**

*How COVID-19 Spreads*, CDC (July 14, 2021),
   https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick
   /how-covid-spreads.html....................................................................................... 24

Stephen C. Robin, *Healing Medicare: Enforcing Administrative Law
Deadlines in Medicare Appeals*,
   95 N.C. L. REV. 1293, 1303 (2017)...................................................................... 13

## INTRODUCTION

Defendants have responded reasonably to the COVID-19 pandemic by adjusting Department of State ("Department") and U.S. embassy and consulate (collectively "posts") operations to account for COVID-19 risks and local COVID-19-related restrictions while continuing to provide the most critical services. The resulting delays in appointments for Certificate of Loss of Nationality (CLN) services have therefore been reasonable and fall well within the Department's statutory and constitutional responsibilities. As COVID-19-related restrictions and limitations have decreased, posts have been addressing the backlog of individuals awaiting various services, including CLN services, as expeditiously as is safe and feasible. All posts relevant to this litigation have lifted the temporary suspension of appointments for CLN services and, as a result, four of the eight Plaintiffs who had requested an appointment for CLN services have now obtained that appointment and received a CLN. The remaining four continue to move up their respective waitlists, with one scheduled for an appointment in August, and two others projected to have their appointment before the end of the year.

Plaintiffs' arguments in opposition to Defendants' motion for summary judgment are meritless. Plaintiffs have failed to show that the delays some of the Plaintiffs have experienced are unreasonable or unlawful. They have also failed to establish that the Department lacks the statutory authority to prioritize its services, particularly during the COVID-19 pandemic and the resulting limitations on staffing and in-person capacities at posts. Finally, they have not tied their allegation that an appointment for CLN services must be provided in days or weeks to any recognized fundamental right under the Fifth Amendment, nor should this Court recognize such a right (or even a broader right to expatriation in general).

Because Plaintiffs have failed to make the necessary showings for their claims and because the Department maintains a strong interest in exercising its discretion to allocate its limited

1

resources to where they are most needed, the Court should grant Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment and deny Plaintiffs' cross-motion for summary judgment.

**ARGUMENT**

I.   **PLAINTIFFS' STATUTORY APA CLAIMS ARE MERITLESS.**

        **A.  Plaintiffs fail to establish jurisdiction for their unlawful withholding and unreasonable delay claim.**

Defendants established in their opening brief that Plaintiffs have not met the threshold requirements for a claim of an unreasonably delayed or unlawfully withheld government action because they have not shown that there is a clear and indisputable right to relief or that the Department of State has violated a clear duty to act.  Defs.' Mem. in Support of Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. at 14-15, ECF No. 17-1 ("Defs.' Mem.").  Nor could Plaintiffs make such a showing because there is no statutory deadline by which the Department must offer an appointment for CLN services.  Thus, the delays that Plaintiffs have experienced for appointments for CLN services during the COVID-19 pandemic cannot rise to the level of an unlawful withholding or an unreasonable delay.

Plaintiffs respond by reiterating that the Department has a "mandatory, nondiscretionary duty to fulfill [its] role" as the "agency responsible for processing voluntary renunciation applications."  Mem. of Points and Authorities in Opp'n to Defs.' Mot. to Dismiss or, in the Alternative for Summ. J. and in Support of Pls.' Cross-Mot. for Summ. J. at 29, ECF No. 19-1 ("Pls.' Mem.").  They go on to emphasize that the Department "has a discrete duty to allows its citizens to appear before" consular officials for appointments for CLN services and that it "must make necessary arrangements for applicants to schedule a time for making the requisite appearance."  *Id.*  But the question before the Court is not whether the Department is required to

2

provide a service.  There is no dispute that the Department is obligated to process requests to take an oath of renunciation, which it does through scheduling appointments for CLN services. Indeed, as evidenced by several declarations that Plaintiffs filed with their cross-motion for summary judgment, many individuals have recently had appointments for CLN services before consular officers.  *See, e.g.*, ECF No. 19-2 at 7, 21-22, 26-27, 30.

The question at hand is whether Defendants have *unreasonably* delayed providing that service and have a discrete ministerial duty to provide it within a specific time frame.  There is, however, no required timeline for offering an appointment for CLN services following a request for such an appointment, either through statute or the constitution.  Plaintiffs assert that "[t]he moment a U.S. citizen requests to renounce, the government's duty to schedule an appointment for the applicant to appear is immediately triggered."  Pls.' Mem. at 29.  But Plaintiffs' "immediately triggered" language imposes a sense of immediacy that is entirely absent from the legal requirements.

Nor do the "general principles of administrative law" require the Department to schedule appointments for CLN services more quickly.  *Id.* at 30.  Plaintiffs can point to no "specific, unequivocal command" for the Department to schedule appointments for CLN services sooner than it has been scheduling them under the circumstances presented by the COVID-19 pandemic. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004).  Plaintiffs have also failed to establish that the amount of time it has taken the Department to schedule such appointments is unreasonable given the extenuating circumstances of the pandemic, which, as Defendants' opening brief established, have stretched the Department's resources thin.

Moreover, if Congress intended to direct that the Secretary adjudicate a request for a CLN within a certain timeframe, then Congress would have explicitly stated this requirement, which

Congress has done in other sections of the INA. *Cf.* 8 U.S.C. §§ 1189(a)(4)(B)(iv)(I) ("Not later than 180 days after receiving a petition for revocation submitted under this subparagraph, the Secretary [of State] shall make a determination as to such revocation."), 1372(a)(1), (2) ("[t]he Attorney General, in consultation with the Secretary of State and the Secretary of Education, shall develop and conduct a program" that "shall commence not later than January 1, 1998."); *see Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954) (finding no indication that Congress intended to make the phase of national banking at issue there subject to local restrictions, as it had done by express language in other instances).

For these reasons, Plaintiffs have not made the threshold showing required to establish standing to bring a claim of unreasonable delay or unlawful withholding.

## B. The Department of State has not unlawfully withheld or unreasonably delayed CLN services.

As Defendants established in their opening brief, even assuming for the sake of argument that Plaintiffs had met the jurisdictional requirements for their unlawful withholding and unreasonable delay claims, those claims still fail under the *TRAC* factors.[1] *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"). Plaintiffs' assertions to the contrary are unavailing.

The first *TRAC* factor, the "rule of reason," favors Defendants. *Id.* at 80. Despite the binding precedent indicating that this factor "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful,"

---

[1] Plaintiffs appear to concede through their silence on the topic and failure to include these individuals on their list of the waiting period for named plaintiffs, that Plaintiffs Anne Misslin and Mark Lewis do not have claims for delay because, as of April 4, 2022, there was no record of them contacting any Department posts to request an appointment for CLN services. *See* Pls.' Mem. at 3 n.5; Defs.' Mem. at 16 n.6.

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003), Plaintiffs insist that "[a] U.S. citizen wishing to voluntarily expatriate . . . should be able to do so within weeks or, at the very most, a few months," "[n]ot years."  Pls.' Mem. at 34.  This arbitrary standard does not meet the rule of reason, particularly in the pandemic-related circumstances surrounding the delays in this case.  Instead, as *Mashpee Wamponoag Tribal Council* instructs, this Court should evaluate the Department's delay in providing appointments for CLN services based on factors such as "the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."  336 F.3d at 1102.

Under each of these factors, Defendants have met the rule of reason.  Most significantly, the rule of reason indicates that Defendants should prevail because "the resources available to the agency" have significantly decreased during the COVID-19 pandemic.  *Id.*; *see* Defs.' Mem. at 17-18.  Plaintiffs maintain that this resource shortage "can hardly be a reason to impose a blanket suspension of renunciation services or indefinite waiting lists lasting more than a year."  Pls.' Mem. at 35-36.  But this conclusory statement contradicts the purpose of the "rule of reason" *TRAC* factor.  If time-based bright-line rules were dispositive in this instance, then the *TRAC* factors would be irrelevant.  The "rule of reason" allows courts to consider all the relevant circumstances influencing the delay of which the plaintiffs complain.  One of the most relevant circumstances here is the COVID-19 pandemic, and its imposition of severe burdens on staffing and processing capabilities, with which the Department is still dealing and from which it is still recovering.  These restrictions on Department resources are one of the reasons why the recent cases addressing visa-related delays are relevant—because the courts in each of those cases determined that significant delays were reasonable in light of the burdens the Department was facing due to the COVID-19 pandemic.  *See, e.g.*, *Khushnood v. U.S. Citizenship & Immigr. Servs.*, CIV A. No.

5

21-2166 (FYP), 2022 WL 407152, at *4 (D.D.C. Feb. 10, 2022) (determining that the rule of reason supported the Department's over eighteen-month delay in scheduling a visa interview for the plaintiff, particularly "given the impact of the pandemic").

Plaintiffs do not contest the various, systemic resource challenges that the Department has faced during the pandemic, which include COVID-19 conditions, local government restrictions, capacity limitations, staffing shortages, spikes in demand for emergency services that take priority for consular resources, and decreased funds due to the fee-funded nature of the Bureau of Consular Affairs' operations. *See* Declaration of Douglass Benning, Principal Deputy Assistant Secretary of State for Consular Affairs ¶¶ 4, 14-17, ECF No. 17-2 ("Benning Decl."). The pandemic even led to the closure of many of the relevant posts for *all* routine consular services during its early stages, which overlapped with the early months of the delays that some Plaintiffs experienced. *Id.* ¶¶ 20, 20 n.1, 31-34, 36. The fact of this closure is "highly relevant" to assessing the reasonableness of the claimed delays. *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 165 (D.D.C. 2021). Plaintiffs also do not contest that the pandemic-related decrease in services offered created a backlog for many routine services, including CLN services. Benning Decl. ¶¶ 27-28. In light of these uncontested challenges to the Department's resources, the delays that Plaintiffs have experienced meet the rule of reason.

The severe constraints on the Department's resources are alone sufficient to meet the rule of reason but, incidentally, the complexity of the task of handling appointments for CLN services and the significant consequences of losing U.S. citizenship also indicate that the rule of reason favors Defendants. In arguing that the tasks involved in an appointment for CLN services are "not complicated" and that the interviews generally take no more than five or ten minutes, Pls.' Mem.at 34-35, Plaintiffs fail to account for a few important considerations. First, not all appointments for

CLN services are alike.   While some appointments might present a more "straightforward" scenario, *id.* at 34, others will be more complicated and therefore take more time.   Ex. A, Supplemental Declaration of Douglass Benning, Principal Deputy Assistant Secretary of State for Consular Affairs ¶ 9, ("Suppl. Benning Decl.").   Second, regardless of the length of an appointment for CLN services, the complexity of the tasks required of consular officers prior to, during, and after that appointment is high.  *Id.*  For example, prior to the appointment, the consular officer must complete record searches to confirm the U.S. citizenship of the individual requesting CLN services and to determine whether that individual has previously lost nationality, been issued a passport, or received other consular services.  *Id.* ¶ 10.   Depending on the individual's birth circumstances, the consular officer may need to conduct additional research to determine the origin of the individual's asserted U.S. citizenship.  *Id.*  The consular officer also evaluates the request for any "flags" that should "inform the handling of the case," such as potential cognitive impairment or other mental incapacity, whether the individual is a minor, or whether loss of nationality would result in statelessness.  *Id.* ¶ 11.   If any such issues are present, the consular officer often coordinates and consults with the Department, which can be a time-consuming process.  *Id.*  The consular officer must also translate forms for individuals who do not read or write in English.  *Id.*  After these initial tasks are complete, the consular officer sends a packet of forms and information regarding the loss of nationality process to the individual requesting CLN services.  *Id.* ¶ 12.   Once the requester completes the forms, the consular officer holds the initial interview, which sometimes occurs telephonically or through email rather than in person.  *Id.* ¶ 13. The first interview may raise additional questions or concerns that require consultation with the Department.  *Id.* ¶ 14.   Only after all of these steps are complete is the second, in-person interview

available.  *Id.*  As noted above, the interview's length can vary depending on "the circumstances the individual presents and the individual's responses to interview questions."  *Id.*

The consular officer's tasks regarding the CLN service are not complete at the conclusion of the second, in-person interview.  Instead, the consular officer must upload interview notes to the case file, write a memorandum recommending approval or denial of a request for a CLN, including observations from the interview that support the recommendation, and assemble, scan, and send the entire CLN package (which includes the individual's signed forms, the recommendation memorandum, and the CLN if approval is recommended) to the Bureau of Consular Affairs, Overseas Citizens Services Directorate, Office of American Citizens Services. *Id.* ¶ 16.  That office then reviews the CLN package and makes a final determination as to loss of nationality, which requires double-checking the research and reasoning of the consular officer and, in some cases, asking for additional information from the requester or consulting with the Office of the Assistant Legal Adviser for Consular Affairs for legal guidance.  *Id.* ¶ 17.  When a CLN is approved, post must handle the logistics of getting the CLN to the requester, while the Department notifies various agencies of the loss of nationality based on its statutory obligation to do so. *Id.* ¶ 18.  Plaintiffs also do not dispute that renunciation has significant effects, Pls.' Mem. at 35, which adds to the length of an appointment for CLN services and the time that must be put into the preparation for and steps taken after that appointment.  *See* Benning Decl. ¶ 11; Defs.' Mem. at 16-17.  Thus, there are many tasks surrounding CLN services that are not reflected in the number of minutes that the second, in-person interview lasts and, to the extent the appointment is efficient, that is merely a reflection of the large amount of work that goes on behind the scenes.  The complex and time-intensive nature of the CLN service provides additional evidence that the rule of reason favors Defendants.

Plaintiffs argue that the rule of reason does not favor Defendants because Defendants have not "provide[d] any explanation as to why renunciation services for U.S. citizens are a lower priority than non-immigrant visa services for foreign nationals." Pls.' Mem. at 36. But Plaintiffs' argument falsely implies that non-immigrant visa (NIV) services do not benefit U.S. citizens when, in fact, they do. For example, U.S. citizens are benefited by the processing of NIVs for medical professionals, which the Department has prioritized during the pandemic because they "are vital to the ability to staff U.S. medical facilities and to continue the fight against the COVID-19 pandemic." Suppl. Benning Decl. ¶¶ 19-20. Other categories of NIVs that the Department focused on during the heart of the pandemic benefitted U.S. citizens by aiding in U.S. economic recovery and stability, such as NIVs associated with food production, repair and maintenance of capital equipment, transportation, and tourism. *Id.* Issuance of NIVs also benefits the U.S. economy by facilitating U.S. business activities and movement of U.S. goods abroad, through principles of comity and reciprocity. *Id.* ¶ 20. Still other categories of NIVs were prioritized on an emergent, humanitarian basis, such as visas for humanitarian or medical emergencies. *Id.* ¶ 19. Thus, there are myriad reasons why NIV issuance is of critical importance to U.S. citizens and is a necessary tool for humanitarian relief. The Department recognized these reasons in its November 2021 guidance, which asked posts to "work to reintroduce routine nonimmigrant visa (NIV) appointment types into [their] workload" because "[v]isas and travel to the United States for work and tourism are crucial to continued U.S. economic recovery." Benning Decl. Attachment I at 1, 5, ECF No. 17-2. Thus, the Department's continued provision of NIV services does not undermine the reasonableness of the delays in providing CLN services during the pandemic, which affect fewer U.S. citizens and are not emergent.

As for the second *TRAC* factor, Plaintiffs do not dispute that when there is no statutory "timetable or other indication of the speed" by which the government must act, *TRAC*, 750 F.2d at 80, the agency is "entitled to considerable deference" regarding any alleged delay, *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citation omitted).  Further, they do not dispute that courts have recognized that the COVID-19 pandemic may make it impossible to meet even strict statutory deadlines, where they exist.  *See Gomez v. Trump*, 485 F. Supp. 3d 145, 201 (D.D.C. 2020), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), and *amended in part sub nom. Gomez v. Biden*, No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021), *appeal filed*, No. 20-5292 (D.C. Cir. Sept. 28, 2020).  Based on this deference and the significant resource constraints caused by the COVID-19 pandemic, the second *TRAC* factor favors Defendants.

The third and fifth *TRAC* factors—which instruct courts to consider that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake" and to assess "the nature and extent of the interests prejudiced by delay" — also favor Defendants.  750 F.2d at 80.  Defendants recognize that Plaintiffs at least arguably possess a "human health and welfare" interest in obtaining appointments for CLN services and that those interests can be prejudiced by a delay.  But Plaintiffs do not have a corner on the market of human-health-and-welfare interests implicated by a delay in the provision of consular services.  Indeed, the individuals seeking virtually any other consular service also possess human-health-and-welfare interests that can be prejudiced by delays in obtaining those services.  Increasing the rate of appointments for CLN services would not, therefore create a net benefit to human health and welfare because other consular services would suffer if the rate of appointments for CLN services was increased.  Plaintiffs do not dispute that courts have previously rejected delay claims

10

under the third *TRAC* factor when a finding of delay for that plaintiff would harm "others similarly situated." Defs.' Mem. at 19 (quoting *Pushkar v. Blinken*, Civ. A. No. 21-2297 (CKK), 2021 WL 4318116, at *9 (D.D.C. Sept. 23, 2021)). Further, the D.C. Circuit has recognized that the third *TRAC* factor "alone can hardly be considered dispositive when, as in this case, virtually the entire docket of the agency involves [interests relating to human health and welfare]."[2] *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987), *abrogated on other grounds*. Because the Department and many posts are currently experiencing backlogs for many services and any time spent on appointments for CLN services is, necessarily, time *not* spent on another service, the third and fifth *TRAC* factors do not favor Plaintiffs and, even if they did, cannot be dispositive of the delay claim.

Plaintiffs also argue that Defendants failed to explain why speeding up the rate of appointments for CLN services would harm human health and welfare, but they ignore Defendants' statement about the "health risks of assembling large groups of people in one place" during the COVID-19 pandemic. Defs.' Mem. at 19. In other words, the early phases of the delay are "attributable to the [Department's] efforts to protect the health and safety of consular . . . officials during the COVID-19 pandemic" as well as the safety of individuals seeking the Department's services. *See Khushnood*, 2022 WL 407152, at *5 (holding that the third and fifth

---

[2] Plaintiffs also argue that the third and fifth *TRAC* factors favor Plaintiffs because Defendants have failed to address why the Department has been providing "non-immigrant visa services for foreign nationals . . . more efficiently and faster" than it has been providing appointments for CLN services during the same timeframe. Pls.' Mem. at 37. But they fail to connect this statement to the requirements of the third and fifth *TRAC* factors. Neither factor conditions the Court's consideration on the citizenship status of the individuals at issue. Instead, they ask the Court to consider "*human* health and welfare" and "the interests prejudiced by delay." *TRAC*, 750 F.2d at 80 (citations omitted) (emphasis added). It is of no moment, then, whether the human-health-and-welfare interests at stake for other consular services, including NIVs, are those of U.S. citizens (which they often are) or of non-citizens.

*TRAC* factors favored the government defendants where this health rationale was the basis for the delay in services).  For these reasons, the third and fifth *TRAC* factors do not favor Plaintiffs.

The fourth *TRAC* factor—the "effect of expediting delayed action on agency activities of a higher or competing priority"—strongly favors Defendants.  750 F.2d at 80.  Now that all relevant posts have lifted their COVID-19-related restrictions on services and are offering the full range of services, *see* Suppl. Benning Decl. ¶¶ 3-8, Plaintiffs have no need for a court order requiring posts to resume providing appointments for CLN services.  Instead, Plaintiffs' remaining request is for the Court to require posts to provide appointments for CLN services at a faster rate than posts currently offer them.  Because posts offer many services that are of a higher or competing priority than CLN services, however, a court order forcing posts to re-allocate some of their limited resources to processing appointments for CLN services at a faster rate would necessarily drain agency resources from activities of a competing or higher priority.  *See* Defs.' Mem. at 19.

Plaintiffs attempt to get around this fact by arguing that because they are "not asking to jump ahead in the line of other individuals waiting for the Government to take action on renunciation applications," they will somehow not be displacing services of a higher or competing priority.  Pls.' Mem. at 38 (quotation marks and citation omitted).  But this argument strains logic. While it is true that Plaintiffs do not ask for their appointments for CLN services to be scheduled any faster than the appointments for others waiting for appointments for CLN services, Plaintiffs ask for the entire category of CLN services to jump the queue and take priority over other services that the Department provides.  Plaintiffs' conclusion that this systemic argument does not run afoul of the fourth *TRAC* factor assumes that the Department has *extra* resources that it can deploy towards appointments for CLN services at a moment's notice without negatively affecting other

consular services.  As Defendants' opening brief and supporting declaration established, this is far from true.  Instead, the COVID-19 pandemic placed a severe strain on the Department's already finite resources, and any redirection of those limited resources to processing appointments for CLN services at a faster rate will detract from the Department's ability to offer other services of higher or competing priority.[3]  In other words, this situation is akin to the scenarios in which a plaintiff asks to be sent to the front of a queue, which necessarily places all the other individuals in the queue back by one spot.  The cases and article Plaintiffs cite do not require otherwise, and Plaintiffs misrepresent their holdings and statements.  *Godsey v. Wilkie*, 31 Vet. App. 207, 228 (Vet. App. 2019) (acknowledging that class-wide relief avoided "the undesirable consequence of line-jumping associated with individual petitions alleging delay" with respect to a particular government service, but ultimately determining that the fourth *TRAC* factor did not favor defendants because defense counsel had admitted that the delayed action was supposed to be "give[n] primacy" among the agency's other activities and was "of the utmost priority"); *Ebanks v. Shulkin*, 877 F.3d 1037, 1039-40 (Fed. Cir. 2017) (not addressing the *TRAC* factors whatsoever and, instead, suggesting that individual unreasonable delay claims "in VA's first-come-first-served queue" may be "best addressed in the class-action context"); Stephen C. Robin, *Healing Medicare: Enforcing Administrative Law Deadlines in Medicare Appeals*, 95 N.C. L. REV. 1293, 1303 (2017) (simply describing how the court in *Air Line Pilots Ass'n, Int'l v. C.A.B.*, 750 F.2d 81 (D.C.

---

[3]  Plaintiffs argue that, to the extent this resource reallocation consequence occurs, it does not tip the *TRAC* factor balance towards Defendants because "voluntary renunciation services should take priority over services that do not further any constitutional right whatsoever, such as non-immigrant visa services."  Pls.' Mem. at 39.  But it is not for Plaintiffs to decide what agency services ought to be of higher or competing priority.  Defendants' counsel is not aware of any case in which a court assessed the fourth *TRAC* factor based on a plaintiff's opinion of how an agency should allocate its resources.  Plaintiffs' argument also presumes that appointments for CLN services implicate a constitutional right to expatriate or to do so within a certain timeframe when no such right has ever been recognized.  *See* Defs.' Mem. at 28, 31 n.9.

Cir. 1984) had "disregarded the common line-jumping or resource allocation arguments" by "focus[ing] on the unreasonable delays felt by all claimants" whose unemployment benefits cases had not been heard by the Civil Aeronautics Board) (emphasis omitted); *see also Air Line Pilots Ass'n*, 750 F.2d at 84 (not addressing any specific *TRAC* factors by name and, instead, concluding that none "of the relevant considerations in th[e] case [could] adequately excuse the agency" for its five-year delay).   Thus, Defendants' argument stands—the fourth *TRAC* factor supports Defendants because ordering the Department to provide appointments for CLN services more quickly would serve only to delay the Department's provision of services of higher or competing priority.

As for the final *TRAC* factor, which indicates that the Court "need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed,'" 750 F.2d at 80 (citation omitted), Plaintiffs continue to assert, without foundation, that the delay in appointments for CLN services is attributable to what it calls a "general anti-expatriation policy." Pls.' Mem. at 40.   In the sworn declaration Defendants submitted with their opening brief, the Principal Deputy Assistant Secretary of State for Consular Affairs, Douglass Benning, explained that the Department and posts determined how to prioritize their various services during the COVID-19 pandemic based upon the emergent nature of the varying services offered by posts, which necessitated that appointments for CLN services were of lesser priority than many of the other services the Department and posts offer.  *See* Benning Decl. ¶¶ 8, 18-23.  And, contrary to Plaintiffs' assertion, the government has not told "its citizens that they must wait over a year to renounce."[4]   Pls.' Mem. at 40.   Indeed, Plaintiff Christopher Bousigues took the oath of

---

[4]  Plaintiffs add that it is "illegitimate . . . to actively discourage/prevent expatriation by means of levying astronomical fees," Pls.' Mem. at 40, but the lawfulness of the renunciation fee is not at issue in this litigation and is, therefore, not properly before this Court.

renunciation less than 10 months after requesting an appointment to do so, Benning Decl. ¶ 33, and Plaintiff Stephen Collins is on track to have his appointment for CLN services less than a year after requesting it, Suppl. Benning Decl. ¶ 8.  To the extent that some individuals have experienced a delay of longer than one year, posts have been working diligently to address such backlogs. For example, in the last two months, Post Frankfurt has reduced its waitlist of 980 requests for CLN services to around 700, *id.* ¶ 3, while Post Amsterdam has reduced its waitlist from 140 to 85 over the same period, *id.* ¶ 6.  Post Paris is processing requests for CLN services at a higher rate than it was prior to the pandemic, to address its wait list of approximately 135 people. *Id.* ¶ 4. Post Marseille has only 62 people remaining on its waitlist, *id.*, while Post Helsinki has only 24, *id.* ¶ 7.  Since February, Post Singapore has reduced its waitlist for CLN services from 120 to approximately 20 individuals. *Id.* ¶ 5.  Post Bern has reduced its waitlist for CLN services from 700 in March to approximately 577 and offers around 20 appointments for CLN services each week. *Id.* ¶ 8.  This good-faith effort to address the delays of which Plaintiffs complain "weighs against relief." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 150, *appeal dismissed sub nom., Tate v. Blinken*, No. 21-5068, 2021 WL 3713559 (D.C. Cir. Jul. 22, 2021) (quoting *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 120 (D.D.C. 2005)).

Plaintiffs' other assertions in support of their argument that there is impropriety behind the delays in appointments for CLN services—the existence of some short final interview appointments, and the disparity between processing times for NIV appointment requests and CLN service appointment requests—have already been refuted above.  In short, the fact that some final interview appointments may not take much time does not negate the complex and time-intensive nature of providing CLN services because the final interview represents only a small fraction of the overall time required to process a request for a CLN from start to finish, and the length of the

15

final interview varies by individual.  The Department's processing rate and timing for NIVs is based on the weight of the interests at issue in that context, which often include important benefits for the U.S. economy or emergent circumstances.  There is no impropriety behind the delay in appointments for CLN services, which have been a direct consequence of the COVID-19 pandemic and resulting resource constraints.

In sum, the delay in appointments for CLN services is reasonable because each of the *TRAC* factors favors Defendants.  Considering the long-standing principle that "[t]he agency is in a unique—and authoritative—position to view its projects as a whole . . . and allocate its resources in the optimal way," *In re Barr Lab'ys*, 930 F.2d 72, 76 (D.C. Cir. 1991), this Court should decline Plaintiffs' invitation to engage in "judicial reorderings of agency priorities."  *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 309 (D.D.C. 2020) (citation and alterations omitted) (collecting cases), *appeal dismissed sub nom. Milligan v. Blinken*, 2021 WL 4768119 (D.C. Cir. Sept. 21, 2021). Instead, the Department's "interests in balancing its own priorities and determining how to allocate scarce resources in a global pandemic outweigh [P]laintiffs' interest in immediate [scheduling] . . . of their [appointments for CLN services]."  *Tate*, 513 F. Supp. 3d at 150-51 (citation omitted).

### C. The Department of State's temporary cessation of appointments for Certificate of Loss of Nationality services at some posts and use of a waitlist at others falls well within the Department's statutory authority.

In their opening brief, Defendants addressed Plaintiffs' statutory authority argument in terms of whether a delay in the provision of appointments for CLN services violates the Department's statutory authority.  Defs.' Mem. at 23-27.  Plaintiffs contend that viewing the temporary suspension of appointments at certain posts and the use of a waitlist at others as a delay in provision of CLN services is a "convenient[] mischaracteriz[ation]."  Pls.' Mem. at 41 n. 24 (arguing that a suspension is legally distinguishable from a "mere delay") (quotation marks

omitted).  But Plaintiffs fail to explain how the temporary suspension of appointments and the use of a waitlist amount to something other than a delay, either legally or practically.  The temporary suspension of appointments for CLN services at certain posts had the legal and practical effect of delaying appointments for those services for individuals who were seeking to renounce their U.S. citizenship.  No citizen was permanently denied the opportunity to take an oath of renunciation because of this temporary suspension.  Regardless, all posts relevant to this litigation have now resumed their provision of appointments for CLN services, so no live claim remains regarding the temporary suspension of CLN services.  *See* Suppl. Benning Decl. ¶¶ 3-8.  The only remaining question is whether the use of a *waitlist* for the backlog of individuals awaiting an appointment at certain posts, which Plaintiffs characterize in the Amended Complaint as an "effective suspension," exceeds the Department's statutory authority.  Pls.' Am. Compl. at 30.  Plaintiffs do not appear to press this aspect of their statutory argument in their opposition and cross-motion.  *See* Pls.' Mem. at 41-42 (mentioning only a suspension of CLN services in the section on statutory authority).  To the extent that Plaintiffs have nonetheless succeeded in preserving this argument, Defendants address it here.

Plaintiffs' conception of the waitlist as an "effective suspension" of CLN services is meritless.  *See* Defs.' Mem. at 26-27.  Requiring an individual to wait his or her turn to obtain a service that the agency does not have unlimited resources to provide is not the same as suspending that service.  All relevant posts are providing CLN services, with some posts even providing ten or more such appointments each week.  Suppl. Benning Decl. ¶¶ 3-8.  Deeming these efforts to be an "effective suspension" of the CLN services simply because many individuals wish to obtain such appointments defies logic.  Indeed, the use of a waitlist aids the orderly *provision* of CLN services to individuals.

Nor can Plaintiffs succeed on the argument that they hint at elsewhere in their brief—that the waitlist procedure exceeds the Department's authority because the waitlist was caused by the temporary suspension of CLN services which, they assert, exceeded the Department's authority. *See* Pls.' Mem. at 26.  Plaintiffs cite two cases in support of the proposition that the Department exceeded its statutory authority when it temporarily suspended CLN services during the earlier stages of the pandemic, *id.* at 41-42, but neither case supports this conclusion.  In both cases, the courts determined that plaintiffs were likely to succeed on the merits of their claims that the Department of State had exceeded its statutory authority in suspending visa processing because they concluded that the Department's stated reason for the suspension was legally incorrect. *See Milligan*, 502 F. Supp. 3d at 315-16; *Gomez*, 485 F. Supp. 3d at 193-94.  The Department's justification for the temporary suspension in this case, however, is quite different.  The Department temporarily suspended appointments for CLN services based on the severe resource constraints imposed by the COVID-19 pandemic.  This distinction is critical because, while there is no doctrine requiring courts to defer to an agency's legal interpretation that the court finds to be incorrect, courts do defer to an agency's "broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."  *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007).  *Milligan* and *Gomez* therefore do not support Plaintiffs' argument that the Department lacked authority to temporarily suspend appointments for CLN services during the COVID-19 pandemic.

Plaintiffs emphasize the absence of a provision expressly authorizing the Department to "suspend voluntary renunciation services," Pls.' Mem. at 41, but the absence of such a provision is not dispositive.  Instead, because a temporary suspension of CLN services during the pandemic and the use of waitlists to organize the individuals awaiting that service is best understood as

having delayed the appointments for CLN services, the question is whether the Department has the authority to determine the timing of appointments for CLN services.  Plaintiffs fail to address any of Defendants' arguments on this point, which include the absence of a deadline by which the Department must act on a request for an appointment for CLN services, the discretion Congress has granted the Department to allocate its limited consular resources, and the deference due to such agency decisions.  *See* Defs.' Mem. at 24-25.  Plaintiffs have therefore failed to show that the Department has exceeded its statutory authority.

## II.   PLAINTIFFS' FIFTH AMENDMENT CLAIMS ARE MERITLESS.

Plaintiffs do not address, and therefore concede, Defendants' position that, under the doctrine of constitutional avoidance, which is the "established practice" of the Supreme Court, *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988), courts "must consider nonconstitutional grounds for decision" "prior to reaching any constitutional questions," *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981).  *See* Defs.' Mem. at 27.  This Court, therefore, should not reach Plaintiffs' Fifth Amendment claims unless doing so is necessary to the outcome of the case.

Defendants maintain that the right that Plaintiffs seek to have recognized as fundamental is a right to voluntarily expatriate within days or weeks of requesting to do so.  *See id.* Plaintiffs attempt to dispute this characterization—arguing that the right for which they seek recognition is, instead, simply "the right to voluntarily renounce citizenship."  Pls.' Mem. at 20. But Plaintiffs' own pleadings belie this broad construction.  In their amended complaint, Plaintiffs assert that "[t]he government has a constitutional duty to ensure sufficient resources enabling its citizens to exercise their fundamental right to expatriate within a certain and reasonable timeframe on the order of days or weeks (and not months or years)."  First Am. Compl. ¶ 88, ECF No. 12. Thus, Plaintiffs' own pleadings assert that the alleged fundamental right *includes* a constitutionally

19

imposed timeline for service.  Plaintiffs appear to recognize the distinction between what they are asking for and a generalized right to expatriate by stating that "[t]he contemporary practice of the State Department is consistent with over two centuries of United States expatriation policy." Pls.' Mem. 16.  In other words, the Department has long afforded the opportunity for voluntary expatriation, Plaintiffs admit that the Department continues to do so, and Plaintiffs are not seeking an injunction here to compel the Department to do so.  This further confirms what the Amended Complaint seeks to challenge:  that Plaintiffs seek recognition of a right that is more specific than a constitutional right to voluntarily expatriate, but, rather, to do so within an expedited time frame and at a specific overseas post of their choosing.

And as to that question, Plaintiffs do not contest that no court has ever recognized that a right to obtain an appointment for CLN services within days or weeks of requesting one exists or rises to the level of a constitutionally cognizable fundamental right.  Such an alleged right fails to meet either prong of the *Glucksberg* framework: it is not "objectively, deeply rooted in this Nation's history and tradition" for an individual to be granted the right to expatriate within days or weeks of requesting to do so, nor is it "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist" if an individual had to wait longer than days or weeks to expatriate. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations and quotation marks omitted).  In fact, as Defendants pointed out in their opening brief and Plaintiffs do not refute, liberty and justice would be *harmed* by recognition of a fundamental right to expatriate within a period of days or weeks, because such a tight timeframe would impair the Department's ability to allocate sufficient resources to its emergency consular services, which can have significant impacts on life-or-death situations and the immediate health, safety, and welfare of U.S. citizens and their families. *See* Defs.' Mem. at 29.

As Defendants also argued in their opening brief, because a delay of more than days or weeks between the request for CLN services and the provision of those services does not "impinge upon constitutionally protected rights," this Court should analyze the constitutionality of the delay under the rational basis test. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40, 44 (1973). This Court should uphold the Department's actions because they "bear[] [a] . . . rational relationship to [the] legitimate state purpose" of protecting health and safety. *Id.*; *see Simopoulos v. Virginia*, 462 U.S. 506, 519 (1983) (recognizing a state's compelling interest in protecting a woman's health and safety); *United States v. Lafley*, 656 F.3d 936, 940–41 (9th Cir. 2011) (recognizing the government's compelling interest in protecting the health and safety of prison inmates).   As pandemic conditions have fluctuated in the various countries in which the Department's posts are located, the posts have shifted their operations to account for those risks while still carrying out their mission. *See, e.g.* Benning Decl. ¶ 33.  Because the Department's appointment procedures for CLN services amply satisfy rational basis review, this Court should reject Plaintiffs' Fifth Amendment claims.

Even if Plaintiffs had asserted a broader right—a general right to voluntarily expatriate—the Court need not determine whether such a right exists because the Department's ordering of its priorities in light of COVID-19 risks during the height of the pandemic, which led to the delays that Plaintiffs challenge, would survive strict scrutiny even if such a right did exist.[5]

---

[5] Defendants do not concede that a constitutional right to expatriate exists, and, indeed, no court has ever recognized such a right as fundamental under the Fifth Amendment's Due Process Clause. *See* Defs.' Mem. at 31 n.9.  Moreover, as Defendants argued in their opening brief, courts have repeatedly recognized the legality of limitations on the ability to relinquish U.S. citizenship without applying strict scrutiny to such limitations.  Defs.' Mem. at 29-30.  Although some of these cases have occurred in a prison context, even in that context a court recognized the broader principle that "Congress has broad authority over the circumstances and the procedures a citizen must satisfy to expatriate." *Scott v. United States*, No. 1:13-CV-2030 LJO-BAM, 2014 WL 2807652, at *2 (E.D. Cal. June 20, 2014).  Plaintiffs dismiss the examples of limitations on

Plaintiffs counter that the temporary suspension of appointments for CLN services and use of a waitlist to organize the backlog of individuals awaiting such appointments were not necessary to achieve a compelling governmental interest. Pls.' Mem. at 21, 25. They attempt to set forth a separate strict scrutiny analysis for the temporary suspension of CLN services and the use of a waitlist at posts that have lifted the suspension (which all relevant posts have now done). And they argue that the use of waitlists for CLN services does not serve a compelling governmental interest *because* posts that have resumed all regular services are not operating under COVID-19-related safety restrictions. *See* Pls.' Mem. at 26.[6]

But this approach makes little sense because the two issues are inextricably intertwined—the analysis of the waitlist must include the governmental interests asserted for the temporary suspension. Indeed, Plaintiffs admit that it is necessary to consider the circumstances that led to the creation of the waitlists—namely, the temporary suspension of appointments for CLN services due to COVID-19 risks and COVID-19-related limitations on agency resources. *See id.* Put differently, it is not the use of a waitlist that causes the delay of which Plaintiffs complain, but rather the *volume* of the waitlist, and that was occasioned by the temporary suspension of CLN

---

expatriation outside the prison context as irrelevant, Pls.' Mem. at 19 n.19, but fail to explain how the Department's recognized "discretion to determine whether an individual has adequately renounced affiliation with the United States" can be irrelevant. *Lozada Colon v. U.S. Dep't of State*, 2 F. Supp. 2d 43, 45 (D.D.C. 1998). If expatriation was a fundamental right, courts would be expected to have subjected any exercises of Department discretion regarding whether an individual met the requirements for expatriation to strict scrutiny but, instead, have routinely recognized the legitimacy of limitations on expatriation without applying such a standard.

[6] Although this clarification is not directly relevant to whether a compelling interest exists, it is worth mentioning that Plaintiffs oversimplify the current situation with respect to COVID-19's impact on operations at posts that have resumed all of their regular services; although all relevant posts have resumed offering CLN services, COVID-19 concerns often remain and have an impact on staffing, either due to a continuing staffing shortage from earlier in the pandemic or due to current staff becoming ill with COVID-19. *See* Suppl. Benning Decl. ¶ 4 (noting that French regulations regarding self-quarantine after a positive COVID-19 test create staff shortages), ¶ 6 (citing continuing staff shortages at Post Amsterdam).

services during the COVID-19 pandemic.  *See* Benning Decl. ¶ 28 (stating that the "significant increase in the backlog of individuals waiting for an appointment to take the oath of renunciation" was "directly driven by the challenges of meeting demand due to COVID-19 restrictions").

And the temporary suspension of appointments for CLN services was indeed narrowly tailored to a compelling governmental interest.  *See* Defs.' Mem. at 31-32 (identifying a compelling interest in "protecting the health and safety of its personnel and of individuals seeking Department services").  Plaintiffs "assume, but do not concede, that fighting the spread of COVID-19 is a 'compelling interest.'"  *Id.* at 21 n.21.  And they otherwise do not address, for purposes of the suspension argument, the "compelling governmental interest in allowing the Department to balance its competing priorities as it sees fit in light of the severe constraints that the COVID-19 pandemic has placed on the Department."  Defs.' Mem. at 31 (quoting *Didban v. Pompeo*, 435 F. Supp. 3d 168, 177 (D.D.C. 2020)) (brackets omitted).  Without the temporary suspension of CLN services during the height of the pandemic, the Department would have been forced to choose between risking the health and safety of its personnel and the general public by offering more services than it could safely provide or by prioritizing CLN services above more urgent services, such as emergency consular services for U.S. citizens.  In addition, Department policy permitted posts to make locality-specific determinations regarding when to begin offering certain services again, which provides additional evidence of the narrow tailoring of the temporary suspension in appointments for CLN services.  *See* Defs.' Mem. at 32.

Plaintiffs also claim that the temporary suspension was not narrowly tailored because 1) "there is not an iota of evidence that the provision of these services would have contributed to the spread of COVID-19," and 2) "the government can continue to provide renunciation services without endangering staff or the public, as it does with other services that it has not suspended."

Pls.' Mem. at 22.  The first assertion is illogical, and neither of these statements are true.  It would be nigh impossible to prove definitively that the provision of particular services actually contributed to the spread of COVID-19.  But there is a great deal of evidence indicating that if posts had provided such services during the height of the pandemic, that decision would have greatly risked the spread of COVID-19.  The reasons for this should be by now obvious.  COVID-19 is known to spread through small droplets in the air and on surfaces and, in particular, where persons are in close quarters indoors, and many countries and localities have implemented capacity restrictions and social distancing requirements throughout the pandemic in an effort to slow the spread of the virus.  *See, e.g.*, *How COVID-19 Spreads*, CDC (July 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; Benning Decl. ¶¶ 31-36.

Plaintiffs' second statement—that the government could provide appointments for CLN services at their normal rates without causing a COVID-19-related danger to staff or the public— seems premised on the notion that the Department has unlimited resources and facilities large enough to accommodate a normal level of operations for all its services, regardless of the risk of COVID-19 or capacity restrictions that were in place during the height of the pandemic.  This premise is also baseless.  When posts were under COVID-19-related restrictions, either imposed by post itself or by local health guidelines (or both), they were forced to prioritize which services to provide; business as usual simply ceased while the world was in the grips of the pandemic, and there is nothing remotely unreasonable with the Department reacting to those circumstances.  The provision of CLN services at a normal rate during this time would have necessitated ceasing to provide, or providing at a much slower rate, services that the Department had deemed to be of higher or competing priority.

Plaintiffs also contend that the Department's "continued provision of non-immigrant visa services . . . belies the contention that it was ever necessary to suspend [appointments for CLN] services due to COVID-19." Pls.' Mem. at 23. For support, Plaintiffs cite to two Supreme Court cases granting relief pending appellate review to plaintiffs challenging state restrictions on private gatherings during the COVID-19 pandemic, when those restrictions were applied unequally to religious activities. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020). But COVID-19-related restrictions on private gatherings are not analogous to COVID-19-related limitations on what government services are offered by an agency. The driving factors in what services could be safely offered during the height of the pandemic were the agency's finite resources and the health-and-safety-related need to impose capacity limitations. In contrast, there is no limitation on the number or size of private gatherings that might occur absent any governmental restrictions. Further, the standards at issue in this case and in the cases Plaintiffs cite are vastly different. The Supreme Court sided with the plaintiffs in *Tandon* and *Roman Catholic Diocese of Brooklyn* because the applicants had "made a strong showing that the challenged restrictions violate[d] the minimum requirement of neutrality to religion." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 66 (citation omitted); *see Tandon*, 141 S. Ct. at 1296. There is no analogous requirement that an agency treat each of its services neutrally—giving them equal priority. Much to the contrary, courts recognize that agencies have a "compelling governmental interest in [being] allow[ed] . . . to balance [their] competing priorities as [they] see fit." *Didban*, 435 F. Supp. 3d at 177. Because posts were forced to offer a more limited selection of services during the height of the pandemic, and because appointments for CLN services were not nearly as critical as other Department services such as emergency consular services or even NIV services, posts properly suspended CLN services for a time to free up their

severely limited resources to address the most critical services.  The fact that some posts were offering NIV services before they resumed offering CLN services does not undercut this point because NIV services implicate a variety of interests important to U.S. economic stability and humanitarian relief that are not implicated (or certainly not to the same extent) by CLN services. *See* Suppl. Benning Decl. ¶¶ 19-20.  For these reasons, the Department's temporary suspension of appointments for CLN services during the height of the pandemic was narrowly tailored to serve compelling governmental interests.

The use of waitlists would survive strict scrutiny for the same reasons that the temporary suspension policy would.  Plaintiffs contend that the use of a waitlist at a post that has resumed all its services without COVID-19 restrictions does not support a compelling interest in health and safety.  *See* Pls.' Mem. at 26.  And they argue further that an agency's interest in balancing competing priorities does not qualify as a compelling interest because no court has ever recognized it as a compelling interest in the context of a fundamental right.  *Id.*  These contentions badly miss the mark.  Because the volume of the waitlists came about through the temporary suspension of CLN services during the height of the pandemic, the Department's compelling interest in protecting the health and safety of its personnel and the general public justified and continues to justify the use of the waitlists even though that interest may no longer require suspending CLN services.  Beyond the health and safety interests, the use of waitlists allows posts to track the number of individuals awaiting the service and allocate resources for such appointments while continuing to devote some of their finite resources to other services of competing or higher priority. Ordering the Department to expedite carrying out a particular obligation, despite the fact that doing so would actively harm agency obligations that carry more weight and that the agency has

reasonably given higher priority, would surely harm a range of compelling interests in the provision of an array of consular services.

Plaintiffs add that even if the Department had a compelling interest in balancing competing priorities, such a compelling interest could not stand here because "the government has not proffered any evidence that it made any attempt to consider the right to expatriate in carrying out its alleged prioritization of its services" and its "alleged prioritization is [an] illusory *post hoc* rationalization." Pls.' Mem. at 26. But aside from the fact that no court has ever recognized expatriation as a fundamental right, the Department has carried out a thorough prioritization analysis throughout the pandemic, as evidenced by the Department cables Defendants submitted in this case. For example, the Department's May 14, 2020, guidance directed posts in limited phases of operation due to the pandemic to offer only "emergency [American Citizens Services (ACS)] and mission critical consular services." Benning Decl. Attachment E at 1, ECF No. 17-2. Even for posts that had determined it was sufficiently safe and advisable to resume public services, the guidance directed posts to do so "at a level determined by the consular section chief based on local conditions" and permitted them to phase in appointments for routine ACS services. *Id.* at 2. The decision to prioritize other services over CLN services, particularly during the height of the pandemic, was therefore explained contemporaneously and Defendants' justifications are not *post hoc*.

Plaintiffs eventually recognize that "the government may have some limited authority to prioritize," but emphasize that the government's prioritization is still subject to "reason and fairness." Pls.' Mem. at 27. They then argue that the Department has violated "reason and fairness" by prioritizing nonimmigrant visa processing over appointments for CLN services despite "fail[ing] to provide any explanation" for doing so. *Id.* But the Department made this

prioritization decision in a well-reasoned manner, based in part on the need for NIVs to support the U.S. economy and to provide humanitarian assistance. *See* Suppl. Benning Decl. ¶¶ 19-20; Benning Decl. Attachment I at 1, 5, ECF No. 17-2. Moreover, in terms of fairness, the use of a waitlist is the fairest way to provide appointments for CLN services to the individuals awaiting the service. Plaintiffs do not explain how it would be remotely feasible for the Department to hold appointments for all the individuals awaiting the service, which comprise several hundred individuals at some posts, without utilizing a waitlist to organize and prioritize them on a first-come, first-serve basis. Using a waitlist is the most efficient and rational way to ensure that the remaining Plaintiffs receive appointments as quickly as is reasonably feasible.

Plaintiffs further argue that waitlists are not narrowly tailored because the Department has "fail[ed] to take into consideration other alternatives that would make the renunciation process more efficient, such as remote renunciation appointments." Pls.' Mem. at 27. But remote renunciation appointments are not an option. The statute requires that an individual seeking to take the oath of renunciation must do so "before a diplomatic or consular officer of the United States in a foreign state." INA 349(a)(5). The Department has always interpreted this to require an in-person appointment, particularly given the need to thoroughly analyze the individual's "demeanor, composure, and state of mind at the moment of the requester's performance of the potentially expatriating act (taking the oath of renunciation)." Benning Decl. ¶ 12. The Department's use of a waitlist for CLN appointments at posts with a backlog of individuals awaiting the service serves the Department's compelling interests in ensuring that these significant actions are properly considered and carried out.

In sum, the Department's use of waitlist at some posts and temporary suspension of CLN services at other posts would satisfy strict scrutiny, even if that were the applicable standard, and

the Court need not reach the issue of whether a fundamental right to expatriate or to expatriate within days or weeks of requesting to do so exists and should reject Plaintiffs' Fifth Amendment claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss Plaintiffs' claims or, in the alternative, for summary judgment and should deny Plaintiffs' cross-motion for summary judgment.

Dated:  June 15, 2022                                     Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Laurel H. Lum*
LAUREL H. LUM
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 305-8177
Email: laurel.h.lum@usdoj.gov
*Counsel for Defendants*