UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| L'ASSOCIATION DES AMERICAINS ACCIDENTELS, *et al.*,<br><br>          Plaintiffs,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>          Defendants. | Case No. 1:20-cv-02933 (TNM) |

**MEMORANDUM OPINION**

During the COVID-19 pandemic, the Department of State suspended or curtailed a wide variety of consular services previously available abroad. Among those services was the process for an American citizen to formally renounce his or her citizenship. L'Association des Américains Accidentels and some of its members sued (collectively, the Association), arguing the Department's suspension and delay of renunciation services violated the Administrative Procedure Act (APA) and the Fifth Amendment's Due Process Clause. The Government now moves for dismissal and summary judgment on several grounds. The Court will grant that motion.

The Association's claims about the suspension of renunciation services are moot because the Department has resumed providing those services at its posts. Those claims must be dismissed. The Government is entitled to summary judgment on the Association's remaining APA claim because the Department's "waitlist" policy has not unreasonably delayed renunciation services. The remaining Fifth Amendment claim must be dismissed because the Association has not pled facts suggesting it is entitled to relief.

I.

The facts underlying this case are "largely undisputed," Opp. 7, ECF No. 19, so the Court only offers limited background here.

The Immigration and Nationality Act (INA) allows Americans to abandon their citizenship in limited circumstances. *See* 8 U.S.C. § 1481(a)(1)–(7). Relevant here, an individual may relinquish his nationality by voluntarily "making a formal renunciation of nationality before a diplomatic or consular officer of the United States." *Id.* § 1481(a)(5); *see also id.* § 1501 (authorizing consular officers to administer the oath of renunciation).

At the start of the COVID-19 pandemic, the Department of State suspended almost all routine consular services, including loss-of-nationality services. *See* Decl. of Douglass Benning, Principal Dep. Asst. Sec. of State for Consular Aff. (Benning Decl.) ¶¶ 4, 14–17, ECF No. 17-2. Consular posts have faced in-person capacity limitations, staff illnesses, in-country restrictions on public movements, and budgetary constraints due to losing fee-for-service revenue. *Id.* ¶¶ 15–16, 18.

Those resource constraints compounded in late 2021, as "many posts were [] called upon to assist U.S. citizens evacuating Afghanistan, process immigrant visas for Afghans on an expedited basis, and respond to a high volume of inquiries from Congress." *Id.* ¶ 14. Consular officers are also playing an integral role in responding to the Russia-Ukraine war and its attendant refugee crisis. *Id.* ¶ 16–17. The Department has now resumed renunciation services at those posts that previously offered them, but applicants face significant waits as consular officers work through backlogs. *See, e.g.*, Supp. Benning Decl. ¶¶ 3–8, ECF No. 21-1 (waitlist for renunciation services at Post Frankfurt is ~700 applicants; Post Paris ~135 applicants; Post Marseille ~62 applicants; Post Singapore ~120 applicants).

Individual Plaintiffs here are individuals who applied for, but have not yet received, certificates of loss of nationality (CLN) under § 1481(a)(5).[1]  They are joined by L'Association des Americains Accidentels, which seeks to protect the interests of American citizens living abroad.  They sued the Department of State, Secretary of State Antony Blinken, and Assistant Secretary of State for Consular Affairs Rena Bitter (collectively, the Government).  The Association alleges the Department's suspension of renunciation services and later delays violate the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and the Fifth Amendment's Due Process Clause, U.S. Const. amend. V.  *See* Amend. Compl., ECF No. 12.  The Government now moves to dismiss in part and for summary judgment in part.  *See* Def.'s Mot., ECF No. 17.  The Association opposes that motion and cross-moves for summary judgment.  *See* Opp., ECF No. 19.  The motions are now ripe for resolution.

## II.

A complaint must contain "a short and plain statement of the grounds for the court's jurisdiction," as well as a "statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1), (2).  A defendant may move to dismiss for failure to satisfy either of these requirements.  *See id.* 12(b)(1), (6).  When a defendant moves to dismiss for lack of subject matter jurisdiction, the court must presume that "a cause lies outside [its] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and the plaintiff bears the burden of overcoming that presumption, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

---

[1] At least four named plaintiffs (Lilian Pam, Philip Boeffard, Christopher Bosigues, and Martin Kracklauer) have now taken the oath of renunciation and received a CLN.  *See* Supp. Benning Decl. ¶¶ 2, 4–6.  Another two (Anne Misslin and Mark Lewis) have not contacted a consular post to request renunciation services.  *Id.*

While the Court accepts factual allegations in the complaint as true, those allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Nepal v. U.S. Dep't of State*, --- F. Supp. 3d ---, 2022 WL 1500561, at *3 (D.D.C. May 12, 2022). And the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharma., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Factual disputes are genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" for purposes of Rule 56 if it affects the outcome of the case under the substantive governing law. *See id.* In assessing whether a summary judgment movant has carried this burden, the Court must "draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 520 U.S. 133, 150 (2000).

**III.**

The Court starts, as it must, with jurisdiction. *See Ex Parte McCardle*, 74 U.S. 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause.").

To press his claims in federal court, a plaintiff must establish the "irreducible constitutional minimum" of standing: that he has suffered (1) an injury in fact (2) caused by, and traceable to, the defendant's allegedly unlawful conduct and (3) that a favorable judicial decision is "likely" to redress his injury. *Lujan*, 504 U.S. at 560. Because "standing is not dispensed in gross," a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up).

4

Plaintiffs must also "maintain a personal interest in the dispute" throughout "all stages of litigation." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). Standing "assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Id.*; *see also* Henry Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973) (explaining that mootness is "the doctrine of standing set in a time frame"). If a "court finds that it can no longer provide a plaintiff with any effectual relief, the case is generally moot." *Uzuegbunam*, 141 S. Ct. at 796. This requirement, like standing, applies to every form of relief a litigant seeks. *See, e.g.*, *In re Smith*, 114 F.3d 1247, 1249 (D.C. Cir. 1997) (holding that a request for habeas relief was moot, but that claims for injunctive, declaratory, and monetary relief were not).

Here, the Association has standing to sue on behalf of its members, but a subset of its claims are moot and must be dismissed.

**A.**

The Government's primary jurisdictional argument is that the Association does not have "associational standing" to sue in its members' behalf. To establish associational standing, an entity must show: (1) that its members would have standing to sue in their own right, (2) that it seeks to protect interests germane to the organization's purpose, and (3) that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Nat'l Assoc. of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).

The Government disputes only the first prong—whether the Association's members would have standing to sue. It says the Association has not alleged any of the named plaintiffs are members of the organization or that the delay of renunciation services injured its members. *See* Def.'s Mot. 13. The record says otherwise. In a declaration appended to the Association's

Opposition, Plaintiff Sofianne Thoulon says she is a member of the Association, has waited "well over a year" to complete the renunciation process, and has suffered financial injury because of the delay in renouncing her citizenship. *See* Thoulon Decl. ¶¶ 6–13, 15, 21, ECF No. 19-2; *cf. Jerome Stevens Pharma.*, 402 F.3d at 1253 (noting courts "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction"). Those facts are enough to establish Thoulon has standing to sue in her own right, and the Government has offered no contrary evidence.[2]

      The Government also argues the Court lacks jurisdiction to consider the APA claims because the Department did not violate a "clear duty to act" in suspending or delaying renunciation services. Def.'s Mot. 14. That argument misapprehends the jurisdictional/merits distinction. The APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). That provision creates a cause of action and defines a remedy; it does not confer or restrict jurisdiction. *See Califano v. Sanders*, 430 U.S. 99, 107 (1977); 28 U.S.C. § 1331 (federal-question jurisdiction). The issue of whether the Department's delay or suspension violated a mandatory duty is thus a merits question, not a jurisdictional question. *Cf. Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006) (holding that the APA's "final agency action" requirement is not jurisdictional). To hold otherwise would contradict the Supreme Court's admonition that lower courts should treat statutory limitations as jurisdictional only where Congress frames those limitations in jurisdictional terms. *See, e.g., Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006) ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.").

---

[2] The second and third prongs are met, and the Government does not argue otherwise, so the Court will not address them at length. The Government dropped the issue of associational standing altogether in its Reply.

In sum, neither of the Government's jurisdictional arguments have merit.

**B.**

Next, mootness. Since the filing of the Amended Complaint, the Department has substantially increased the number of consular services it provides worldwide. *See generally* Supp. Benning Decl., ECF No. 21-1. Relevant here, the Department lifted its previous suspension of renunciation services at those posts that offer them. *See id.* ¶¶ 3–8. That means the Court cannot "[i]ssue an order requiring Defendants to immediately resume renunciation-related services," Amend. Compl. 33, because they have already done so. The same goes for declaratory relief. The Court cannot "[i]ssue a declaratory judgment that the government is not authorized to suspend . . . renunciation services," *id.* at 33, because that declaration would be purely advisory.

The Association asks the Court to disregard these changed circumstances and render declaratory judgment because the Government "can easily reinstate the suspension." Opp. 3 n.4. It appears to rely on an exception to mootness for issues "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911). That exception applies if: "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990) (en banc) (cleaned up). Importantly, the recurring legal "wrong" "must be defined in terms of the precise controversy it spawns." *People for the Ethical Treat. of Animals, Inc. v. Gittens*, 396 F.3d 416, 422 (D.C. Cir. 2005).

Here, there is no reason to think the Association's members "would be subjected to the same action again." *Clarke*, 915 F.2d at 704. A generational pandemic precipitated the State

Department's decision to curtail consular services. The Department and two presidential administrations then "adopted ad hoc policies to respond to that pandemic, which had the effect of substantially curtailing [renunciation services]." *Nepal*, --- F. Supp. 3d at ---, 2022 WL 1500561, at * 8. Since then, the Biden administration's withdrawal from Afghanistan and the Russia-Ukraine war have imposed further emergency responsibilities on Department personnel throughout Europe and Asia.

The Association claims its members are "under constant threat that the government will return to its suspension policy under the guise of a global crisis," Opp. 3 n.4, but the available evidence suggests otherwise. The clear trend across consular posts is that renunciation services are *increasing*, despite the ongoing Russia-Ukraine war and COVID-19 pandemic. *See* Supp. Benning Decl. ¶ 4 ("Post Paris estimates it has approximately 135 people on its CLN wait list and is currently processing requests for CLN appointments at a rate higher than before the pandemic."); *id.* ¶ 5 (noting "all services are currently available at Post Singapore, and are expected to tend towards pre-pandemic levels"); *id.* ¶ 3 ("Post Frankfurt resumed offering CLN services appointments . . . and is no longer operating under any COVID-related restrictions."). Given that trend, there is no reason to think the Association's members are likely to suffer "the same wrong again." *Lewis*, 494 U.S. at 481.

In any case, granting declaratory judgment is discretionary. *See generally Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("[A] district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close."). Courts often decline to grant declaratory judgment where it would have no remedial effect. *See* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2759 (4th ed. 2022) ("One of the most important

considerations that may induce a court to deny declaratory relief is that the judgment sought would not settle the controversy between the parties."). That's doubly true when, as here, declaratory judgment in the Association's favor would render an advisory opinion on a significant question of administrative and constitutional law. *See id.* ("[C]ourts particularly are reluctant to resolve important questions of public law in a declaratory action."). So even if this case raised issues "capable of repetition yet evading review," the Court would still decline to grant declaratory relief.

In sum, the Association's APA and Fifth Amendment claims related to the Department's suspension of renunciation services are moot; its claims related to the Department's delay in rendering those services survive.

### III.

Now for the merits of the Association's claims about that delay. The Association alleges the Department's delay in providing renunciation services violates both the APA and a Fifth Amendment substantive due process right to expatriate. But the Government is entitled to summary judgment on the Association's unreasonable-delay claim because no factfinder would dispute it has acted reasonably given the circumstances. The Court will dismiss the Fifth Amendment claim because the Association has not alleged facts showing it is entitled to relief.

### A.

The APA "imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time,' and authorizes a reviewing court to 'compel agency action unlawfully withheld or unreasonably delayed.'" *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003) (quoting 5 U.S.C.

§§ 555(b), 706(1)).  Courts in this circuit consider six factors (the *TRAC* factors) when evaluating unreasonable-delay claims:

1. The time for agencies to make a decision must be governed by a "rule of reason."
2. Statutory time limits on agency proceedings may supply the content for the "rule of reason."
3. Delays that may be reasonable in "economic regulation are less tolerable when human health and welfare are at stake."
4. The effect of expediting delayed action on agency activities of a higher or competing priority.
5. The "nature and extent of the interests prejudiced by delay."
6. An agency action may be "unreasonably delayed" even if bad faith or impropriety did not cause the delay.

*See Telecomm. Rsch. and Action Ctr.* (*TRAC*) *v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984); *see also Dastigar v. Blinken,* 557 F. Supp. 3d 160, 164 (D.D.C. 2021) (applying *TRAC* factors to unreasonable delay claim).  Applying the *TRAC* factors here, the Department has not "unreasonably delayed" renunciation services.

Under the *first TRAC* factor, agency decision-making must follow a "rule of reason"—that is, an agency's response time must be "governed by an identifiable rationale."  *Palakaru v. Renaud*, 521 F. Supp. 3d 46, 51 (D.D.C. 2021).  The D.C. Circuit has said this factor is the "most important" and can often be "decisive."  *In re Core Comms., Inc.*, 531 F.3d 849, 857 (D.C. Cir. 2008).  There is "no per se rule as to how long is too long."  *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004).  Instead, whether an agency's approach is reasonable "will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee*, 336 F.3d at 1102.

Here, there is a clear "identifiable rationale" that explains the State Department's delay in providing renunciation services: In response to the COVID-19 pandemic the Department suspended nearly all routine consular services. *See* Benning Decl. ¶ 4. Resource constraints later compounded when the American withdrawal from Afghanistan and the Russia-Ukraine war required consular staff to focus on providing emergency services. *See id.* ¶ 14 ("[C]onsular sections' crisis response work and emergency services responsibilities, such as travel documents for stranded U.S. citizens, have increased exponentiality."); *id.* (detailing Afghan resettlement efforts). Faced with these challenges, the Department prioritized providing mission-critical services while protecting the health and safety of its staff. *See id.* ¶ 18. As those exigent circumstances have eased, consular posts have begun working through significant backlogs for routine services (including renunciation services) using "waitlists." *See, e.g.*, Supp. Benning Decl. ¶ 3 (Post Frankfurt reduced CLN waitlist from 980 to 700 between April 8, 2022 and June 15, 2022); *id.* ¶ 5 (Post Singapore reduced waitlist from 120 in February to 20 in June); *id.* ¶ 6 (Post Bern reduced waitlist from 700 in March to 577 in June, offering 20 appointments per week).

Usually, that kind of "first in, first out" method supplies an adequate rule of reason. *See, e.g.*, *Palakuru,* 521 F. Supp. 3d at 51. That is doubly true here given the limited "resources available to the agency." *Mashpee*, 336 F.3d at 1102. To be sure, some Plaintiffs have waited a long time to renounce their citizenship—Joshua Grant for at least 23 months; Sofianne Thoulon for at least 18 months. But courts routinely bless visa-adjudication wait times exceeding two years. *See Ghadami v. DHS*, 2020 WL 1308376, at *8 (D.D.C. Mar. 19, 2020) ("[M]any courts evaluating similar delays [i.e., 25 months] have declined to find a two-year period to be unreasonable as a matter of law."); *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153–54 (D.D.C. 2017)

11

(two-year delay "does not typically require judicial intervention"); *Bagherian v. Pompeo*, 442 F. Supp. 3d, 87 95 (D.D.C. 2020)  ("[T]he twenty-five-month delay at issue here is not unreasonable as a matter of law, given the circumstances.").

The Association nonetheless contends the Government has not proffered a legitimate rule of reason.

First, it argues the standards for unreasonable delay in visa cases should not apply to delays in providing renunciation services.  *See* Opp. 32–33 ("A U.S. Citizen has a natural, fundamental, and constitutional right to expatriate.  An alien, on the other hand, has 'no constitutional right of entry' to the United States." (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)).  Because the right to expatriate is rooted in the Constitution, the Association says, the Court should apply standards of timeliness from constitutional cases.  *See id.* at 33 (citing cases striking down 20-day, 30-day, and 45-day advance notice requirements for First Amendment activity).  But the Association's analogy falters.  In the typical First Amendment case, a claimant wants to exercise her rights unilaterally and only seeks to avoid Government interference.  Those cases turn on how quickly a *claimant* can act.  In contrast, the APA provides a statutory framework for reviewing how agencies accomplish their ends.  The dispositive issue here is thus how quickly *the government* must act.  Eliding that distinction makes no sense.

Second, the Association argues "the complexity of the task at hand," *Mashpee*, 336 F.3d at 1102, favors Plaintiffs because "voluntary expatriation is not complicated," Opp. 34.  It says renunciation interviews are relatively short and that consular officials need only verify "the renunciant is taking the oath voluntarily with the intent to expatriate." *Id.*  Perhaps, but the Government's evidence shows the broader renunciation process requires more than a simple interview.  Consular officials must conduct an "initial screening," searching for and compiling

12

records establishing an applicant's eligibility to renounce his citizenship, *see* Supp. Benning Decl. ¶ 10; determine whether an applicant suffers from mental incapacity or cognitive impairment, *id.* ¶ 11; and manage all relevant documents in the application process, *id.* ¶ 14. After conducting an interview, consular officials "prepare a memorandum that includes a recommendation as to whether to approve or deny the request for a CLN as well as supporting observations from the interview." *Id.* ¶ 16. That process is fairly involved, reflecting the "significance (and permanence)" of renouncing citizenship. *Mashpee*, 336 F.3d at 1102. If anything, the "complexity" and "significance" of renunciation services supports the Government, not the Association.

The Government has articulated a straightforward "rule of reason"—faced with resource constraints it paused non-emergency services. It has since made reasonable efforts to work through substantial backlogs of consular-services claims. There is no genuine dispute about the credibility of that rationale. This first *TRAC* factor—the "most important"—strongly counsels against finding an unreasonable delay.

The *second TRAC* factor asks whether a statutory timetable dictates the boundaries of the "rule of reason." *TRAC*, 750 F.2d at 80. Here, there is no statutory limit, so the agency is "entitled to considerable deference" in setting administrative timelines. *Mexichem Spec. Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). This factor favors the Government.

Courts often consider the *third* and *fifth TRAC* factors together. These factors focus on the "nature and extent of interests prejudiced by delay" and whether "human health and welfare are at stake." *TRAC*, 750 F.3d at 80.

The Association offers several declarations detailing the "interests prejudiced" by the Department's delay in providing renunciation services. *See* Pl.'s Statement of Mat. Undis. Fact

(PSMUF) ¶ 8 (explaining that "almost one-quarter of Americans living abroad who attempted to open a savings or retirement account . . . were unable to do so" due to the Foreign Account Tax Compliance Act); *id.* ¶ 12 ("Plaintiff Ms. Thoulon's bank accounts have been frozen numerous times because of her U.S. citizenship."); *id.* ¶ 13 ("Due to his U.S. citizenship, Plaintiff Mr. Lazarz is unable to secure finance to purchase a home."). These financial concerns are serious but are only indirectly related to the Department's delay. By the Association's own account, its members' financial problems started in 2010 when the Foreign Account Tax Compliance Act went into effect. *Id.* ¶ 7. The regulatory scheme causing Plaintiffs' financial harm thus predates the Department's decision to curtail renunciation services in response to COVID-19. Delay in adjudicating renunciation applications might worsen that harm, but only marginally. This factor slightly favors the Association.

There is, however, no indication the Department's delay endangers "human health and welfare." *TRAC*, 750 F.3d at 80. The Association's allegations largely concern potential financial difficulties, not the kind of danger to physical health courts have found salient in applying this factor. *Cf. Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1157 (D.C. Cir. 1983) (holding OSHA unreasonably delayed rulemaking where "[a]mple evidence in the record indicate[d] a significant risk that some workers, who are actually being exposed to levels of [dangerous chemicals] greater than the 10 ppm 'average' . . . currently encounter a potentially grave danger to both their health and the health of their progeny"). At the same time, the Government offers nothing to support its assertion that increasing the rate of CLN appointments would prejudice the human health or welfare of "individuals seeking [] other consular service[s]." Reply 10. Given the dearth of evidence supporting either side, this factor is neutral.

The *fourth TRAC* factor focuses on the "effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80.

The D.C. Circuit has emphasized "the importance of competing priorities in assessing the reasonableness of an administrative delay." *Mashpee*, 336 F.3d at 1100 (cleaned up). This factor is so critical that the Circuit has "refused to grant relief, even though all the other factors considered in *TRAC* favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." *Id.* (cleaned up) (referring to *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991)). This is so because courts "have no basis for reordering agency priorities." *In re Barr*, 930 F.2d at 76. Rather, the agency is "in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *Id.*

The Association says granting relief here would not put Plaintiffs "at the head of the queue" at the expense of other renunciation applicants. *Mashpee*, 336 F.3d at 1100. It asks the Court to "rule that any delay in processing voluntary renunciation applications—for *all* renunciation applicants—must be reasonable." Opp. 38. That argument fails for two reasons.

First, the Association lacks standing to seek class-wide relief. Recall that "standing is not dispensed in gross," so a "plaintiff must demonstrate standing for . . . for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008). Presumably some portion of renunciation applicants have only waited a few weeks or months. The Association's own timeliness rule would say those individuals have not suffered an unreasonable delay in resolving their applications. Opp. 34 ("A U.S. citizen wishing to voluntarily expatriate . . . should be able to do so within weeks or, at the very most, a few months."). But if some portion of renunciation applicants have not suffered an unreasonable delay, they have not suffered a legal injury this

15

Court can fix through injunctive relief.  *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring) (noting the "general rule" that American courts do not "provide relief beyond the parties to the case").  If the Association wanted class-wide relief it should have sought to certify a class.  *See* Fed. R. Civ. P. 23.

Second, even assuming the Court *could* grant relief to all renunciation applicants, doing so would simply put those applicants "at the head of the queue" for consular services while moving other types of applicants "back one space."  *Mashpee*, 336 F.3d at 1100.  That kind of judicial "reordering [of] agency priorities" requires a showing that one agency action is more pressing than others.  *In re Barr*, 930 F.2d at 76; *cf. Auchter*, 702 F.2d at 1150 (granting relief where agency conceded the project backed by the plaintiff was more "urgent" than others it might displace).  The Government's evidence shows the Department "carefully calibrated" its prioritization of consular services, "first focusing on categories that would reunite families, protect our national security, and provide critical services to the U.S. citizen public."  Suppl. Benning Decl. ¶ 19.  And while it is true the Department resumed providing non-immigrant visa before renunciation services at some posts, it "directed that only certain visas would be prioritized: humanitarian emergencies; diplomatic visas; visas associated with food production or medical professionals; visas for individuals traveling to the United States as air or sea crew; medical emergencies; and visas that provide particular benefit to the U.S. economic recovery."  *Id.*  The Association has offered little evidence to suggest this prioritization was irrational.

Moving renunciation applicants to the front of the queue would "produce no net gain" and would jeopardize agency activities of competing priority, *Mashpee*, 336 F.3d at 1100, so this factor strongly favors the Government.

The *sixth TRAC* factor states that agency action may be unreasonably delayed even if bad faith or impropriety did not cause the delay. *See In re United Mine Workers*, 190 F.3d at 549. Here, there is no showing of agency bad faith or impropriety. The Association vaguely suggests the Government has an "anti-expatriation" policy, *see* Opp. 40, but it offers no admissible evidence to support that idea. Without more, the Department's decisions are entitled to a presumption of good faith. *See United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). This factor is therefore neutral.

\* \* \*

On balance, the *TRAC* factors strongly favor the Government. There is no genuine dispute that the Department's delay in providing renunciation services was reasonable considering the extenuating circumstances. The Government is therefore entitled to summary judgment on the Association's live APA claims.

**B.**

The Association asserts a substantive due process right to expatriate under the Fifth Amendment. The parties vehemently dispute the existence of such a Constitutional right. But even if such a right exists, the Association has failed to state a claim.

The Due Process Clause protects "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Abigail All. for Better Access to Develop. Drugs v. von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007) (en banc) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). Because "guideposts for responsible decisionmaking in this unchartered area are scarce

and open-ended," *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992), a litigant must offer a "careful description of the asserted fundamental liberty interest," *Glucksberg*, 521 U.S. at 720–721. That requirement is essential, as the judiciary "comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution." *Moore v. City of East Cleveland*, 431 U.S. 494, 544 (White, J., dissenting).

Cases that challenge executive action on substantive due process grounds, like this one, "present[] an issue antecedent to any question about the need for historical examples of enforcing a liberty interest of the sort claimed." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). The threshold issue is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.*; *see also Geo. Wash. Univ. v. District of Columbia,* 318 F.3d 203, 209 (D.C. Cir. 2003 (explaining plaintiff must show "egregious government misconduct"); *Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997) (the doctrine prohibits "actions that in their totality are genuinely drastic"). Plaintiffs can satisfy that threshold showing by alleging "a substantial infringement of state law prompted by personal or group animus" or "deliberate flouting of the law that trammels significant personal or property rights." *Tri Cnty. Indus.*, 104 F.3d at 459 (citing *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988)).

Applying these standards, the Association has not stated a viable substantive due process claim.

Congress has statutorily provided U.S. citizens with a means to exercise their right to expatriate. *See Savorgnan v. United States*, 338 U.S. 491, 498 n. 11 (1950) (noting the Expatriation Act is "broad enough to cover, and does cover, the corresponding natural and

inherent right of American citizens to expatriate themselves"). The Supreme Court has affirmed Congress's power to regulate that process, but it held the Constitution requires an "ultimate finding that the citizen has committed the expatriating act with the intent to renounce his citizenship." *Vance v. Terrazas*, 444 U.S. 252, 266 (1980). To that end, the INA requires renunciants to make their oath "before a diplomatic or consular officer of the United States in a foreign state." 8 U.S.C. § 1481(a)(5).

The Association's pleadings reveal the Department has made good-faith efforts to carry out that mandate. Its recent delay in providing renunciation services is attributable to once-in-a-generation pandemic, the American withdrawal from Afghanistan, and the ongoing Russia-Ukraine war. Perhaps the Association believes the Department has erred in setting its priorities, but improper prioritization in the face of sui generis resource constraints is not "deliberate flouting of the law." *Tri Cnty Indus.*, 104 F.3d at 459. And in any case, the Court has already explained the Department's prioritization rationale is well supported. *See* Part III.A, *supra*. Indeed, if the Department began providing telephonic or expedited renunciation services it may well violate its obligation to ensure expatriation is done voluntarily.

There is no basis to conclude the Constitution requires the Department to act more quickly than it did, given the circumstances. This is not a First Amendment case, in which an individual simply wants to speak free from governmental restraint; where it is "necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring). Here, Plaintiffs seek government action for them to vindicate their right. The Association thus asserts a right much more like the Sixth Amendment's Speedy Trial guarantee. And in that context, the Supreme Court has blessed wait times exceeding *five years* even though that right explicitly contains a timeliness component:

"speedy". *See, e.g.*, *Barker v. Wingo*, 407 U.S. 514 (1972) (holding five-year delay in bringing criminal prosecution did not violate Speedy Trial Clause). Even assuming there is a constitutional right to expatriate, nothing in the sources the Association cites suggests there is a right to do so "within weeks or, at the very most, a few months." Opp. 20. Indeed, the Court was unable to find a single decision reaching that conclusion. So it does not "shock the contemporary conscience," *Lewis*, 523 U.S. at 847 n.8, that Plaintiffs have waited (on average) just over a year to renounce their citizenship. And unlike the First Amendment context, that delay will not prevent Plaintiffs from exercising their right to expatriate.

This would be a much harder case if Congress had not provided a mechanism for individuals to expatriate, or if that mechanism remained indefinitely suspended. But that is not this case, at least not anymore. The Association's Fifth Amendment claim will be dismissed for failure to state a claim.

**IV.**

For all these reasons, the Court will grant the Government's motion for summary judgment in part and grant its motion to dismiss in part.[3] A separate Order will issue today.

Dated: September 28, 2022                                    TREVOR N. McFADDEN, U.S.D.J.

---

[3] The Court declines to hold oral argument on these motions. *See* LCvR 7(f) ("A party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the Court.").